IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MARK S. URIOSTE, | ) |
| Plaintiff, | ) ) ) |
| -vs- | ) No. 04-1380 |
| NURSE C. NELSON; et al., | ) ) ) |
| Defendants. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

NOW COME Defendants, CONNIE NELSON, ERNESTINE DANIELS, ROSS ANDERSON, NEDRA CHANDLER, MARY HENRY, and MICHAEL GORMAN (herein collectively the "Defendants"), by and through their attorney, LISA MADIGAN, Attorney General of the State of Illinois, and in support of their Motion for Summary Judgment, state as follows:

### I.  INTRODUCTION

On or about October 29, 2004, the Plaintiff's Complaint in the above-listed matter was received by the Court.  On December 21, 2004, the Court entered an Order setting forth its merit review findings.  The Plaintiff's lawsuit is brought pursuant to 42 U.S.C. §1983.  Order, dated December 21, 2004 at 1.  The Plaintiff alleges that the discipline imposed on the Plaintiff, as a result of a September 26, 2004, incident violated the Plaintiff's due process rights.  *Id.*  The Plaintiff also vaguely alleges that the discipline imposed violated his First Amendment (freedom of religion) and Eighth Amendment (freedom from cruel and unusual punishment) rights. *Id.*

## II.  UNDISPUTED MATERIAL FACTS

**The Plaintiff**

1. The Plaintiff, Mark S. Urioste, is incarcerated at the Dixon Correctional Center, 2600 Brinton Avenue, Dixon, Illinois 61021.  Complaint at 1; Answer, ¶1.

2. The Plaintiff has been a state prisoner for many years.  Complaint at 4; Answer, ¶10.

3. The Plaintiff is presently serving a sentence for murder.  Transcript of Deposition of the Plaintiff on October 28, 2005 (attached hereto as Defendants' Exhibit 1) (herein "Tr.") at 55.

4. According to the Plaintiff he has "terrific brain damage."  Tr. at 15.

5. The Plaintiff also claims to be "Saint Mark" and that he was told he was a saint by Jesus, when he saw him in "'81."  Tr. at 13.

**The Defendants**

6. In September of 2004, Connie Nelson was a nurse at the Dixon Correctional Center.  Complaint at 1; Answer, ¶2.

7. Ernestine Daniels is a lieutenant at the Dixon Correctional Center.  Complaint at 1; Answer, ¶3.

8. Ross Anderson is a counselor at the Dixon Correctional Center.  Complaint at 1; Answer, ¶4.

9. Nedra Chandler is the acting warden at the Dixon Correctional Center.  Complaint at 1; Answer, ¶5.

10. Mary Henry was a superintendent and is now an Assistant Warden at Dixon Correctional Center. Complaint at 2; Answer, ¶6; Tr. at 49.

**September 26, 2004**

11. On September 26, 2004, the Plaintiff was at the Health Care Unit to receive eye drops. Complaint at 5; Answer, ¶11.

12. While the eye drops were being applied, the Plaintiff touched and grabbed Nurse Nelson. Complaint at 5; Answer, ¶12.

**The Disciplinary Proceeding**

13. The Plaintiff received a disciplinary ticket from Nurse Nelson charging him with assault and sexual misconduct. Complaint at 5; Answer, ¶14; Tr. at 37.

14. Adjustment Committee members Ernestine Daniels and Ross Anderson heard the ticket and found the Plaintiff guilty of assault. Complaint at 5; Answer, ¶15.

15. The Plaintiff was placed in segregation, where he had more restrictions. Complaint at 5; Answer, ¶16.

16. The Plaintiff was in segregation for thirty days. Tr. at 46.

17. The Plaintiff was also not allowed contact visits for six months. Tr. at 46-47.

**The Plaintiff's Motive**

18. Nurse Nelson said that the Plaintiff touched her intentionally. Complaint at 5; Answer, ¶13.

19. The Plaintiff admits that his hand touched Ms. Nelson's body, but he contends that he "didn't do it on purpose."

20. At the time of his murder conviction, the Plaintiff was also convicted of attempted aggravated criminal sexual assault, with respect to the same incident. *See, People v. Urioste*, 203 Ill. App. 3, 1062, 561 N.E.2d 471, 149 Ill. Dec. 193 (5th Dist. 1990).

