E-FILED
Monday, 28 November, 2005  01:39:14 PM
Clerk, U.S. District Court, ILCD

1

2                UNITED STATES DISTRICT COURT

3                CENTRAL DISTRICT OF ILLINOIS

4                        (PEORIA)

5    MARK S. URIOSTE,          )      **CERTIFIED**
                                )      **ORIGINAL**
6              Plaintiff,        )
                                )
7         vs.                   )   Case No. 04 CV 1380
                                )
8    NURSE C. NELSON, et        )
     al.                        )
9                               )
               Defendants.      )
10

11

12         The deposition of MARK S. URIOSTE taken by the

13   defendants before Deborah Fabritz, Certified Shorthand

14   Reporter, Registered Professional Reporter, and Notary

15   Public, at 1:18 p.m., October 28, 2005, at the Dixon

16   Correctional Center, 2600 Brinton Avenue, Dixon,

17   Illinois.

18

19              A P P E A R A N C E S

20

21         MR. DAVID M. WALTER, Assistant Attorney

22   General, General Law Bureau, 500 S. Second Street,

23   Springfield, Illinois, for the defendants.

24

                Midwest                    eporting



DEFENDANT'S
EXHIBIT
1

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

(PEORIA)

MARK S. URIOSTE,          )
                          )
        Plaintiff,        )
                          )
    vs.                   )  Case No. 04 CV 1380
                          )
NURSE C. NELSON, et       )
al.                       )
                          )
        Defendants.       )

        The deposition of MARK S. URIOSTE taken by the
defendants before Deborah Fabritz, Certified Shorthand
Reporter, Registered Professional Reporter, and Notary
Public, at 1:18 p.m., October 28, 2005, at the Dixon
Correctional Center, 2600 Brinton Avenue, Dixon,
Illinois.

                A P P E A R A N C E S

        MR. DAVID M. WALTER, Assistant Attorney
General, General Law Bureau, 500 S. Second Street,
Springfield, Illinois, for the defendants.

---

2

                    I N D E X

EXAMINATION                              PAGE

Mr. Walter................................  3


                E X H I B I T S

EXHIBIT NUMBER                          MARKED

Deposition Exhibit No. 1................  3


Certificate.............................. 62

---

3

1        (Deposition Exhibit No. 1 was marked for
2 identification by the court reporter.)
3                  MARK S. URIOSTE
4 having been first duly sworn, was examined and
5 testified as follows:
6                  EXAMINATION
7 BY MR. WALTER:
8      Q    My name is David Walter and I represent
9 Connie Nelson, Ernestine Daniels, Ross Anderson, Nedra
10 Chandler, Mary Henry and Michael Gorman.
11         Have you ever been deposed before?
12     A    What do you mean?
13     Q    Have you ever been in a deposition before?
14     A    No, sir.
15     Q    Okay.  I'm going to quickly summarize for
16 you some of the aspects of the deposition process.
17     A    Okay.
18     Q    Although this is an informal setting, you
19 realize you're under oath?
20     A    Yes.
21     Q    Do you understand your testimony today may
22 have the same force and effect as if you were at trial
23 in a courtroom with a Judge or jury present?
24     A    Yes, sir.

---

4

1      Q    Okay.  The court reporter will be taking
2 down all of the testimony, and there are some
3 guidelines that will make her job easier.
4          For example, please speak up and answer
5 verbally.  By that I mean that you should avoid
6 gestures such as nodding or shaking your head?
7      A    Yes, sir.
8      Q    And you should use, or you should avoid
9 phrases such as "uh-huh" or "huh-uh" and say "yes" or
10 "no" instead.
11     A    Crystal clear.
12     Q    If you do not understand a question that I
13 ask, please do not try to answer it.  Instead tell me
14 that you don't understand, and I will try to clarify
15 the question, okay?
16     A    Yes, sir.
17     Q    After we finish your deposition, the court
18 reporter will prepare a transcript of the testimony
19 given here, and you will have an opportunity to review
20 it and to make corrections or changes.
21         If you do make such changes, counsel will
22 be able to comment on those changes at trial.
23         Thus, it is important that you give us
24 correct testimony now.  Do you understand this?

5

```
1.    A    Yes, sir.
2     Q    Is there anything that would impair your
3  ability to testify truthfully and accurately today,
4  such as that you are ill, that a loved one has
   recently died, or that you are taking medications that
6  impair your ability to think clearly or the like?
7     A    No, sir, none of the above.  Man, I take no
8  medicine.  I know as if it was yesterday.
9         It happened August 26, '04, at 12:45.
10    Q    Okay.  One thing that I'm going to ask you
11 to do and keep in mind as well, she's trying to take
12 down what both of us say.
13    A    Yes.
14    Q    So we have to be careful that we're not
15 both talking at the same time.
16    A    Yes, sir.
17    Q    So if you would wait until I finish my
18 questions before you answer, and I'll try to be sure
19 and not try to start with another question while
20 you're still answering.
21        So, will you help me with that?
22    A    Crystal clear.
23    Q    Okay.  Did you file a complaint against
24 Connie Nelson, Ernestine Daniels and the other
```

6

```
1  defendants that I previously identified?
   A    Yes, sir.
   Q    Okay.  I'm going to show you what has been
4  marked for identification purposes as Exhibit No. 1
5  and ask you if you recognize it.
6     A    Yeah, something like that.
7     Q    Is that your handwriting on that document?
8     A    Yes, sir.
9     Q    That's the complaint that you filed in this
10 case, correct?
11    A    Yes, sir.
12    Q    Go ahead and take a moment to look at it.
13    A    What does "N/A" mean?
14    Q    Well, you wrote it, right?
15    A    No, my lawyer did, Albert Sullivan.
16    Q    When you say "your lawyer", you mean your
17 jailhouse lawyer, right?
18    A    Yes.
19    Q    He's a fellow inmate here in Dixon?
20    A    Yes,  When this all started.
21    Q    Now you're looking at the page that says
22 statement of claim, correct, at the top?
23    A    Yes.
24    Q    Okay.  Is that your handwriting on this
```

7

```
1  page?
2     A    Where?
3     Q    The handwriting that you're looking at, is
4  that your -- is that your handwriting?
5     A    Albert Sullivan's.
6     Q    So he wrote this for you?
7     A    Yes, I can't write.
8     Q    Okay.  Are you able to read?
9     A    Yes.
10    Q    Okay.  Can you read for me the first
11 paragraph on this page?
12    A    "Where?  Dixon Correctional Center, STC,
13 Psychiatric Unit, hospital dispensary.
14        When?  About September 26, 2004, up until
15 today.
16        Who and what?  For seven years, I have been
17 a State prisoner in the Psychiatric Unit of prison,
18 while receiving daily psychiatric drugs and
19 treatment."
20    Q    Okay.  That's sufficient.
21        This is not your handwriting on this page?
22    A    No, I told him what to do.  I can't write,
23 so.
24    Q    Okay.  When you say you "can't write", is
```

8

```
1  there something wrong with your hand that prevents you
2  from writing?
3     A    Yes, it shakes sometimes.  It scribbles all
4  over the place.
5     Q    Now, there are several letters that were
6  sent to Judge Baker in this case, do you recall those
7  letters?
8     A    Was I wrote them?
9     Q    They came from you.  They've got your name
10 on them.
11    A    I printed, right, they all printed?
12 Because I can't write.  I got to print.
13    Q    Okay.  So you printed those letters?
14    A    Yes.
15    Q    That went to Judge Baker?
16    A    Yes, sir.  I got like about seven certified
17 mail letters I mailed him.
18    Q    Okay.  I want to show you one of those
19 letters, make sure we're talking about the same thing
20 here.
21        Okay.  I'm going to show you a letter that
22 has been file stamped July 13, 2005, and at the top of
23 the page, if I could see this just for a moment.
24    A    I'm sorry.
```

