DATE: 7-9-2006

IN THE UNITED STATES
DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MARK S. URIOSTE | NO. 04-1380 |
| PLAINTIFF, PRISONER | APPLY- ATKINS |
| AND MENTAL PATIENT | -V- VIRGINIA |
| -VS- | 536 U.S. 304 |
| NURSE L. NELSON, | (2002) AND |
| ET. AL - DEFENDANTS | ENCLOSED EXHIBITS |

MOTION FOR SUMMARY
JUDGMENT
PURSUANT TO FED. R. CIV. PRO. RULE 1
AND 56 ET SEQ "

And

MOTION FOR IMMEDIATE
MEDICAL ATTENTION AND TREATMENT
FOR MY-BROKEN PAINFUL DISLOCATED
COLLAR BONE! THAT I HAVE BEEN
DENIED AND     DATE: 7-9-2006
DEPRIVED       Sincerely Yours, PRO SE PLAINTIFF
MEDICAL        Mark S. Urioste N-87529
TREATMENT      MARK S. URIOSTE - N 87529
WITH DELIBERATE DIXON CORRECTIONAL CENTER
INDIFFERENCE   2600 N. BRINTON AVE.

*[Handwritten margin notes: "US-V-Nixon U.S. Las Fitz-off"; "EX AG - All History Laws and Cases Apply To US"; "Exhibit"]*

DIXON CC XHOUSE
SEGREGATION USE ONLY

---

judgment (No. 73–1834) because of the public importance of the issues presented and the need for their prompt resolution 417 U.S. 927 and 960, 94 S.Ct. 2637 and 3162, 41 L.Ed.2d 231 (1974).

FN1. See 28 U.S.C. ss 1254(1) and 2101(e) and our Rule 20. See, e.g. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160 (1936); Rickert Rice Mills v. Fontenot, 297 U.S. 110, 56 S.Ct. 374, 80 L.Ed. 513 (1936); Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935); Norman v. Baltimore & Ohio R. Co., 294 U.S. 240, 55 S.Ct. 407, 79 L.Ed. 885 (1935).

FN2. The cross-petition in No. 73–1834 raised the issue whether the grand jury acted within its authority in naming the President as a coconspirator. Since we find resolution of this issue unnecessary to resolution of the question whether the claim of privilege is to prevail, the cross-petition for certiorari is dismissed as improvidently granted and the remainder of this opinion is concerned with the issues raised in No. 73–1766. On June 19, 1974, the President's counsel moved for disclosure and transmittal to this Court of all evidence presented to the grand jury relating to its action in naming the President as an unindicted coconspirator. Action on this motion was deferred pending oral argument of the case and is now denied.

On March 1, 1974, a grand jury of the United States District Court for the District of Columbia returned an indictment charging seven named individuals [FN3] with various offenses, including conspiracy to defraud the United States and to obstruct justice. Although he was not designated as such in the indictment, the grand jury named the President, among others, as an unindicted coconspirator. [FN4] On April 18, 1974, upon motion of the Special \*688 Prosecutor, see n. 8, infra, a subpoena duces tecum was issued pursuant to Rule 17(c) to the President by the United States District Court and made returnable on May 2, 1974. This subpoena required the production, in advance of the September 9 trial date, of certain tapes, memoranda, papers, transcripts or other writings relating to certain precisely identified meetings between the President and others. [FN5] The Special Prosecutor was able to fix the time, place, and persons present at these discussions because the White House daily logs and appointment records had been delivered to him. On April 30, the President publicly released edited transcripts of 43 conversations; portions of 20 conversations subject to subpoena in the present case were included. On May 1, 1974, the President's counsel, filed a 'special appearance' and a motion to quash the subpoena under Rule 17(c). This motion was accompanied by a formal claim of privilege. At a subsequent \*\*3098 hearing, [FN6] further motions to expunge the grand jury's action naming the President as an unindicted coconspirator and for protective orders against the disclosure of that information were filed or raised orally by counsel for the President.