21. At his deposition, the Plaintiff stated that he had previously received a disciplinary ticket for asking a female correctional officer to marry him and to come back to his cell and kiss him. Tr. at 18.

22. In December of 2004, the Plaintiff was admonished not to send letters to the Court. Order, dated December 21, 2004, at 2.

23. Since the Court's admonishment, the Plaintiff has submitted numerous letters to the Court, in which he refers to the Honorable Judge Baker as a "righteous stud." Tr. at 10.

24. During his deposition, in what he describes as a "joke," the Plaintiff stood up and reached for his pants to show counsel for the Defendants his underwear. Tr. at 31.

**Grievance Procedure**

25. There is a grievance procedure available at the Dixon Correctional Center. Complaint at 3; Answer, ¶8.

26. Generally, an inmate must first attempt to resolve grievances through his counselor. Affidavit of Jackie Miller (attached hereto as Defendants' Exhibit 2), ¶2.

27. The Plaintiff filed a grievance with his counselor concerning some of the facts relating to this complaint. Complaint at 3; Answer, ¶9.

28. If the issue remains unresolved, the inmate may submit a written grievance to the grievance officer at the institution where the inmate is incarcerated. Miller Affidavit, ¶2.

29. The grievance officer's conclusions and recommendations are forwarded to the Chief Administrative Officer (i.e., Warden). Miller Affidavit, ¶2.

30. The Warden or his designee's decision is then forwarded to the inmate who submitted the grievance. Miller Affidavit, ¶2.

31. If, after receiving the Warden's decision, the inmate feels the issue is unresolved, he may appeal in writing to the Director by submitting the grievance officer's report and the Warden's decision to the Administrative Review Board ("ARB"). Miller Affidavit, ¶3.

32. The ARB submits a written report and recommendation to the Director or the Director's designee, who then reviews the report and makes a final determination on the grievance. Miller Affidavit, ¶3.

33. A copy of the ARB's report and the Director's final decision is then sent to the inmate who submitted the grievance. Miller Affidavit, ¶3.

34. The Plaintiff has not followed the grievance process through to conclusion with the ARB, with respect to either his disciplinary report, dated September 26, 2004, or the practice of his Catholic religion. Miller Affidavit, ¶7.

**The Plaintiff's Claims**

### Nurse Nelson

35. The Plaintiff claims that Nurse Nelson acted unprofessionally by standing in front of and leaning over him while administering the eye drops, instead of standing beside him. Tr. at 25-26; 31-32.

36. The Plaintiff claims that Nurse Nelson should have let the Plaintiff administer the eye drops himself. Tr. at 31-32.

37. The Plaintiff claims that Nurse Nelson lied and said the Plaintiff rubbed her, when it "was only a tap." Tr. at 31-32.

38. The Plaintiff claims that Nurse Nelson lied and said that he smiled at her. Tr. at 31-32.

39. Despite numerous requests, the Plaintiff identified no other claims of wrong-doing by Nurse Nelson during his deposition. Tr. at 33-41.

### Michael Gorman

40. The Plaintiff claims that Lt. Gorman called him a "pervert." Tr. at 52-53.

41. The Plaintiff claims that Lt. Gorman shoved the Plaintiff into a truck, before taking him to segregation. Tr. at 52-53.

### Ernestine Daniels

42. Ernestine Daniels was on the Adjustment Committee. Complaint at 5; Answer, ¶15.

43. The Plaintiff claims that Ernestine Daniels is gullible, and believes correctional staff, rather than the Plaintiff's version of events. Tr. at 42-44.