9

1.   Q    I want to read a number in.  This is
2 document number 32 in the Court's file.
3         Do you recognize this letter?
4    A    This is my first letter.  I think, what
happened though --
6    Q    Is this a letter that you wrote?
7    A    Yes, it is, sir.
8    Q    Okay.  If you turn -- does it have a second
9 page?
10   A    Yes, that tells -- that is the ticket part.
11   Q    That's the what part?
12   A    This is the ticket right here.
13   Q    It's about a ticket?
14   A    Yeah.
15   Q    Okay.  A disciplinary ticket?
16   A    It's where I tell Ernestine Daniels that
17 committee, head of the committee.
18   Q    Ernestine Daniels from the Adjustment
19 Committee?
20   A    Adjustment Committee.
21   Q    On that second page, is that your name at
22 the bottom?
23   A    Yes.
24   Q    Did you write your name there?

10

1    A    I printed it.  I can't write.
Q    And these two pages of this letter are
where you printed information to Judge Baker, correct?
4    A    That's right, sir.  To tell you what
5 happened, though, because I did not assault her like
6 she said --
7    Q    I'll tell you what.  Let me ask you
8 questions, okay?
9    A    Sure.
10   Q    And we'll get to your allegations.  Right
11 now I'm just wanting to know about this letter.  Okay?
12        Now down at the bottom you have right above
13 your signature, can you read that line?
14   A    "God bless you righteous stud."
15   Q    That's a letter that you made to Judge
16 Baker?
17   A    That's right, brightest man, what he's
18 doing.  Is "bright" a bad word?
19   Q    I ask the questions, sir.  I want to know
20 whether you wrote that?
21   A    Yes, sir.
22   Q    Did you, in fact, put "righteous stud" on
23 several of your letters to Judge Baker?
24   A    Yes, sir.

11

1    Q    I want to show you one of the other
2 letters.
3    A    Yes, sir, that's the way I talk, nothing
4 wrong with it.  I was told that's a good word.
5    Q    What word is that?
6    A    Righteous.
7    Q    What do you mean by "stud"?
8    A    A man, righteous man.
9         I should put that down, but I put stud
10 down.  That's what I think sometimes.
11   Q    I want to show you another letter.  This
12 one has been file stamped, looks like April the 25th
13 of 2005, and it's document number 30 in the Court
14 file.                  Do you recognize that letter?
15   A    Yes, sir.
16   Q    And did you print that letter?
17   A    Yes, sir.
18   Q    And did you also close that letter with the
19 phrase "God bless you righteous stud"?
20   A    Yes, sir.  I didn't see nothing wrong with
21 that, you know, "righteous stud."
22   Q    I'm just asking you whether or not that is
23 something you wrote.
24   A    Yes, sir.

12

1    Q    And I want to show you another letter.
2    A    That's what I feel is just like --
3    Q    There's no question pending so.
4    A    Okay.  I should have wrote righteous person
5 but I write "stud."  I call a lot of people stud.
6    Q    Okay.  I'm going to show you a document
7 that has been file stamped as March 16, 2005, in the,
8 from the Court file; do you recognize that letter?
9    A    Yes.
10   Q    Did you print that letter as well?
11   A    Yes, sir.  I can't lie to you, sir.  I'm
12 under oath.
13   Q    Did you also address the Judge "God bless
14 you righteous stud"?
15   A    Yes, sir, I think there's nothing wrong
16 with that, sir.  "Righteous" is not a bad word.
17   Q    Okay.  I want to show you another letter
18 that has been file stamped March 7, 2005, and ask you
19 if you recognize that letter?
20   A    Yes, sir.  What happened with Becky telling
21 that they gave for no reason, and I have got a waste
22 problem and before they put me back locked up, they
23 didn't give me a shower or change of underwear.
24   Q    In this letter, do you also close with "God

13

1 bless you righteous stud"?

2    A    Yes, I'm very religious man.

3         I'm Saint Mark, I was told I be a saint by

4 Jesus in '81 when I seen him, my first lung operation.

I've had three of them. I've got a nice scar on my

6 right.

7    Q    I want to show you another letter that has

8 been marked, or that has been file stamped as February

9 .22, 2005, do you recognize that document?

10   A    Those are all mine, if it's not written in

11 writing, it's my printing.

12   Q    It's a letter that you printed to Judge

13 Baker, correct? ·

14   A    Right.  I'm totally innocent of the charge.

15   Q    In that letter do you also say "God bless

16 you stud"?

17   A    Right, yeah.

18   Q    Okay.  You didn't put "righteous" in that

19 letter, correct?

20   A    Correct.

21   Q ·  Okay.  Now I show you a letter that has

22 been file stamped February 3rd, 2005, in the Court

23 file and ask you if you recognize this letter?

24        Is that your printing?

14

1    A    Yes, sir.

2    Q    Okay.  In the beginning of this letter do

you -- who's this letter addressed to?  Who are you

4 writing to in this letter?

5    A    Dear sir, my -- to Judge --

6    Q    This is a letter to Judge Baker, correct?

7    A    Correct, I know, dear sir.

8    Q    Now in this letter, do you state "when I

9 seen you on the video, I seen a real good looking man

10 who listens"?

11   A    That's right.  I feel everybody deserves a

12 compliment in life.

13   Q    At the close of the letter, did you say --

14   A    "God bless you, stay good looking, stud."

15   Q    You said "God bless" --

16   A    I say I wrote it.

17 · Q    "God bless" --

18   A    God loves you, bless you.  God is a good

19 person.  I met maybe one, real nice guy.

20   Q    Did you close "stay good looking, stud"?

21   A    Yes.  Nothing wrong with that stud part.

22        You know, could be dud like me.

23   Q    Could be what?

24   A    A dud.

15

1    Q    A stud like you?

2    A    A dud.

3    Q    I'm sorry?

4    A    I'm a dud.  I'm not -- you know, dud,

5 d-u-d.  No, no, no.

6    Q    Have you ever addressed yourself as a stud

7 in any of your letters?

8    A    No, sir.

9  · Q    Is it possible that you have and you've

10 simply forgotten?

11   A    Probably.

12   Q    It's possible that you have called yourself

13 a stud in one of your letters and simply forgotten?

14   A    I don't know.

15   Q    You may have, you may not have?

16   A    Hard to know, sir.  You got to know one

17 thing, I've had bad accident, okay?  I got terrific

18 brain damage.  I'm disabled totally, 100 percent

19 disabled. ·I got disabled papers that proves disabled,

20 indefinite medical lay-in.

21  · Q    What was the last name?

22   A    Medical --

23   Q    Medical label?

24   A    I don't work.  I can't work.  I'm disabled.

· 16

1    Q    I still didn't understand that last word.

2         Indefinite medical lay-in?

3    A    Lay-in.

4    Q    L-a-y?

5    A.   In, dash i-n.  Since 4/30/98 or '99.  Ever

6 since, I never work in dietary as a porter.  Since I

7 been lay-in I don't work for these people.  They put

8 me in segregation.

9    Q    Now what did you say about that, you were

10 working as a porter, I understood that part.

11   A    Yes.  I work as dietary, doing pots and

12 pans.

13   Q    You worked in dietary cleaning pots and

14 pans?