FN3. The seven defendants were John N. Mitchell, H. R. Haldeman, John D. Ehrlichman, Charles W. Colson, Robert C. Mardian, Kenneth W. Parkinson, and Gordon Strachan. Each had occupied either a position of responsibility on the White House staff or the Committee for the Re-election of the President. Colson entered a guilty plea on another charge and is no longer a defendant.

FN4. The President entered a special appearance in the District Court on June 6 and requested that court to lift its protective order regarding the naming of certain individuals as coconspirators and to any additional extent deemed appropriate by the Court. This motion of the President was based on the ground that the disclosures to the news media made the reasons for continuance of the protective order no longer meaningful. On June 7,

---

the District Court removed its protective order and, on June 10, counsel for both parties jointly moved this Court to unseal those parts of the record which related to the action of the grand jury regarding the President. After receiving a statement in opposition from the defendants, this Court denied that motion on June 15, 1974 except for the grand jury's immediate finding relating to the status of the President as an unindicted coconspirator. 417 U.S. 960, 94 S.Ct. 3162, 41 L.Ed.2d 1134.

FN5. The specific meetings and conversations are enumerated in a schedule attached to the subpoena. App. 42a–46a.

FN6. At the joint suggestion of the Special Prosecutor and counsel for the President, and with the approval of counsel for the defendants, further proceedings in the District Court were held in camera.

be foreclosed by the decision in Nixon v. Sirica, 159 U.S.App.D.C. 58, 487 F.2d 700 (1973).

The District Court held that the judiciary, not the President, was the final arbiter of a claim of executive privilege. The Court concluded that under the circumstances of this case the presumptive privilege was overcome by the Special Prosecutor's prima facie 'demonstration of need sufficiently compelling to warrant judicial examination in chambers . . .' 377 F.Supp., at 1330. The court held, finally, that the Special Prosecutor had satisfied the requirements of Rule 17(c). The District Court stayed its order pending appellate review on condition that review was sought before 4 p.m., May 24. The court further provided that matters filed under seal remain under seal when transmitted as part of the record.

On May 24, 1974, the President filed a timely notice of appeal from the District Court order, and the certified record from the District Court was docketed in the United \*690 States Court of Appeals for the District of Columbia Circuit. On the same day, the President also filed a petition for writ of mandamus in the Court of Appeals seeking review of the District Court order.

Later on May 24, the Special Prosecutor also filed, in this Court, a petition for a writ of certiorari before judgment. On May 31, the petition was granted with an expedited briefing schedule, 417 U.S. 927, 94 S.Ct. 2637, 41 L.Ed.2d 231. On June 6, the President filed, under seal, a cross-petition for writ of certiorari before judgment. This cross-petition was granted June 15, 1974, 417 U.S. 960, 94 S.Ct. 3162, 41 L.Ed.2d 1134, and the case was set for argument on July 8, 1974.

I
JURISDICTION

The threshold question presented is whether the May 20, 1974, order of the District Court was an appealable order and whether this case was properly 'in' the Court of Appeals when the petition for certiorari was filed in this Court. 28 U.S.C. s 1254. The Court of Appeals' jurisdiction under 28 U.S.C. s 1291 encompasses only 'final decisions of the district courts.' Since the appeal was timely filed and all other procedural requirements were met, the petition is properly before this Court for

was testimony that the effects of inadequate physical facilities are aggravated by deficiencies in sanitation and infection control; the number of physicians is inadequate; and TDC improperly relies on inmate medical assistants, who lack adequate training, for medical care. Inmate assistants have amputated fingers, set bones, applied casts, sutured wounds, repaired Achilles' tendons, given injections, administered medications, and kept records. Inmates, in many instances lacking adequate training, also serve as laboratory technicians, X-ray technicians, physical therapists, respiratory therapists, first aid attendants, and medical records clerks. Many of the inmates assigned to these tasks are uneducated and some are illiterate. The district court found "numerous" instances of "[g]rievous neglect of the personal care of patients at the HUH,"[162] but nothing in the findings indicates either that these are imminent in the hospital or that they are not remediable by a larger and better-trained staff.