### Ross Anderson

44. Ross Anderson was also on the Adjustment Committee. Tr. at 44-45.

45. The Plaintiff's claim against him is that Ross Anderson is gullible. Tr. at 45.

### Nedra Chandler

46. The Plaintiff described Warden Chandler as "a beautiful person, beautiful in heart, soul and everything else...." Tr. at 45.

47. The Plaintiff's claim against Warden Chandler is that she looked at the information from Ms. Daniels and Ms. Nelson and signed off on the discipline imposed on the Plaintiff, without personally talking to him. Tr. at 47-48.

### Mary Henry

48. The Plaintiff's claim against Assistant Warden Henry is based upon an assumption that she sent him to segregation. Tr. at 51.

49. At the close of his deposition, the Plaintiff could think of no other claims against any of the Defendants, besides those he had discussed. Tr. at 54.

**Defendants' Denial**.

50. The Defendants deny the Plaintiff's claims of wrongdoing. *See*, Answer and Affidavits of defendants' attached hereto.

**Religious Practice**

51. According to DOC records, the Plaintiff has submitted no grievance at all regarding the alleged denial of his religious rights. Miller Affidavit, ¶7; Affidavit of Mary Henry (a copy of which is attached hereto as Defendants' Exhibit 3), ¶9.

52. Inmates at Dixon are offered the opportunity to participate in the religion of their choice. Henry Affidavit, ¶11.

53. Weekly chapel services are available to inmates of various faiths, including Catholics. Henry Affidavit, ¶12.

54. The Chaplaincy Department provides visitation to inmates. Henry Affidavit, ¶13.

55. Faith representatives, including Catholic faith representatives, are also available to provide pastoral counseling, when requested. Henry Affidavit, ¶14.

56.     Inmates in segregation are provided reasonable opportunities to pursue their religious beliefs and practices, including visitation by the Chaplaincy Department and faith representatives, subject to concerns regarding safety and security.  Henry Affidavit, ¶15.

### III.  APPLICABLE LAW

**A.     STANDARD FOR SUMMARY JUDGMENT**

Summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Allen v. Rockford*, 349 F.3d 1015, 1019 (7th Cir. 2003).  While a court must review the record in the light most favorable to the nonmovant, a party who bears the burden of proof on a particular issue may not rest on his pleading, but must set forth specific facts showing that there is a genuine issue of material fact which requires a trial.  *Brownell v. Figel, et al.*, 950 F.2d 1285, 1292-1293 (7th Cir. 1991).

**B.     PERSONAL INVOLVEMENT**

When bringing a claim against a state employee under §1983, a plaintiff must show the employee was "personally responsible for the constitutional deprivation."  *J.H. and J.D. v. Johnson, et al.*, 346 F.3d 788, 793 (7th Cir. 2003).  This limitation mandates that, in order to be held liable under Section 1983, a supervisor must have "had some personal involvement in the constitutional deprivation, essentially directing or consenting to the challenged conduct."  *Id.*

**C.     DUE PROCESS**

The Fourteenth Amendment to the United States' Constitution prohibits any State from depriving a person of life, liberty, or property without due process of law.  *Meachum v. Fano*, 427 U.S. 215, 223 (1976).  The United States Supreme Court has long rejected

the notion, however, that "*any* grievous loss visited upon a person by the State" is sufficient to invoke the procedural protections of the Due Process Clause. *Id.* at 224 (emphasis in original).

Procedural due process questions are examined in two steps: the first asks whether a liberty or property interest has been interfered with by the State; the second asks whether the procedures associated with the deprivation of that interest are constitutionally sufficient. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989).

> The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," and must be based on more than a "unilateral hope." Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Id.* (citations omitted).

Protected liberty interests may arise from the Due Process Clause itself and the laws of the States. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). By itself, however, a state law violation does not form the basis for imposing §1983 liability. *J.H. and J.D. v. Johnson*, 346 F.3d. 788, 793 (7th Cir. 2003).