15   A    Yes, sir.

16   Q    Then what happened?

17   A    Like I did windows, signs, vents, table

18 tops.

19   Q    You cleaned signs and the table tops and --

20   A    Inside the seats, legs.  I did everything.

21 I worked hard.  I'm an ex-Marine.

22   Q    When did you go to segregation after you

23 had been working in dietary?

24   A    Well --

17

1   Q      I don't know the connection, help me
2 understand.
3   A      Okay.  When I work in dietary as a porter,
4 that's compassion because you work for them.  I done
5 something for them.  But then I didn't work in '99,
6 around this November, I got my first ticket.
7   Q      So you got a ticket and then you went to
8 segregation?
9   A      Yes.
10  Q      Did you continue to work as a porter then?
11  A      No, no, I was lay-in then.
12  Q      You were a lay-in?
13  A      I've been lay-in since '98, April 30.
14  Q      Of 1998?
15  A      '99.
16  Q      Of 1999, that was the first ticket you
17 received was in 1999?
18  A      Yes, sir.
19  Q      What was that disciplinary ticket for?
20  A      It was for stupid stuff.  I was not
21 thinking, okay?  She was not thinking.  She wasn't
22 acting professional.  I went up to her and I asked was
23 -- will she marry me?  That was it.  She was a
24 beautiful blonde, right.  This time she was a

18

1 beautiful blonde.  I just asked the question, will you
2 marry me.  And I said, give your answer, come back to
3 my cell and give me a kiss, give me an answer.  She
4 wrote me a ticket.
5   Q      You asked her to come back to your cell and
6 give you a kiss?
7   A      Yes, just tell me yes or no, let me know.
8 Instead, she wasn't professional.
9   Q      Who was this that gave you the ticket?
10  A      Officer Lloyd.
11  Q      Lori?
12  A      Lloyd.
13  Q      What was her last name?
14  A      Lloyd.
15  Q      Was it Lloyd or Lori?
16  A      L-l-d-o-y or y-o-d or --
17  Q      Okay.  Lloyd, that was her last name?
18  A      Yes, sir.
19  Q      Was she a Correctional Officer?
20  A      Yes, sir, she wasn't acting professional.
21 As I think about it, if I was her, I would put me in a
22 day room, sat me down and told me the proper
23 procedure.  An officer and inmate can't get married,
24 but didn't tell me that.  She should do her job right,

19

1 they don't do their job right.
2   Q      That disciplinary ticket is not one of the
3 tickets you're complaining about in your complaint?
4   A      No, this one right here is totally wrong.
5 I mean, what happened was August 1st and August 7th.
6   Q      What year are you talking about?
7   A      '84 -- '08.
8   Q      Of 2004?
9   A      Yes, sir.
10  Q      Okay.  Now you're talking about the ticket
11 that you received and that you discuss in your
12 complaint?
13  A      Yes.
14  Q      That was in August of 2004?
15  A      Right, I had smacked my head on a window, I
16 went to Control and asked officer for something, they
17 are why are your eyes so red?  I don't know.  I went
18 back to see if --
19  Q      Can I stop you for a second, make sure I
20 understand.  I want to back up and actually, why don't
21 you pause every so often and I'll see if I understand
22 what you're saying because it's a little bit hard to
23 get this all, this down whenever you talk in a
24 narrative form.

20

1   A      All right.
2   Q      You were in your cell and you hit your
3 head, is that right?
4   A      On my window.  I got dizzy and I fell and
5 hit my head on a window.
6   Q      You felt you were dizzy and you fell, hit
7 your head on the window?
8   A      I get dizzy a lot.
9   Q      You get dizzy a lot?
10  A      Yeah.
11  Q      Then you met with an officer, is that
12 correct?
13  A      I went to control window and asked the
14 officer --
15  Q      And asked the officer something?
16  A      Yes, he said your, why are your eyes
17 bloodshot so.
18  Q      Okay.  Stop for a second.  Let me make sure
19 we get this down.  He said why are your eyes
20 bloodshot, is that right?
21  A      Yes, sir.
22  Q      Can we go off the record just one moment?
23         (A discussion was held outside the record.)
24 BY MR. WALTER:

21

1    Q    We're going to go ahead and go back on the
2  record.
3    A    Okay.
4    Q    You went to the control window and you
  spoke with an officer?
6    A    Yes. He told me, your eyes was red. I
7  went back to my cell, looked in the mirror, see if he
8  was telling the truth. So I signed for sick call and
9  went to sick call, seen a nurse. She signed me in to
10  see a doctor, Doctor --
11    Q    Hang on. You went to sick call and you saw
12  a nurse, right?
13    A    Right.
14    Q    And then she signed you up to see the
15  doctor?
16    A    Dr. Mesrobian, M-e-s-r-o-b-i-a-n.
17    Q    Then what happened?
18    A    He told me I'm going to put some eye drops
19  into you.
20    Q    The doctor was a male?
21    A    Yes.
22    Q    And he told you he was going to put some
23  eye drops in your eyes?
24    A    Four times a day, which the rules say three

22

1  times, some two times. Okay. I went for three times
2  a day, right.
3    Q    You were supposed to put the eye drops in
4  your eyes three times a day?
5    A    No, four times. At night is when I have to
6  do it by myself, right.
7    Q    At night?
8    A    I have to do it by myself. In daytime some
9  nurses just put, like they figure we're SK -- STC --
10  we're all retarded, special treatment center.
11    Q    So the nurses sometimes would put the eye
12  drops in for you?
13    A    Yes, but they, at night we done it by
14  ourselves, no problem, right?
15        Because there were no more people. But see
16  what happened was, it was August 26, that Sunday,
17  September 26, '04, that Sunday --
18    Q    Now wait. I'm confused. Was it August 25
19  --
20    A    26th.
21    Q    -- or September? You said both.
22    A    August 26, August 26, '04. I went. It was
23  a day before my last day, which was Monday, right. It
24  was Sunday.

23

1    Q    The day before your last day of what?
2    A    Getting eye drops.
3    Q    Okay.
4    A    Okay. I went to the medicine line, with
5  medicine line got to the window, got to the
6  dispensary, sat down, had my hands behind my back like
7  this (indicating.)
8    Q    What kind of chair were you sitting on?
9    A    Regular chair.
10    Q    Like what?
11    A    A regular chair.
12    Q    Is it a plastic chair like the one you're
13  sitting in today?
14    A    Yes.
15    Q    Did it have a back on it?
16    A    It had a back on it.
17    Q    Did it have arms on it?
18    A    No.
19    Q    What happened?
20    A    I had my hands behind my back like this. I
21  don't think professional --
22    Q    You need to sit down.
23    A    I'm going to explain to you.
24    Q    Sit down. Sit down.

24

1    A    Better relation by showing you what I'm
2  talking about.
3    Q    You can tell me. If I want you to
4  demonstrate, I'll ask you to stand up, okay?
5    A    Okay. I had my hands behind my back,
6  right?
7    Q    Uh-huh.
8    A    The nurse announced, she stand over me,
9  right. Now she doing, though, is not professional,
10  she's not a professional at all. She was standing
11  over me, right? Can I show you what I'm talking
12  about?
13    Q    Go ahead and tell me. If I think I need
14  further explanation, I'll let you demonstrate.
15    A    How I tell you, standing over me?
16    Q    She was standing over you, then what
17  happened?
18    A    Over me like this (indicating.) My hands
19  got away. I got two memos that says my hands jerk.
20  One memo, I keep in my property -- lid off my property
21  box. Another one is every Sunday I get two straws. I
22  was getting two straws now, two straws every week.
23    Q    You normally got --
24    A    Two drinking straws to drink with.