JCAH standards are applied to hospitals in Texas by THA. Although HUH does not meet these standards, the record establishes that no prison hospital in any other state does. Some Federal Bureau of Prisons hospitals meet them but others do not. Of the 7,000 private hospitals in the United States, only 3,000 meet JCAH standards adequately for full accreditation and an additional 1,000 are on probation or one-year accreditation; the other 3,000 are not accredited because they do not meet the standards. Literally millions of persons receiving private medical care are being treated in hospitals that do not meet the requirements imposed by the district court's decree.

[63] Expert standards are a useful guide but they are not a constitutional measure.[163] Restricting use of HUH to Huntsville inmates and permitting it to render only infirmary care do not solve the medical care problem. Moreover, there have been additional developments since the district court issued its decree. By orders dated October 19, 1981, and November 5, 1981, the district court stayed the provision of its decree pertaining to HUH. In its October 19 order, the district court directed TDC to file a formal response to particular suggestions made by the plaintiffs concerning HUH. TDC filed this response. In the court's November 5 order, TDC's response is described as exhibiting "a commendable air of conciliation." That order further directs the parties to meet and discuss possible agreement on continued operation of HUH.

[64] Accordingly, we vacate the provision of the district court's decree pertaining to the HUH and remand that issue to the district court for further proceedings consistent with this opinion after the district court has received a report concerning the results of the discussion it has ordered. Should the district court consider injunctive relief still necessary, its order shall not command the closing of HUH or restrict its use solely to Huntsville inmates. The order should instead be limited to requiring that TDC provide the minimum level of hospital care required by the Constitution.

### 6.7 Double-Celling and Exercise for Inmates in Administrative Segregation

Some inmates are confined to cells in a separate part of each unit for a variety of nonpunitive reasons. Some are confined pending investigation of potential disciplinary charges; others are confined awaiting a hearing after charges are filed; still others are confined because they need protec-

---

162. 503 F.Supp. at 1312.

163. *Bell v. Wolfish*, 441 U.S. at 543 n.27, 99 S.Ct. at 1876 n.27, 60 L.Ed.2d at 471 n.27; *see Ramos v. Lamm*, 639 F.2d at 567 n.10; note 182 and accompanying text *infra*.

---

tive custody, because they are security risks, or because, after being punished, they cannot safely be returned to the regular prison population.[164]

[65] In *Rhodes v. Chapman*, the Court declined to find cruel and unusual punishment in the practice of confining two inmates on "restrictive classification" to a cell.[166] The inmates so confined in *Rhodes* had been found guilty of rule infractions after a hearing or were "there by 'choice' at least to some degree."[167] Although most of the TDC inmates in administrative segregation have not yet been found responsible for rule violations, we are unable to perceive that punishment that is not imposed only after compliance with the procedures now in force or soon to be in force at TDC. Accordingly, we vacate Part IV(C)(3) of the district court's decree.

In the past, inmates sometimes were confined in administrative segregation for lengthy periods without any evaluation by prison officials of the reasons for the confinement; however, TDC policy now requires periodic review of the reasons for this confinement after the inmate has been in administrative segregation thirty to forty-five days. The review is repeated every ninety days thereafter.[165] In addition, the first consent decree requires TDC to file with the district court a plan setting forth (1) the circumstances under which inmates may be confined in administrative segregation; (2) confinement procedures conforming to the requirements of *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and *Wright v. Enomoto*, 462 F.Supp. 397 (N.D.Cal.1976) (three-judge court), aff'd mem., 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978); and (3) procedures for regular and frequent review of the status of each inmate so confined as well as the standards for such review.

Aside from matters disposed of by the first consent decree, the district court's decree requires two special relief measures for inmates in administrative segregation: not more than one inmate may be confined in a cell containing sixty square feet or less, Part IV(C)(3), and each inmate must be afforded the opportunity for at least one hour of exercise a day if he is in administrative segregation for more than three consecutive days, Part IV(C)(1).