To prevail on a due process claim, a plaintiff must also have been prejudiced. *Capric v. Ashcroft*, 355 F.3d 1075, 1087 (7th Cir. 2004).

> It is well established that"[a] section 1983 action is a tort damage action even though the duty the defendant is alleged to have breached is created by the Constitution or federal law." As in a common law tort action, the plaintiff in a civil rights tort action bears the burden of establishing that the defendant owed the plaintiff a duty, that the defendant breached his duties to the plaintiff, and that this breach caused the plaintiff actual damages.
>
> * * *
>
> ["G]eneral damages (i.e., damages not based on proof of actual injury) cannot be awarded in a suit alleging denial of due process in its primary sense – which is the sense that the plaintiffs here invoke – of fair procedure.

> *It is not enough for plaintiff to show that he should have had a hearing of a particular sort; he must show, with some degree of probability, that such a hearing would have prevented the deprivation of which he complains. Otherwise, the failure to provide the hearing did not injure him; and tort damages cannot be awarded if there is no injury.*"

*Garza v. Henderson*, 779 F2d 390, 395-396 (7th Cir. 1985) (emphasis in original; citations omitted).

An inmate has no protected liberty interest, which prohibits him from being placed in segregation, without due process:

> *[W]hen the entire sanction is confinement in disciplinary segregation for a period that does not exceed the remaining term of the prisoner's incarceration, it is difficult to see how, after [Sandin v. Conner, 515 U.S. 472 (1995)] it can be made the basis of a suit complaining about a deprivation of liberty.* Every state must have somewhere in its prison system single-person cells in which prisoners are sometimes confined not because they have misbehaved but simply because the prison has no other space, wishes to protect some prisoners from others, wishes to keep prisoners isolated from others, wishes to keep prisoners isolated from one another in order to minimize the risk of riots or other disturbances, wishes to prevent the spread of disease, and so forth. Almost 6 percent of the nation's prison inmates are in segregation... and it appears that the great majority of these are not in disciplinary segregation... so even a prisoner who committed a white-collar crime and had been assigned to the lowest security prison in the state's system might find himself in segregation for a nondisciplinary reason. Under *Sandin* this possibility is probably enough to prevent him from complaining successfully of a deprivation of liberty if he is transferred into segregation for a disciplinary infraction.

*Wagner v. Hanks*, 128 F.3d 1173, 1176 (7th Cir. 1997) (emphasis added) (citations omitted); *see also, Lekas v. Briley*, 405 F.3d 602, 607 (7th Cir. 2005)(an inmate has no liberty interest in remaining in general population and prison administrators are accorded wide deference as to what they believe is needed in order to preserve internal order and discipline).

10

Similarly, an inmate has no constitutional right to any particular outcome from the grievance process. *See*, *Antonelli v. Sheahan*, 81 F.3d 1422, 1430-1431 (7th Cir. 1996) (grievance procedures do not give rise to a liberty interest protected by the Due Process clause).

**D.    FREEDOM OF RELIGION**

As the Seventh Circuit has recently reiterated, an inmate retains the right to exercise his religious beliefs in prison. *Kaufman v. Mcaughtry*, 419 F3d 678, 681 (7th Cir. 2005). Nevertheless, when a prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Id.* at 682-683. In the context of the free exercise clause, a plaintiff must first establish that his right to practice his religion was burdened in a significant way. *Id.* at 683. Moreover, an inmate is not entitled to follow every aspect of his religion; the prison may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious interests. Id. (summary judgment with respect to free exercise proper, where denial of request for religious study group was reasonably related to prison officials legitimate interest in maintaining institutional security).