25

1    Q    You got two drinking straws?

2    A    Because my hands shake in my cell, and I

3 spill all the drinks all over the place.

4    Q    Now what happened when the nurse was

standing over you administering the eye drops?

6    A    Okay. Can I show you what she was doing,

7 though? Can I demonstrate?

8    Q    Just tell me.

9    A    I can't tell you. I have to show you.

10 Maybe you see she was doing the right thing, though.

11    Q    Okay. Stand up by your chair and show me

12 what you want to show me.

13    A    I'm standing right there, hands behind my

14 back, right, she leans over like this, like this

15 (indicating.)

16    Q    Stop for a second. Let me put it in the

17 record and you see if I'm accurately describing what

18 you just did.

19        You turned and were facing the chair, so if

20 there were a person sitting in the chair, both would

21 be facing each other?

22    A    That's right.

23    Q    And you demonstrated someone bending down

24 over the person sitting in the chair holding an eye

26

1 drop bottle in their right hand, is that an accurate

2 description of what you just did?

3    A    Right.

4    Q    Right?

5    A    Yes, sir.

6    Q    Okay. Go ahead and continue your

7 demonstration.

8    A    Okay. She is like this, right, not a

9 professional nurse. I mean, when they bend back and

10 put eye drops like this, I'm in the crazy house, a

11 professional nurse put -- she's not a professional

12 nurse, right -- is like that.

13    Q    You're saying that what she should have

14 done is had you lean back as opposed to sitting in the

15 chair when she administered the eye drops?

16    A    No, I sit in the chair, I lean my head

17 back, she should do it this way, instead of this way,

18 which is not the right way crawling over me like that.

19    Q    Okay. Now let me see if I can explain it,

20 what you're doing.

21        You're saying that she should have stood to

22 the side of you, as opposed to in front of you, is

23 that right?

24    A    That's right.

27

1    Q    That's right?

2    A    I had my head back and she administered

3 like that, instead of standing in front of me like

4 this. What happened was, my hands got away and tapped

5 her one time.

6    Q    Where did you tap her?

7    A    I don't know.

8    Q    So your hands, you were holding them behind

9 your back, came around to where she was standing in

10 front of you and touched her?

11    A    I didn't do it on purpose, though.

12    Q    But you agree that your hand came around

13 and touched her?

14    A    I just tapped her. I tapped light not

15 touching as she --

16    Q    You agree your hand touched her body,

17 correct?

18    A    She stand so close. I mean, my hands

19 jerked.

20    Q    You agree that your hand touched her body,

21 correct?

22    A    Correct.

23    Q    Okay. Thank you. Go ahead.

24    A    Not on purpose, though. I'm trying to say

28

1 not on purpose. It was an accident. A reflection --

2 you know, my arm just jerked. I can't have no control

3 over it.

4    Q    So you're saying it was an accident, that

5 your hand came all the way from behind the chair --

6    A    I was like this.

7    Q    -- directly in front of you and touched the

8 nurse?

9    A    I didn't reach out like that. She standing

10 over me like this. So I accidentally hit her, right.

11 I didn't mean to.

12    Q    What happened after that?

13    A    Okay. She went back to the officer,

14 officer -- I'm sitting down, right.

15    Q    Okay. I think you can sit down for this

16 explanation. I don't think you need to be standing

17 up.

18    A    Okay. She told me, told the officer,

19 officer, have him sit by Room Two.

20    Q    I didn't follow that, the officer had you

21 sit where?

22    A    On a bench by Control Room by Room Two.

23    Q    Sit on a bench by the Control Room by Room

24 Two?

29

1    A      Yes, so I sat there a couple minutes,
2  right. Next thing I know an officer come back to the
3  dispensary, I sat down, I see it was Lieutenant
4  Gorman, Mark Gorman, okay. I told him nice and
5  kindly, am I going to segregation. He brought
6  handcuffs, am I going to segregation. "Shut up,
7  pervert."
8    Q      You just yelled that.
9    A·     No, he yelled at me.
10   Q      You just yelled it at me.
11   A      He yelled at me, "shut up, pervert."
12   Q      Whenever you demonstrated, you yelled that?
13   A      Correct. He yelled "shut up, pervert". I
14 was amazed. What's going on. I don't believe you
15 could call anyone that name, a higher rank, call
16 someone a pervert, you know. I got handcuffed, out we
17 went inside the truck, went to segregation. And they
18 know I'm in segregation, I have a waste problem,
19 right, medical waste problem. So I had a bowel
20 movement and they didn't give me shower or nothing,
21 change of underwear or nothing. They put me in my
22 cell, I had shit all over the place, right.
23   Q      This was the same day?
24   A      Same day.

30

1    Q      Did you eventually get a shower?
2    A      No.
3    Q      Okay. You're not in segregation now, are
4  you?
5    A      No.
6    Q      How long was it before you were able to get
7  cleaned up?
8    A      Right after, right after I went to my cell.
9    Q      Okay. So when you went to your cell, you
10 were able to clean yourself up?
11   A      That's right. I'm capable of doing that,
12 you know. I used the sink, washed down there, washed
13 all over, didn't get no underwear.
14   Q      Did you eventually get some underwear?
15   A      Yes -- no -- I don't know.
16   Q      You don't know?
17   A      I don't remember.
18   Q      Okay. Well, you received underwear since
19 then, you have underwear now?
20   A      Oh, yeah, I got underwear now. You want to
21 see?
22   Q      No, I don't want to see.
23          You need to stay seated. You just started
24 to stand up to show me your underwear?

31

1    A      It was a joke.
2    Q      You stood up, reached for your pants like
3  you were going to show me your underwear, correct?
4    A      Correct, poor joke that get me in trouble.
5    Q      Now, what happened after you went to
6  segregation -- actually, let me back up.
7          What did Connie Nelson do that you claim
8  wronged you, how did she violate your rights?
9    A      By not doing her job right, by --
10   Q      By standing over you instead of standing to
11 your side?
12   A      Yes, sir.
13   .Q     Is there anything else she did that wronged
14 you?
15 ·  A      Thinks I'm retarded because every other
16 nurse would let me do it by myself, right, but not
17 her. She thought she would do it standing over me.
18   Q      Is there anything else that Connie Nelson
19 did that you think wronged you?
20   A      Her lying statement, try to say I rubbed
21 her, which was only a tap. I did not rub her.
22          She also said I smiled at her. How could I
23 smile at her when I don't have no dentures in?
24          I mean, I had no teeth to smile. That's

32

1 what I don't get. She said on the ticket I rubbed her
2 right thigh, right? It was a tap, not a rub. How
3 could it be a rub when it was a tap?
4          I don't get that.
5    Q      Let me make sure I've got all these right
6  here.
7          Your claim against Connie Nelson is based
8  on the fact that she stood over you instead of
9  standing to the side, that's one, correct?
10   A      (Nodding head up and down.)
11   Q      You need to answer yes or no.
12   A      Yes, sir.
13   Q      Okay. That, and, two, that she wouldn't
14 let you put in the eye drops yourself, that's another
15 thing that you think she did wrong to you?
16   A      Yes, sir.
17   Q      The fact that she said you rubbed her when
18 you say you tapped her?
19   A      That's right, sir.
20   Q      And the fact that she says that you smiled
21 at her and you say you did not smile at her?
22   A      I had no teeth.
23   Q      Okay. You have teeth today, don't you?
24   A      But I didn't get my dentures until December

**33**

1 to where I was in DPU.