Whether the failure to afford inmates the opportunity to exercise is cruel and unusual punishment was considered by us in *Jones v. Diamond, supra,* in which, equally divided, we affirmed the district judge's denial of relief.[168] That case, however, involved a county jail in which most of the inmates were confined for relatively brief periods.[169] We deal here with a maximum security prison in which, under our disposition of this case, two persons could be confined in a forty-five-square-foot cell too small to permit any real exercise, for almost twenty-four hours a day. This confinement is continual, unbroken by work assignment, school, or other outside activity. Moreover, although a confined inmate's status is subject to regular review to determine whether the necessity for administrative segregation still exists, this review is no guarantee that

---

164. 503 F.Supp. at 1365.

165. *Id.* at 1364.

166. See 452 U.S. at 349 n.15, 101 S.Ct. at 2400 n.15, 69 L.Ed.2d at 71 n.15.

167. *Id.* (quoting *Chapman v. Rhodes*, 434 F.Supp. 1007, 1013 (S.D.Ohio 1977)).

168. 636 F.2d at 1376.

169. *See Hutto v. Finney*, 437 U.S. at 686, 98 S.Ct. at 2571, 57 L.Ed.2d at 531 ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."); *Smith v. Sullivan*, 553 F.2d 373, 379 (5th Cir. 1977) ("types of inmates and the lengths of their stays in the jail"); *cf. Cruz v. Hauck*, 515 F.2d 322, 333 (5th Cir. 1975) (county jail; access to courts) ("inmates whose confinement is of a very temporary nature"), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1118, 47 L.Ed.2d 322 (1976); *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980) (county jail) ("in determining maximum occupancy, we consider that most inmates are confined in the jail for relatively short periods of time.").

RUIZ v. ESTELLE
Cite as 679 F.2d 1115 (1982)

U.S. SUPREME COURT REPORTS

Congress is responsible for the actions of the Legislative Branch, or the entire Judiciary for those of the Judicial Branch. It thereby creates a constitutional equivalence between a single President, on the one hand, and many legislators, or judges, on the other.

The Founders created this equivalence by consciously deciding to vest Executive authority in one person rather than several. They did so in order to focus, rather than to spread, Executive responsibility thereby facilitating accountability. They also sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing it in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many. Compare U. S. Const., Art. II, § 1 (vesting power in "a President"), with U. S. Const., Art. I, § 1 (vesting power in "a Congress" that "consist[s] of a Senate and House of Representatives"), and U. S. Const., Art. III, § 1 (vesting power in a "supreme Court" and "inferior Courts").

The authority explaining the nature and importance of this decision is legion. See, e.g., J. Locke, Second Treatise of Civil Government § 144 (J. Gough ed. 1947) (desirability of a perpetual Executive); 1 W. Blackstone, Commentaries *242–*243 (need for single Executive); The Federalist No. 70, p. 423 (C. Rossiter ed. 1961) (A. Hamilton) (Executive "[e]nergy" needed for security; "steady administration of the laws," "protection of property," "justice," and protection of "liberty"); Ellsworth, The Landholder, VI, in Essays on the Constitution 161, 163 (P. Ford ed. 1892) ("supreme executive should be one person, and unfettered otherwise than by the laws he is to execute"); *Morrison v Olson*, 487 US 654, 698-

699, 101 L Ed 2d 569, 108 S Ct 2597 (1988) (Scalia, J., dissenting, describing history); *id.*, at 728 (describing textual basis); *id.*, at 729, 101 L Ed 2d 569, 108 S Ct 2597

[520 US 714]

policy arguments). See Federalist No. 71, at 431 (A. Hamilton); P. Kurland, Watergate and the Constitution 135 (1978) ("sole indispensable man of government" and "should not be distracted from his duties "at the beck and call of any other . . . branch of the government"); Calabresi, Some Normative Arguments for the Unitary Executive, 48 Ark. L. Rev. 23; cf. T. Roosevelt, An Autobiography 372 (1913).