**E.    CRUEL AND UNUSUAL PUNISHMENT**

The Eighth Amendment of the United States Constitution prohibits the infliction of "cruel and unusual punishment." *Wilson v. Seiter*, 501 U.S. 294, 296-297 (1991). This prohibition against cruel and unusual punishment applies to the States through the Due Process Clause. *Id.* at 296-297. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. *Id.* at 298-299. In other words, when an inmate claims that

a prison official has inflicted cruel and unusual punishment on him, the officials state of mind must be inquired into. *Id.* at 299. Not every push or shove by a prison guard violates a prisoner's constitutional rights. *DeWalt v. Carter*, 224 F3d 607, 619-620 (7th Cir. 2000).

Deliberate indifference involves more than mere negligence. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).

> The infliction of punishment is a deliberate act intended to chastise or deter. This is what the word means today; it is what it meant in the eighteenth century.... [If a] guard accidentally stepped on [a] prisoner's toe and broke it, this would not be punishment in anything remotely like the accepted meaning of the word, whether we consult the usage of 1791, 1868, or 1985.

*Wilson*, 501 U.S. at 300.

In order to set forth a cognizable claim, a plaintiff must (1) establish that the danger to him was objectively serious, posing a substantial risk of serious harm, and (2) demonstrate that the defendant prison official was deliberately indifferent to his health and safety. *Haley v. Gross*, 86 F.3d 630, 640-641 (7th Cir. 1996). To show that a prison official was deliberately indifferent, the Plaintiff must establish that (a) the defendant prison official was actually aware of the facts from which an inference could be drawn that a substantial risk of harm existed;(b) that the prison official actually drew the inference; and (c) that the prison official nevertheless disregarded the risk to the inmate's health and safety. *Miller v. Neatherly*, 52 F.3d 634, 638 (7th Cir. 1995). Extreme deprivations are required to make out a conditions of confinement claim. *Babcock v. White*, 102 F.3d 267, 273 (7th Cir. 1996). *DeWalt v. Carter*, 224 F3d 607, 619-620 (7th Cir. 2000).

**F.    QUALIFIED IMMUNITY**

The defense of qualified immunity is designed to protect government agents "from liability for civil damages insofar as their conduct does not violate clearly established

statutory or constitutional rights of which a reasonable person would have known." *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003).

> To determine the availability of qualified immunity in a particular case we must engage in a two step-inquiry. The initial, threshold question is whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. If a constitutional right is violated, then we must determine if that right was clearly established at the time of the alleged violation.

*Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003) (Citations omitted) (holding that summary judgment was proper, because no constitutional rights were violated).

### G.    NO CONTINUING VIOLATION

"When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers." *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991); *see also, Verison MD, Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002) ("a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective"); *Green v. Mansour*, 474 U.S. 64, 71 (1985)(request for declaratory judgment that federal law had been violated in the past was improper)*.*

### H.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

Pursuant to the Prison Litigation Reform Act ("PLRA"), prison inmates bringing an action under 42 U.S.C. §1983 with respect to prison conditions must first exhaust all administrative remedies that may be available to them before being allowed to proceed with the lawsuit.

> No action *shall be brought* with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility *until such administrative remedies as are available are exhausted*.

42 U.S.C. §1997e(a)(emphasis added). Section 1997e(a) makes exhaustion a precondition to filing suit. *Perez v. Wisconsin Department of Corrections*, 182 F.3d 532, 535 (7th Cir. 1999).

Inmates in the Illinois Department of Corrections must first attempt to resolve problems with their counselor. 20 Ill. Admin. Code §504.810(a). If an inmate is unable to resolve the problem informally, he or she may file a grievance with the grievance officer, who is also at the institutional level. 20 Ill. Admin. Code §§504.810 and 504.830. The grievance officer considers the grievance and reports his or her findings and recommendations in writing to the Chief Administrative Officer (i.e., Warden). The Chief administrative Officer then advises the offender of the decision, in writing, within two months after receipt of the written grievance. 20 Ill. Admin. Code §504.830(d).