2    Q    Did you have false teeth?

3    A    No, I didn't.  Now I do.

4    Q    You do now, but you didn't back then?

     A    Right.

6    Q    You're saying you couldn't smile because

7 you didn't have any false teeth at that time?

8    A    That's right.

9    Q    You can smile when you don't have teeth,

10 can't you?

11        You're smiling right now?

12   A    She said showed teeth.  I don't smile.

13 There's nothing funny about being in prison.

14   Q    Is there anything else that Connie Nelson

15 did other than those four things we just discussed

16 that you claim wronged you?

17   A    I still -- it's wrong, her standing over

18 me.  That's not professional.

19   Q    I understand that's one of your claims.

20 I'm trying to figure out what all your claims are, and

21 the four that I have is that she stood over you, she

22 wouldn't let you put your eye drops in yourself, she

23 said you rubbed her, and that she said that you smiled

24 at her.

**34**

1        Is there anything else that she did that

2 you claim wronged you?

3    A    I got to rethink it.

4    Q    Go ahead and look at your complaint, see if

5 that helps refresh your recollection.  Take your time.

6    A    It was September, it was September 26.

7    Q    So it was September 26 instead of August?

8    A    Not August, that's right.

9    Q    This was 2004?

10   A    Yes, sir.  With this I got my mask drawn,

11 it's not even Christmas yet.  I had my mask

12 permanently on.

13   Q    You have your mask on, what do you mean by

14 that?

15   A    Halloween mask.

16   Q    You were wearing your Halloween mask?

17   A    Yeah, all year-round.

18   Q    You're not wearing a mask right now, are

19 you?

20   A    Yes, I am.

21   Q    Physically, there is nothing on your face?

22   A    No, I didn't.

23   Q    What do you mean by a "mask"?

24   A    Psychologically, it's just a phrase, ugly.

**35**

1 whatever, you know, I joke around.

2    Q    Okay.  You have looked at the complaint,

3 right?  You need to finish.  Go ahead and take your

4 time.

5    A    That, I don't get it.  If they weren't

6 there, why did they believe their own?  They must be

7 gullible.

8    Q    Gullible?

9    A    To believe their own first, you know, like

10 here it says Miss Daniels believes her own, what they

11 say.  That's not true, though.  I not rub her.  I

12 tapped her by, accidentally, a freak accident.  I got

13 two memos that prove my arms does shake, okay, signed

14 by Dr. Mesrobian.  He's a doctor, right?

15        And I don't get why she lied about that.

16 Also says Ernestine Daniels, Counselor Ross --

17   Q    Hang on.  I've got a copy of your

18 complaint.  I don't need you to read your complaint to

19 me.

20        What I want you to do is look at it, see if

21 there is any other claims that you have against Miss

22 Nelson besides the four that we have already

23 discussed?

24   A    Like I say, she didn't act professional.

**36**

1    Q    Okay.  She didn't act professional, by that

2 you mean she stood over you instead of standing beside

3 you, right?

4    A    Right.  No rights to her allegations

5 against me.

6    Q    Okay.

7    A    It was her fault.

8    Q    Is it fair to say you don't have any other

9 claims against Miss Nelson than the five we have

10 discussed thus far?

11   A    Well, I would like to read the ticket.

12 Have you copies of the ticket?

13   Q    I don't have a copy.  Let me look here, see

14 if I have a copy of your disciplinary ticket.

15        Let me ask you this, what in the

16 disciplinary ticket would help you understand your

17 claims against Miss Nelson?

18   A    What do you mean?

19   Q    Well, are you just saying whatever she said

20 on the disciplinary ticket was false?

21   A    Yes, sir.

22   Q    I think we've got that covered.

23        You claim that she made false allegations

24 against you?

37

1.    A     Yes, sir.

2     Q     Okay.  Is there anything else that you .

3 claim Miss Nelson did that was wrong?

4     A     How do you mean?

    Q     Well, is there anything else that you're

6 basing your complaint upon that Miss Nelson did?

7     A     Lied in a statement, the way she treating

8 me.  She treats me like I'm retarded.

9     Q     By lying statement, you mean what she said

10 about you in the disciplinary proceedings, correct?

11    A     In my ticket.

12    Q     In your ticket?

13    A     I got back my ticket, I got back a copy of

14 my ticket.  It was all lies.

15    Q     Is there any other lies that you're

16 referring to other than what she wrote in the

17 disciplinary ticket, you're claiming those are lies?

18    A     Yes.

19    Q     What else, what other things did she say do

20 you contend is a lie?

21    A     She said that I rubbed her.  It was only a

22 tap.  Actually, I tapped.  When you rub --

23 .  Q     You just hit the table with your fist,

24 right?

---

38

1     A     That's a tap.

2     Q     That's what you're saying you did?

3     A     . I tapped.

4     Q     You're hitting this table hard enough to

5 shake the table, correct?

6     A     No, just a tap, just a tap.

7.    Q     Mr. Urioste, did you just hit your hand on

8 this table and you shook the table, correct?.

9     A     It's a shaky table.

10    Q     And when you hit your hand on the table,

11 the table shook, correct?

12    A     Correct.

13    Q     Okay.  And you're saying that's how you

14 touched her?

15    A     I tapped her.  I barely touched her.  I

16 barely touched her.  Okay.  I hit my fist now against

17 my hand, I barely touched her.

18    Q     Did you hit her with your fist?

19    A     No, I just touched her.

20    Q     So now you're slapping your leg?

21    A .   That's right, I just tapped her.

22    Q     That slap is audible.  We can hear that

23 slap, right?

24    A     It's got -- I got my brush in my pocket.  I

---

39

1 hit my brush.

2     Q     Now, you're slapping your brush?

3     A     I'm just, that sound you hear is my brush,

4 not my pants, okay.  I'm just clarifying that.  All

5 right?  Because you're trying, your allegations is

6 saying that it's my pants that is making that noise,

7 but I'm trying to tell you, clarify it's my brush that

8 I'm hitting.

9     Q     When you slapped your leg with your brush

10 in your pocket to demonstrate how you hit Miss Nelson

11 --

12    A     I not hit her.  I told you.  I said I

13 tapped her.

14    Q     When you struck your leg to demonstrate how

15 you tapped Miss Nelson --

16 .  A     There's a difference between struck, tap

17 and hit and whatever.  There's a difference.  A tap is

18 just like that (indicating.)

19    Q     I'm going to use your words.  I'm going to

20 use your words.  When you tapped your leg to

21 demonstrate how you tapped Miss Nelson and you had

22 your brush in your pocket, it was an audible sound,

23 correct?

24    A     I didn't have my brush in my pocket at the

---

40

1 time.

2     Q     I'm not talking about back then.  I'm

3 talking about just now.

4     A     Just now, I wanted to clarify that your

5 statement you were using about me tapping my pants

6 made a loud noise was not -- I was hitting my brush.

7 I tapped my brush.

8     Q     You're saying it was because you hit your

9 brush, that's why it was audible, is that right?

10    A     No, no, that's wrong.

11    Q     What's wrong about that statement?

12    A     That statement you said was you hit your

13 brush, I said tap.

14    Q     So when you tapped your brush --

15    A     That's right.

16    Q     -- it was audible?

17    A     Clarify your speech.

18    Q     When you tapped your brush, it was audible,

19 correct?

20    A     Audible, what that mean?

21    Q     You could hear it, you could hear your hand

22 tapping your brush, correct?

23    A     No, no, you said it was me.  That noise you

24 heard was hitting my pants, but I'm been trying to

---

41

1 tell you I was tapping my pants and hit the brush.