For present purposes, this constitutional structure means that the President is not like Congress. Congress can function, as a whole, even when up to half its members are absent, see U. S. Const., Art. I, § 5, cl. 1. It is unlike the President. It is not like the Judiciary, for judges often can, and other judges, e.g., from other circuits, to sit even should a particular court be detained by other duties. It means that, unlike the President, which is regularly out of session but for the President never adjourns.

More importantly, these constitutional objectives explain why the President, though able to delegate duties to others, cannot delegate ultimate responsibility or the active obligation to supervise that goes with it . . . for the related constitutional reasons indicate the difference between President Congress and the Judiciary means that scheduling orders in a private civil case must not only take realistic account of, say, a particular travel schedule, or a job on which the President critically depend, or all other

toral mandate. They must respect the fact that interference with the President's ability to carry out public responsibilities is constitutionally equivalent to interference with the ability of the entirety of Congress, or the Judicial Branch, to carry out its public obligations.

II

The leading case regarding Presidential immunity from suit is *Nixon v Fitzgerald*. Before discussing *Fitzgerald*, it is helpful to understand the historical precedent on which

[520 US 714]

it relies. While later events have called into question some of the more extreme views on Presidential authority, the essence of the constitutional principle remains true today. The historical sources, while not themselves fully determinative, in conjunction with this Court's precedent conform my judgment that the Constitution protects the President from judicial orders in private civil actions to the extent that those orders significantly interfere with his ability to carry out his ongoing public responsibilities.

A

Of the historical sources this Court cited in *Fitzgerald*, 457 US, at 750-752, n. 31, 73 L Ed 2d 349, 102 S Ct 2690—a commentary by Joseph Story, an argument attributed to John Adams and Oliver Ellsworth, and a letter written by Thomas Jefferson—each make clear that this is so.

1. Joseph Story wrote in his Commentaries:

"There are . . . incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it.

Among those, must necessarily be included the power to perform them, without any obstruction or impediment whatsoever. The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office; *and for this purpose his person must be deemed, in civil cases at least, to possess an official inviolability.*"[3] J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-419 (1833) (emphasis added), quoted in *Fitzgerald, supra*, at 749, 73 L Ed 2d 349, 102 S Ct 2690.

As interpreted by this Court in *Nixon v Fitzgerald*, the words "for this purpose" would seem to refer to the President's need for "official inviolability" in order to "perform" the duties of his office without "obstruction or impediment." As so read, Story's commentary does not explicitly define the

[520 US 715]

contours of "official inviolability." But it does suggest that the "inviolability" is timebound ("while . . . in the discharge of the duties of his office"); that it applies in private lawsuits (for it attaches to the President's "person" in "civil cases"); and that it is functional ("necessarily implied from the nature of the [President's] functions").

Since *Fitzgerald* did not involve a physical constraint, the Court's reliance upon Justice Story's commentary makes clear, in the Court's view, that the commentary does not limit the scope of "inviolability" to an immunity from a physical imprisonment, physical detention, or physical "arrest"—a now abandoned procedure that permitted the arrest of certain civil case defendants (*e.g.*, those threatened by bankruptcy) during a civil proceeding.

I would therefore read Story's com-

the fire or which patrons would lose their lives; *State v Julius*, 185 W Va 422, 431-432, 408 SE2d 1, 10-11 (1991) (holding that a defendant may be held criminally liable for injury to an unanticipated victim).

Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Prison officials charged with deliberate indifference might show, for example, that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "reasonable safety," *Helling, supra*, at 33, 125 L Ed 2d 22, 113 S Ct 2475; see also *Washington v Harper*,

[511 US 845]

494 US, at 225, 108 L Ed 2d 178, 110 S Ct 1028; *Hudson v Palmer*, 468 US, at 526-527, 82 L Ed 2d 393, 104 S Ct 3194, a standard that incorporates due regard for prison officials' "unenviable task of keeping dangerous men in safe custody under humane conditions," *Spain v Procunier*, 600 F2d 189, 193 (CA9 1979) (Kennedy, J.); see also *Bell v Wolfish*, 441 US 520, 547-548, 562, 60 L Ed 2d 447, 99 S Ct

1861 (1979). Whether one p[...] terms of duty or deliberate [indiffer]ence, prison officials who act[...] ably cannot be found liable un[der the] Cruel and Unusual Punish[ment] Clause.