Once a decision has been rendered at the institutional level, the inmate must appeal within 30 days any adverse result to the Director of the Department through the Administrative Review Board. 20 Ill. Admin. Code §504.850. Thus, an inmate's administrative remedies are not exhausted until the appeal is ruled on by the Director through the Board.

In order to exhaust his administrative remedies, a Plaintiff is required to take all steps prescribed in the prison's grievance system. *See, Ford v. Johnson*, 362 F.3d 395, 397-398 (7th Cir. 2004) (explaining that exhaustion must precede litigation, and affirming dismissal of suit where inmate "jumped the gun" and mailed his complaint to the court two days before the prison administration announced its final decision).

> Rules of form "negotiate now, litigate later" or "administrative remedies first, litigation second" reflect a belief that postponing suits induces people to concentrate their attention on negotiation or alternative dispute resolution, so that some fraction of the time parties will not need to litigate at all. Once litigation commences, however, that casts a pall over negotiation or the administrative process, because it commits both resources and mental energies to court. Some persons are bound to do exactly what Ford did - to declare that the administrative process is irrelevant once suit begins. To prevent this subversion of efforts to resolve matters out of court, it is essential to keep the courthouse doors closed until those efforts have run their course.

*Ford v. Johnson*, 362 F.3d 395, 398 (7th Cir. 2004); *see also*, *Dixon v. Page*, 291 F.3d 485, 489 (7th Cir. 2002) (affirming dismissal pursuant to Rule 12(b)(6) of those claims for which the inmate had failed to exhaust administrative remedies, prior to filing his complaint).

## IV.  ARGUMENT

The Plaintiff's claims against the Defendants fail, as a matter of law. None of the Defendants were personally involved in any violation of the Plaintiff's constitutional rights. The undisputed evidence demonstrates that prison administrators reasonably believed that the discipline imposed upon the Plaintiff was necessary for internal order and security. Moreover, the Plaintiff had no liberty interest in remaining in general population or receiving contact visits. Thus, the Plaintiff's due process rights were not violated by the discipline that was imposed on him. During his deposition, the Plaintiff did not even discuss a religion claim against any of the named Defendants, and he cannot establish that his right to practice his religion was burdened by the Defendants in a significant way. There is also no evidence of conduct by any Defendant that rises to the level of cruel and unusual punishment.

Furthermore, the Defendants are entitled to qualified immunity from damages, because there is no evidence of conduct by any Defendant that violated the clearly

established statutory or constitutional rights of the Plaintiff, which a reasonable person would have known.  Injunctive or declaratory relief would similarly be improper, because there is no evidence of any continuing violation.  Finally, the Plaintiff failed to exhaust his administrative remedies, before filing suit, as required by 42 U.S.C. §1997e(a).

WHEREFORE, Defendants CONNIE NELSON, ERNESTINE DANIELS, ROSS ANDERSON, NEDRA CHANDLER, MARY HENRY, and MICHAEL GORMAN respectfully request that this Court grant them summary judgment in this matter, and grant them such other relief as the Court deems equitable and just.

Respectfully submitted,

CONNIE NELSON, ERNESTINE DANIELS, ROSS ANDERSON, NEDRA CHANDLER, MARY HENRY, and MICHAEL GORMAN,

Defendants,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendants,

David M. Walter, #6244907
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62706
217/782-5819

Of Counsel.

By:  /s/David M. Walter
     David M. Walter
     Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2005, I electronically filed the Memorandum of Law in Support of Defendants' Motion for Summary Judgment with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

None

and I hereby certify that on November 28, 2005, I mailed by United States Postal Service, the document to the following non-registered participants:

>Mark Urioste, #N-87529
>Dixon Correctional Center
>2600 Brinton Avenue
>Dixon, IL 61021

>Respectfully submitted,
>s/David M. Walter
>Assistant Attorney General
>500 South Second Street
>Springfield, IL  62706
>(217)782-5819
>(217) 524-5091 (facsimile)
>dwalter@atg.state.il.us
>#6244907