2 The noise you hear is me tapping my brush. That's

3 probably the problem. You hear that (indicating.)

4    Q    Okay. You're just barely touching your

hand on your pants right now?

6    A    That's what I did to her. I barely touched

7 her. She said I rubbed her, though, her allegations

8 was wrong. She said I rubbed her. It wasn't a rub,

9 it was a tap.

10    Q    Is there anything else that Miss Nelson did

11 that you claim wronged you?

12    A    How do you mean?

13    Q    Other than the things we have discussed

14 this far, is there anything else you're claiming Miss

15 Nelson did that wronged you?

16    A    Her lies on the ticket.

17    Q    We already talked about that. Is there

18 anything else?

19    A    We talked about it. But the way it sounded

20 I don't get the lies she lied. She had people like

21 the warden, who signed off the ticket, Miss Daniels

22 who did not give a true statement, write down what I

23 said. She never does write down what I tell her. She

24 never does. She always believes her own first. I

42

1 don't like that. I dislike that. You know, it's like

2 I have no fair shake around this place. I get no

3 respect.

4        I was a Marine, right, a Lance Corporal in

5 the Marine Corps and I get no respect. I fought for

6 these people. I was in the war against Iran, an

7 American in Iran Conflict. Remember that, about '79

8 or, how old are you or were you born then?

9    Q    Let's talk about Ernestine Daniels. What

10 do you claim Ernestine Daniels did that wronged you

11 other than what you just described, she believed her

12 own staff over your version of events?

13    A    Yes, I tried telling her the truth. She

14 writes her own version down. She reclarifies --

15 reclarifies it, everything I try to tell her, she

16 writes down.

17        I'm not guilty, write a lot of tickets. I

18 wasn't guilty but she believes her own first and that

19 hurts me totally.

20    Q    Is there anything else that Ernestine

21 Daniels did that you claim wronged you?

22    A    Her false statement, believing -- that's

23 all right there, sir, the false statement she put down

24 that she write that ticket. Right then, the warden

43

1 gets it, believes it, believes her things because

2 she's gullible. She believes her things first then

3 the warden believes her and then writes down, see, I

4 survive commissary.

5    Q    Right. You're saying commissary?

6    A    Yes, sir.

7    Q    Now with respect to Ernestine Daniels, you

8 said a couple times that you used the word "gullible,"

9 right?

10    A    Yes.

11    Q    But you're not saying that she was angry at

12 you, right, you're just saying she's gullible?

13    A    Yeah, she believes her own.

14    Q    Okay.

15    A    She believes her own first even though they

16 lie, the officers lie on me.

17    Q    And you think she believes her own because

18 she's gullible?

19    A    She don't know what -- these officers

20 tease me, make fun of me, the way I walk, move, talk.

21 They make fun of me, give me the finger all the time

22 and I give a thumbs up.

23    Q    Those allegations aren't in your complaint,

24 right?

44

1    A    That's right, but I'm saying --

2    Q    Let me be clear about that. Those

3 allegations are not things that you're complaining

4 about in this case?

5    A    You was asking about Daniels, right?

6    Q    Right.

7    A    Ernestine Daniels, I'm telling you what the

8 officers do. They do that, give me false tickets,

9 they joke with me.

10    Q    But you're not claiming Ernestine Daniels

11 does those things to you?

12    A    No. She, I'm trying to say like I, they

13 tease me, then they write me the ticket and Miss

14 Daniels believes her own. She don't hear my side of

15 anything. She just, in one ear and out the other ear.

16    Q    You think she does that because she's

17 gullible?

18    A    Yes.

19    Q    Okay. What about Ross Anderson, what did

20 he do that wronged you?

21    A    Ross Anderson, he stands with her. He

22 believes her.

23    Q    Is he also on the Adjustment Committee?

24    A    He was on the Adjustment Committee at the

45

```
 1  time.
 2      Q    He was what?
 3      A    On Adjustment Committee at the time.
 4      Q    He was a member of the Adjustment
    Committee?
 6      A    Yes, with her.
 7      Q    The same type thing with Ross Anderson, you
 8  think he's gullible?
 9      A    Yes.
10      Q    That's what your claim against him is based
11  upon, his gullibility?
12      A    (Nodding head up and down.)
13      Q    Is that yes?
14      A    Yes.
15      Q    What about Nedra Chandler, what did she do
16  that you claim wronged you?  Who is Nedra Chandler?
17      A    She's the warden, head boss lady, right?
18      Q    Okay.
19      A    I feel like this, she's a beautiful person,
20  beautiful in heart, soul and everything else, right,
21  God bless her, but she wrong, she believes Miss
22  Daniels.  Miss Daniels writes everything down, she
23  believes it.
24    · Q    You think Miss Chandler is gullible, too?
```

46

```
 1      A    Yes, to her own.
 2      Q    Your claim against Miss Chandler is based
 3  upon the fact that you think she's gullible?
 4      A    No, my claim against her, she walk with me,
 5  she's talked with me, she's seen me, she knows me,
 6  right, she knows where I am.  How could she believe
 7  what Nelson writes down, the lies Nelson writes down?
 8           And Miss Daniels, then after she writes
 9  that down, she believes it.  Then Miss Chandler, she
10  signs off like Miss Daniels, she may give me a day, 30
11  days, I got 30-day stay.
12      Q    You received 30 days in segregation?
13      A    Thirty days in segregation without any
14  contact with my parents, I couldn't come them for six
15  months.  They live so far in St. Louis, Missouri, over
16  250 miles away.
17      Q    So you got six months where you were not
18  allowed any contact visits?
19      A    That's right.  I mean, I could visit them
20  in the segregation room, but it's just a big old
21  fence.
22      Q    Let me see if I can clarify.  You can visit
23  them in a segregation room where there was a barrier
24  separating them from you, is that right?
```

47

```
 1      A    That's right.
 2      Q    You just weren't allowed a contact visit
 3  like when you and I are sitting here?
 4      A    I couldn't hug them.
 5      Q    Right.  In this room you and I are sitting
 6  across the table from each other, you're not in any
 7  restraints?
 8      A    No.
 9      Q    Just you and me and the court reporter
10  sitting in a room, is that right?
11      A    That's right.  For six months, my parents
12  didn't do nothing, like I didn't do nothing.  That's
13  what I don't get.  I didn't do nothing.  What did they
14  do?
15      Q    Let's go back to Nedra Chandler.  Let me
16  make sure I understand your claims against her.
17           Your claims against her are that you think
18  she should have believed your version rather than Miss
19  Nelson and Miss Daniels?
20      A    She should have talked to me.  I could get
21  her in the right street, straight line.  I tell her
22  the truth.  But yet she believes Miss Daniels'
23  statement and writes down six months seg, or one month
24  seg, six months contact visits as C grade, one month.
```

48

```
 1  That is $30 a month.
 2           I can spend $30 in one month.  And I
 3  survived on food, so inflict none of my problems on
 4  nobody else.  I do it myself.
 5      Q    Hold on.  Let me back up to Nedra Chandler
 6  now again, make sure I understand what your claims
 7  against her are.
 8           You never spoke with Nedra Chandler
 9  personally about this disciplinary ticket?
10      A    No.
11      Q    She just looked at the information from
12  Miss Daniels and Miss Nelson and signed off on the
13  disciplinary ticket?
14      A    That's right.
15      Q    And that's what your claim against her is
16  based upon?
17      A    That's right.
18      Q    What about Mary Henry, what did she do that
19  wronged you?
20      A    She locked me up in DPU, that's in
21  segregation building, right.
22      Q    Who is Mary Henry?
23      A    She's now -- she was the Major.
24      Q    She was a Major here at Dixon?
```