[8, 9a] We address, finally, [petition]er's argument that a subjective [delib]erate indifference test will [...] require prisoners to suffer p[hysical] injury before obtaining court-o[rdered] correction of objectively in[tolerable] prison conditions. "It would,"[...] "be odd to deny an injunction [to in]mates who plainly proved an [...] life-threatening condition i[n a] prison on the ground that nothing [yet] had happened to them." *Helling, supra*, at 33, 125 L Ed 2d 22, 113 [S Ct] 2475. But nothing in the in[stant case] [...] adopt today clashes with tha[t com]mon sense. Petitioner's argum[ent is] flawed for the simple reaso[n that] "[o]ne does not have to awai[t the] consummation of threatened inju[ry to] obtain preventive relief." *Pennsylvania v West Virginia*, 262 US 553, 67 L Ed 1117, 43 S Ct 658, 32 [ALR] 300 (1923). Consistently with [this] principle, a subjective approach to [de]liberate indifference does not req[uire] a prisoner seeking "a remedy fo[r un]safe conditions [to] await a t[ragic] event [such as an] actual[l] assa[ult] before obtaining relief." *Helling, supra*, at 33-34, 125 L Ed 2d 22, 11[3 S] Ct 2475.

[9b] In a suit such as petition[er's] insofar as it seeks injunctive relie[f to] prevent a substantial risk of serio[us] injury from ripening into ac[tual] harm, "the subjective factor, deli[ber]ate indifference, should be dete[r]mined in light of the prison autho[ri]ties' current attitudes and conduc[t]," *Helling, supra*, at 36, 125 L Ed 2d 22, 113 S Ct 2475: their attitudes a[nd] conduct at the time suit is broug[ht] and persisting thereafter. An inma[te] seeking an injunction on the ground

---

FARMER v BRENNAN
(1994) 511 US 825, 128 L Ed 2d 811, 114 S Ct 1970

sufficient food, and unsanitary conditions). Of course, a district court should approach issuance of injunctive orders with the usual

[511 US 847]

caution, see *Bell v Wolfish, supra*, at 562, 60 L Ed 2d 447, 99 S Ct 1861 (warning courts against becoming "enmeshed in the minutiae of prison operations"), and may, for example, exercise its discretion if appropriate by giving prison officials time to rectify the situation before issuing an injunction.

[10, 11] That prison officials' "current attitudes and conduct," *Helling*, 509 US, at 36, 125 L Ed 2d 22, 113 S Ct 2475, must be assessed in an action for injunctive relief does not mean, of course, that inmates are free to bypass adequate internal prison procedures and bring their health and safety concerns directly to court. "An appeal to the equity jurisdiction conferred on federal district courts is an appeal to the sound discretion which guides the determinations of courts of equity," *Meredith v Winter Haven*, 320 US 228, 235, 88 L Ed 9, 64 S Ct 7 (1943), and any litigant making such an appeal must show that the intervention of equity is required. When a prison inmate seeks injunctive relief, a court need not ignore the inmate's failure to take advantage of adequate prison procedures, and an inmate who needlessly bypasses such procedures may properly be compelled to pursue them. Cf. 42 USC § 1997e [42 USCS § 1997e][...]

continuing constitutional violation a district court may take such developments into account. At the same time, even prison officials who had a subjectively culpable state of mind when the lawsuit was filed could prevent issuance of an injunction by proving, during the litigation, that they were no longer unreasonably disregarding an objectively intolerable risk of harm and that they would not revert to their obduracy upon cessation of the litigation.

9. If, for example, the evidence before a district court establishes that an inmate faces no objectively intolerable risk of serious injury, the defendants could not plausibly persist in claiming lack of awareness, any more than prison officials who state during the litigation that they will not take reasonable measures to abate an intolerable risk of which they are aware could claim to be subjectively blameless for purposes of the Eighth Amendment, and in deciding whether an inmate has established a