49

| | | |
|---|---|---|
| 1 | A | At the time. Now she's Assistant Warden. |
| 2 | Q | She's an Assistant Warden now? |
| 3 | A | Yeah. |
| 4 | Q | At the time she was a Major? |
| | A | A Major. |
| 6 | Q | She put you in the DPU? |
| 7 | A | Yes. |
| 8 | Q | What is DPU? |
| 9 | A | DPU, I don't know what you call it, but DPU |

10 is inside segregation building. And DPU, lock in
11 cages.

| | | |
|---|---|---|
| 12 | Q | DPU is in the segregation building? |
| 13 | A | One hour yard a day. |
| 14 | Q | Hang on. Let me make sure you answer my |

15 question. DPU is in the segregation building?

| | | |
|---|---|---|
| 16 | A | Yes, sir. |
| 17 | Q | When in segregation, you get one hour of |

18 recreation per day?

| | | |
|---|---|---|
| 19 | A | No, three times a day. But see, I didn't |

20 like that because me myself, and I need a chair where
21 I go to the shower because I'm disabled. I can't like
22 stand up like everybody else and wash down like that.
23 I use the chair when I go to the shower.

24            And then I had to sit on the floor and it

50

1 got me a rash on my rectum, because they forced me to
2 sit on the floor which I supposed to be sitting in the
3 chair, my own chair, like one of them, just in the
4 shower, right.

| | | |
|---|---|---|
| 5 | Q | So you thought when you were in segregation |

6 you should have been provided a plastic chair while
7 you were in the shower, so they would help you when
8 you washed; is that correct?

| | | |
|---|---|---|
| 9 | A | Correct. |
| 10 | Q | Okay. |
| 11 | A | When I washed, when I take a shower, scrub |

12 down.

| | | |
|---|---|---|
| 13 | Q | Now Miss Henry is not the one who ordered |

14 that you be sent to segregation, is she?

| | | |
|---|---|---|
| 15 | A | Yes, I think. |
| 16 | Q | What do you base that on? |
| 17 | A | I don't know. |
| 18 | Q | Okay. Now your ticket was signed by the |

19 warden, correct?

| | | |
|---|---|---|
| 20 | A | Right. She signed the ticket for 30 days |

21 seg.

| | | |
|---|---|---|
| 22 | Q | Now did Miss Henry take you to the |

23 segregation building?

| | | |
|---|---|---|
| 24 | A | No, Lieutenant Gorman, Mike Gorman took me |

51

1 to segregation building, took me to seg on September
2 26, '04, from the hospital.
3          I was right there, right after the nurse
4 lied on me.

| | | |
|---|---|---|
| 5 | Q | So right after the events in the dispensary |

6 you were taken immediately to segregation by
7 Lieutenant Gorman?

| | | |
|---|---|---|
| 8 | A | That's why he come to me, said to me first |

9 was "shut up, pervert." I don't know why he said
10 that. I never done nothing. Right when I got back
11 the ticket, I found a bunch of lies though.

| | | |
|---|---|---|
| 12 | Q | Okay. When did you meet with Mary Henry, I |

13 don't know her involvement.

| | | |
|---|---|---|
| 14 | A | I didn't meet with Miss Henry. |
| 15 | Q | You did not meet with Miss Henry? |
| 16 | A | No, I just assumed she sent me there to |

17 DPU.

| | | |
|---|---|---|
| 18 | Q | So your claim against Miss Henry is based |

19 upon the assumption that she sent you to segregation?

| | | |
|---|---|---|
| 20 | A | That's right. |
| 21 | Q | You didn't personally talk to Miss Henry? |
| 22 | A | No. |
| 23 | Q | You didn't receive any documents from her |

24 --

52

| | | |
|---|---|---|
| 1 | A | No. |
| 2 | Q | -- saying send Mr. Urioste to segregation? |
| 3 | A | (Moving head side to side.) |
| 4 | Q | That's a no? You need to answer verbally. |

5 You were shaking your head.

| | | |
|---|---|---|
| 6 | A | What you mean though? |
| 7 | Q | You didn't receive anything in writing from |

8 Miss Henry saying that you were to be taken to
9 segregation, did you?

| | | |
|---|---|---|
| 10 | A | No, sir. |
| 11 | Q | Okay. What about Michael Gorman, what did |

12 he do other than you claim he called you a "pervert"
13 and he took to you segregation, did he do anything
14 else that you claim wronged you?

| | | |
|---|---|---|
| 15 | A | No, sir. The way he treat me in seg, |

16 though, when I got there.

| | | |
|---|---|---|
| 17 | Q | Was he the Lieutenant over segregation? |
| 18 | A | I don't know. |
| 19 | Q | You saw him when you were in segregation? |
| 20 | A | No. |
| 21 | Q | What do you mean by the way he treated you |

22 when you were in segregation?

| | | |
|---|---|---|
| 23 | A | The way they treated me, the officers. |
| 24 | Q | What did Michael Gorman do to you when you |

53

1. were in segregation?

2    A    His claim, disrespecting me.

3    Q    How did he disrespect you?

4    A    "Shut up, pervert."

5    Q    That happened in the dispensary, right?

6    A    Happened in the dispensary, he was rough

7 when he took me over to segregation.

8    Q    What did he do other than those two things?

9    A    Threw me in the truck.

10    Q    He did what?

11    A    Threw me in the truck.

12    Q    You were taken by truck to segregation?

13    A    Yes, sir, I left the dispensary over in the

14 truck.

15    Q    What do you mean he threw you in the truck?

16    A    I tried to get up, he shoved me in there.

17    Q    Did you fall down?

18    A    I don't remember.

19    Q    You don't remember?

20    A    I fall all the time.

21    Q    So he pushed you on the back whenever you

22 were getting in the truck, is that right?

23    A    Yes.

24    Q    And you don't remember if you fell or not?

54

1    A    That's right, because we were walking and I

2 fell down. That's a lying statement.

3    Q    What was the --

4    A    Weeble-wobble, but don't fall down.

5    Q    Weeble-wobble is a lying statement?

6    A    Yes, because I fall down.

7    Q    Because you weeble and wobble and do fall

8 down?

9    A    Yes, sir.

10    Q    Is that one of your jokes?

11    A    Yes, sir.

12    Q    Okay. That one I got, so.

13    A    Went right over your head.

14    Q    You just took your hand and went through

15 your hair, said it went right over my head, right?

16    A    That's right.

17    Q    Okay. Are there any other claims against

18 any of these people who you have sued that you want to

19 tell me about other than the ones that we have

20 discussed?

21    A    No, I can't think of any, no.

22    Q    Are there any witnesses that you intend to

23 call at trial?

24    A    I have no witnesses because I'm a hermit.

55

1    Q    You're a hermit?

2    A    Yes, I do my time alone. I've been here 19

3 years, two months and 20 days.

4    Q    What were you convicted of?

5    A    A murder I didn't do.

6    Q    You were convicted of murder?

7    A    Yes, Judge Chapman the one that sends me --

8    Q    I don't need to know about what happened in

9 your criminal case. I just want to know that you were

10 convicted of murder, and that's correct?

11    A    That's right. I didn't do it, though.

12         He wouldn't give me DNA testing.

13    Q    You can't challenge that in a civil case,

14 so you were convicted of murder, correct?

15    A    Right.

16    Q    When is your out date?

17    A    August 8, 2006.

18    Q    So next year?

19    A    283 days from now.

20    Q    Are there any exhibits that you intend to

21 use at trial other than your disciplinary ticket?

22    A    Like what?

23    Q    I don't know. I just want to know whether

24 or not you have any documents or physical objects that

56

1 you plan on using as exhibits at trial?

2    A    Just my papers to prove that my hands

3 shake, the memos that I've got that I keep in my

4 property box, lid off my box. I get two straws a

5 week.

6    Q    So these are memos from the doctor allowing

7 you to keep your lid off your box and allowing you to

8 have two straws when you drink because your hand

9 shakes?

10    A    Right.

11    Q    Okay. Other than those two memos and your

12 disciplinary ticket, is there anything else that you

13 intend to use as an exhibit at trial?

14    A    I don't know.

15    Q    You don't know?

16    A    No, sir.

17    Q    Okay. You've had some time to think about

18 your complaint, correct?

19    A    I haven't really thought about it.

20    Q    You haven't really thought about it?

21    A    No.

22    Q    But as you sit here today, there is nothing

23 else that you can think of that you intend to use as

24 an exhibit at trial?

57

1   A     I can't think of anything else.

2   Q     Okay. Well, thank you for coming in and

3 having your deposition taken. You have the

4 opportunity, as I indicated at the beginning of the

deposition, to review a copy of your transcript.

6       The way that works, since you're in prison,

7 you can't go to the court reporter's office to look at

8 that.

9   A     Do I get a lawyer?

10  Q     This is a civil matter so I know you have

11 asked for the Court to appoint one but you're not

12 entitled to one like you would be in a criminal case,

13 that's for the Judge to make the decision.

14  A     Lisa Madigan, State's Attorney is for --

15 their lawyer?

16  Q     I'm an Assistant Attorney General, yes, I

17 represent the defendants.

18  A     Do you know Lisa?

19  Q     Lisa Madigan is the Attorney General, yes,

20 she's the Attorney General. I'm one of her

21 Assistants.

22  A     Yes. Because I know her as I got back a

23 ticket like a paper that reads everything wrong.

24  Q     Reads what?

58

1   A     That reads something, like telling you who

the prosecutor is, me, and defense is down on the

paper, being charged.

4   Q     You're the plaintiff in this case, you

5 filed the lawsuit so you're the plaintiff and the

6 people who were sued --

7   A     I was wrongfully judged.

8   Q     Well, this case hasn't been decided yet.

9   A     Or accused, I shouldn't have been --

10  Q     Hang on. In this case, you're accusing all

11 these people of doing things. This is a civil case.

12 Okay. And Lisa Madigan is defending those individuals

13 that work here at the prison who you are accusing of

14 doing things?

15  A     She gullible.

16  Q     No, she's not gullible.

17  A     Does she believe, she can't be believing

18 these people? They weren't even there. They don't

19 know what is happening. I was there. It happened to

20 me. She lied on me. So these people wasn't even

21 there. They don't know what was going on, like --

22 Lieutenant Mike Gorman had no right to call me a

23 "pervert," tell me to "shut up, pervert," he had no

24 right. He's a Lieutenant, right, a regular

59

1 Lieutenant. He should have respect. I have respect

2 for him. He should have respect for me. I was a

3 Marine, Lance Corporal in Marine Corps. He should

4 have respect for me.

5   Q     Let's talk about the transcript because the

6 deposition is concluded at this point.

7       You have an opportunity to review a copy of

8 the transcript. What we'll do, we'll send a copy up

9 here, if you would like. You don't have to review it.

10 The court reporter is taking down what you said but if

11 you would like to review it, we'll send a copy up

12 here. Someone will sit with you while you go through

13 it and you can make any changes that you have.

14      Then you can sign the signature page.

15      Would you like to look at a copy of the

16 transcript or do you want to waive signature?

17  A     I want a copy.

18  Q     You would like to look at a copy?

19  A     Also, I can say it now --

20  Q     Hang on. Let me make sure we get this in

21 the record correctly. You want to look at a copy of

22 the transcript so you're reserving your signature,

23 correct?

24  A     What do you mean?

60

1   Q     You just want to look at a copy of the

2 transcript to make sure it's accurate, right?

3   A     How is accurate?

4   Q     Well, is, as I indicated at the beginning

5 of the deposition, you'll have an opportunity to look

6 through the transcript, see if anything has been put

7 down inaccurately.

8   A     Yes.

9   Q     You want to look at the transcript,

10 correct?

11  A     Then what happens then?

12  Q     Then you'll have a page that -- you can

13 make any changes that you have on that page.

14      You want to look at the transcript,

15 correct?

16  A     Right.

17  Q     Okay. That's all the questions I have.

18  A     Okay.

19  Q     We can go ahead -- the deposition is

20 concluded. We can go off the record, then you can ask

21 me any questions that you have.

22      FURTHER THIS DEPONENT SAITH NOT AT 2:25 P.M.

23              (Signature reserved.)

24

61

```
 1              S I G N A T U R E
 2
 3
 4       I, MARK S. URIOSTE, hereby certify that I have
    read the foregoing transcript of my deposition given
 6  in the case of URIOSTE vs. NELSON, ET AL., Case No. 04
 7  CV 1380, on October 28, 2005 at the time and place
 8  aforesaid, consisting of Pages 1 through 61,
 9  inclusive, and have listed all corrections or changes
10  on the attached sheet, and I do again subscribe and
11  make oath that the same is a true, correct, and
12  complete transcript of my deposition as aforesaid as
13  it now appears.
14
15
16
17
18          _____
19                  MARK S. URIOSTE
20
21
22
23  _____
24      Date
```

62

```
 1              C E R T I F I C A T E
 2
 3       I, Deborah L. Fabritz, Certified Shorthand
 4  Reporter, Registered Professional Reporter, and Notary
 5  Public, do hereby certify that I am a court reporter
 6  doing business in the city of Rockford; that I
 7  reported in shorthand the testimony of MARK S. URIOSTE
 8  on October 28, 2005 and that the foregoing is a true
 9  and correct transcript of my shorthand notes so taken
10  aforesaid.
11       I further certify that I am neither counsel
12  for nor related to or employed by any of the parties
13  to this action and that I am not a relative or
14  employee of any counsel employed by the parties hereto
15  or financially interested in the action.
16       Dated at Rockford, Illinois, this 15th day of
17  November, 2005.
18
19
20          _____
21          Deborah L. Fabritz
            Certified Shorthand Reporter
22          Registered Professional Reporter
            License No. 084-003513
23          Notary Public, DeKalb County, Illinois

24
```

1            C E R T I F I C A T E

2

3            I, Deborah L. Fabritz, Certified Shorthand

4    Reporter, Registered Professional Reporter, and Notary

5    Public, do hereby certify that I am a court reporter

6    doing business in the city of Rockford; that I

7    reported in shorthand the testimony of MARK S. URIOSTE

8    on October 28, 2005 and that the foregoing is a true

9    and correct transcript of my shorthand notes so taken

10   aforesaid.

11           I further certify that I am neither counsel

12   for nor related to or employed by any of the parties

13   to this action and that I am not a relative or

14   employee of any counsel employed by the parties hereto

15   or financially interested in the action.

16           Dated at Rockford, Illinois, this 15th day of

17   November, 2005.

18

19

20

21   Deborah L. Fabritz
     Certified Shorthand Reporter
22   Registered Professional Reporter
     License No. 084-003513
23   Notary Public, DeKalb County, Illinois

24

OFFICIAL SEAL
DEBORAH L FABRITZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/27/08

Midwest Professional Reporting
(815) 968-0015