DATE: 7-9-2006

IN THE UNITED STATES
DISTRICT COURT FOR THE
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

FILED
JUL 12 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

MARK S. URIOSTE                 NO. 04-1380
PLAINTIFF, PRISONER             APPLY - CAREY - V -
AND MENTAL PATIENT              Piphus, 435 U.S.
   - VS -                       247 (1978) AND
NURSE G. NELSON                 IN MY OATH - ANY
ET AL - DEFENDANTS              28 USC § 1746
                                18 USC § 1621

MOTION FOR IMMEDIATE
AWARD OF ONE-MILLION DOLLARS
[$1,000,000.00] OR ANY AMOUNT
THIS COURT DECIDE IS JUST, FAIR,
AND APPROPRIATE FOR.

(1) ACTUAL DAMAGES (2) GENERAL
DAMAGES (3) EXCULPATORY DAMAGES
(4) EXEMPLARY DAMAGES (5) NOMINAL
DAMAGES (6) / DATE: 7-9-2006
COMPENSATORY   SINCERELY YOURS, PRO SE
DAMAGES       x Mark S. Urioste N-87529  IN FORMA PAUPERIS
(7) PUNITIVE    MARK S. URIOSTE - N87529
DAMAGES         DIXON CORRECTIONAL CENTER
OR FAIR         2600 N. BRINTON AVE
COURT SETTLEMENT  DIXON, ILLINOIS 61021

98 S.Ct. 1042, 435 U.S. 247, Carey v. Piphus, (U.S.Ill. 1978)                                    Page 6

(Harlan, J., concurring in judgment). In those cases, the task will be the more difficult one of adapting common-law rules of damages to provide fair compensation for injuries caused by the deprivation of a constitutional right.

[2] Although this task of adaptation will be one of some delicacy--as this case demonstrates--it must be undertaken. The purpose of § 1983 would be defeated if injuries caused by the deprivation of constitutional rights went uncompensated simply *1050 because the common law does not recognize an analogous cause of action. Cf. *Jones v. Hildebrant*, 432 U.S. 183, 190-191, 97 S.Ct. 2283, 2288, 53 L.Ed.2d 209 (1977) (White, J., dissenting); *Sullivan v. Little Hunting Park*, 396 U.S. 229, 240, 90 S.Ct. 400, 406, 24 L.Ed.2d 386 (1969). In order to further [435 U.S. 259] the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question--just as the common-law rules of damages themselves were defined by the interests protected in the various branches of tort law. We agree with Mr. Justice Harlan that "the experience of judges in dealing with private [tort] claims supports the conclusion that courts of law are capable of making the types of judgment concerning causation and magnitude of injury necessary to accord meaningful compensation for invasion of [constitutional] rights." *Bivens v. Six Unknown Fed. Narcotics Agents, supra*, 403 U.S., at 409, 91 S.Ct., at 2011 (Harlan, J., concurring in judgment). With these principles in mind, we now turn to the problem of compensation in the case at hand.

C

[3] The Due Process Clause of the Fourteenth Amendment provides:

"[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

This Clause "raises no impenetrable barrier to the taking of a person's possessions," or liberty, or life. *Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that "procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . . ." *Mathews v. Eldridge*, 424 U.S. 319, 344, 96 S.Ct. 893, 907, 47 L.Ed.2d 18 (1976). (FN14) Such rules "minimize[435 U.S. 260] substantively unfair or mistaken deprivations of" life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests. *Fuentes v. Shevin, supra*, 407 U.S., at 81, 92 S.Ct., at 1994.

In this case, the Court of Appeals held that if petitioners can prove on remand that "[respondents] would have been suspended even if a proper hearing had been held," 545 F.2d, at 32, then respondents will not be entitled to recover damages to compensate them for injuries caused by the suspensions. The court thought that in such a case, the failure to accord procedural due process could not properly be viewed as the cause of the suspensions. Ibid.; cf. *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285-287, 97 S.Ct. 568, 575-576, 50 L.Ed.2d 471 (1977); *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 270-271, n. 21, 97 S.Ct. 555, 565-566, n. 21, 50 L.Ed.2d 450 (1977). The court suggested that in such circumstances, an award of damages for injuries caused by the suspensions would constitute a windfall, rather than compensation, to respondents. 545 F.2d, at 32, citing *Hostrop v. Board of Junior College Dist. No. 515*, 523 F.2d, at 579; cf. *Mt. Healthy City Board of Ed. v. Doyle, supra*, 429 U.S., at 285-286, 97 S.Ct., at 575. We do not understand the parties to disagree with this conclusion. Nor do we. (FN15)

*1051 The parties do disagree as to the further holding of the Court of Appeals that respondents are entitled to recover substantial--although unspecified--damages to compensate them for "the injury which is 'inherent in the nature of the [435 U.S. 261] wrong,' " 545 F.2d, at 31, even if their suspensions were justified and even if they fail to prove that the denial of procedural due process actually caused them some real, if intangible, injury. Respondents, elaborating on this theme, submit that the holding is correct because injury fairly may be "presumed" to flow from every denial of procedural due process. Their argument is that in addition to protecting against unjustified deprivations, the Due Process Clause also guarantees the "feeling of just treatment" by the government. *Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 162, 71 S.Ct. 624, 643, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). They contend that the deprivation of protected interests without procedural due process, even where the premise for the deprivation is not erroneous, inevitably arouses

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

1:04-cv-01335-HHB-JAG  Document 20-6  Filed 05/18/06  Page 3 of 7

Page 9 of 14

92 S.Ct. 1113
31 L.Ed.2d 424
(Cite as: 405 U.S. 538, 92 S.Ct. 1113)

Page 9

matters and proceedings, 28 U.S.C. s 1334; review of orders of the Interstate Commerce Commission, 28 U.S.C. s 1336; cases arising under any Act of Congress regulating commerce, 28 U.S.C. s 1337; patent, copyright, and trademark cases, 28 U.S.C. s 1338; postal matters, 28 U.S.C. s 1339; internal revenue and custom duties actions, 28 U.S.C. s 1340; election disputes, 28 U.S.C. s 1344; cases in which the United States is a party, 28 U.S.C. ss 1345, 1346, 1347, 1348, 1349, 1358, and 1361; certain tort actions by aliens, 28 U.S.C. s 1350; actions on bonds executed under Federal law, 28 U.S.C. s 1352; cases involving Indian allotments, 28 U.S.C. s 1353; and injuries under federal law, 28 U.S.C. s 1357.

FN18. 'While this bill applies the $10,000 minimum limitation to cases involving Federal questions, its effect will be greater on diversity cases since many of the so-called Federal question cases will be exempt from its provisions.' S.Rep.No. 1830, 85th Cong., 2d Sess., 6 (1958). The Senate report was echoing the finding of the Judicial Conference's Committee on Jurisdiction and Venue that raising the jurisdictional amount would 'have significant effect mainly upon diversity cases.' Id., at 22.

Recent studies have demonstrated that the amount-in-controversy requirement still has 'relatively little impact on the volume of federal question litigation.' American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 172, 489--492 (1969). See also, Warren, Address to the American Law Institute, 1960, 25 F.R.D. 213; C. Wright, Law of Federal Courts 107 (2d ed. 1970). Information from the Administrative Office of the United States Courts shows that a majority of private federal-question cases involve less than $10,000. American Law Institute, supra, at 491. Although litigation involving federal civil rights is increasing, such actions constituted only 4.6% of the suits instituted in district courts during the 1970 fiscal year.

Administrative Office of the United States Courts, 1970 Report, II--31.

A final, compelling reason for rejecting a 'personal liberties' limitation upon s 1343(3) is the virtual impossibility *551 of applying it. [FN19] The federal courts have been particularly bedeviled by 'mixed' cases in which both personal and property rights are implicated, and the line between them has been difficult to draw with any consistency or principled objectivity. [FN20] The case *552 before us presents a good example of the conceptual difficulties created by the test. [FN21]

FN19. As noted above, we have never adopted the property rights- personal liberties test for s 1343(3) jurisdiction. In Eisen v. Eastman, 421 F.2d 560, the Court of Appeals for the Second Circuit said that application of the test would bar many welfare claims. Id., 421 F.2d at 566 n. 10. We have, however, continually found s 1343(3) jurisdiction in such cases. See, e.g., California Department of Human Resources Development v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666; Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442; King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118; Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287; Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491; Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647. See also Rinaldi v. Yeager, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577; Swarb v. Lennox, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138; Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36. These cases arguably involved only deprivations of property, but we found s 1343(3) jurisdiction nonetheless.

FN20. Difficulty in application has been one source of the commentators' dissatisfaction with the 'personal liberties' limitation. See generally Note, 24 Vand.L.Rev. 990 (1971); Laufer, Hague v. C.I.O.: Mr. Justice Stone's Test of Federal

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

for invalidating state action. Ibid.[1] To those original provisions which

[498 US 456]

secure rights of persons with respect to States, and within the meaning of § 1983, the sponsors of § 1983 added the constitutional guarantees contained in the Civil War Amendments, including the provisions of the Bill of Rights incorporated into the Fourteenth Amendment. Every specific mention of rights secured by the 1871 Act refers to these constitutional provisions. See, e.g., Cong Globe 475-476 (Rep. Dawes; privileges and immunities, Bill of Rights); id., at App 84-85 (Rep. Bingham; equal protection, first eight Amendments); id., at App 153 (Rep. Garfield; right to vote, privileges and immunities, equal protection).

Statements of other supporters of the 1871 Act provide further evidence that Congress did not consider the Commerce Clause to secure the rights of persons within the meaning of § 1983. Representative Hoar distinguished between two objectives of the Constitution: to "provide . . . for the protection and regulation of commercial intercourse, domestic and foreign", and to "promote the general welfare by prohibiting the States from doing what is inconsistent with civil liberty, and compelling them to do what is essential to its maintenance." Cong Globe 333. The 1871 Act was designed to en-

force only those provisions of the Constitution providing for "the protection of personal liberty and civil rights," not "the protection of commerce." Ibid. Representative

[498 US 457]

Trumbull made the same distinction between these categories of constitutional provisions. Id., at 575. The sponsors of § 1983 thus gave us a straightforward answer to the question of which constitutional violations give rise to a § 1983 action, and told us that violations of power-allocating provisions such as the Commerce Clause do not.

Not only did the 42d Congress understand the difference between rights-securing and power-allocating provisions of the Constitution, but this Court's decisions of more than 100 years support the distinction. All previous cases in which this Court has determined (or assumed) that a constitutional violation gives rise to a § 1983 cause of action alleged violations of rights-securing provisions of the Constitution, not power-allocating provisions. See, e.g., Monroe v Pape, 365 US, at 171, 5 L Ed 2d 492, 81 S Ct 473 ("Allegation of facts constituting a deprivation under color of state authority of a right guaranteed by the Fourteenth Amendment satisfies to that extent the requirement of R. S. § 1979

---

1. Shellabarger was discussing the power of Congress to enact § 2 of the 1871 Act, and not the scope of § 1, which we know as 42 USC § 1983 [42 USCS § 1983]. Reliance upon Shellabarger's statement is nevertheless appropriate. The proposed § 2 used the phrase "rights, privileges or immunities of another person," Cong Globe App 69, and Shellabarger was discussing his understanding of the rights, privileges, and immunities secured by the Constitution and laws, not of any language which would differ in meaning as between § 1 and § 2 of the 1871 Act. It matters not whether one repeats Shellabarger's speech of

---

[§ 1983]"); Lane v Wilson, 307 US 268, 83 L Ed 1281, 59 S Ct 872 (1939) (Fifteenth Amendment violation supports § 1983 cause of action).

In our only previous case discussing a § 1983 claim brought for the violation of a supposed right secured by Article I of the Constitution, we held that violation of the Contracts Clause does not give rise to a § 1983 cause of action. Carter v Greenhow, 114 US 317, 29 L Ed 202, 5 S Ct 928 (1885). As is true of the Commerce Clause, the Court held that the Contracts Clause can be said to secure individual rights "only indirectly and incidentally." Id., at 322, 29 L Ed 202, 5 S Ct 928. The Court further explained that the only right secured by the Contracts Clause is the "right to have a judicial determination, declaring the nullity of the attempt to impair [a State's] obligation." Ibid.

The Contracts Clause of Art I, § 10, provides that "[n]o State shall . . . pass any . . . Law impairing the Obligation of . . . Contracts." At least such language would provide some support for an argument that the Contracts Clause prohibits States from "doing what is inconsistent with civil liberty."

[498 US 458]

Cong Globe 333 (Rep. Hoar). If the Contracts Clause, an express limitation upon States' ability to impair the contractual rights of citizens, does not secure rights within the meaning of § 1983, it assuredly demands a great leap for the majority to conclude that the Commerce Clause secures the rights of persons. The Commerce Clause is, if anything, a less obvious source of rights for purposes of § 1983, as its text only implies a limitation upon state power.

At best, all that can be said is that the Commerce Clause grants Congress the power to regulate interstate commerce; from this grant of power, the Court has implied a limitation upon the power of a State to regulate interstate commerce; and in turn, courts provide a person injured by taxation that exceeds the limits of the Commerce Clause the "right to have a judicial determination, declaring the nullity of the attempt to levy a discriminatory tax. Carter, supra, at 322, 29 L Ed 202, 5 S Ct 928. I find it ironic that Carter draws a distinction of nearly the same character as Golden State, between provisions which directly secure rights and those which do so "only as an incident" of their purpose. Golden State, 493 US, at 109, 107 L Ed 2d 420, 110 S Ct 444. Yet, the majority finds that the Commerce Clause was "intended to benefit the putative plaintiff," Golden State, supra, at 108, 107 L Ed 2d 420, 110 S Ct 444, while Carter held that the Contracts Clause only provides incidental benefits.

In Lynch v Household Finance Corp. 405 US 538, 31 L Ed 2d 424, 92 S Ct 1113 (1972), we rejected an attempt to limit § 1983 to personal rights as opposed to property rights, in that case a deprivation of property in violation of the Due Process Clause of the Fourteenth Amendment. The legislative history of § 1983 did not support such a distinction, and we recognized both its false nature and the impossibility of its application. Today, on the other hand, the Court rejects a distinction which finds strong support in the legislative history of § 1983 and would bring no difficulties of application. I see no good reason for this rejection and suggest that the Court's decision only can do mischief.

## CLINTON v JONES
(1997) 520 US 681, 137 L Ed 2d 945, 117 S Ct 1636

of the Presidency."⁹ In her brief in opposition to certiorari, respondent argued that this "one-of-a-kind case is singularly inappropriate" for the exercise of our certiorari jurisdiction because it did not create any conflict among the Courts of Appeals, it "does not pose any conceivable threat to the functioning of the Executive Branch," and there is no precedent supporting the President's position.¹⁰

**[4]** While our decision to grant the petition, 518 US 1016, 135 L Ed 2d 1066, 116 S Ct 2545 (1996), expressed no judgment concerning the merits of the case, it does reflect our respectful and deliberate appraisal of its importance. The

**[520 US 690]**

representations made on behalf of the Executive Branch as to the potential impact of the precedent established by the Court of Appeals merit our respectful and deliberate consideration.

**[5a, 6a]** It is true that we have often stressed the importance of avoiding the premature adjudication of constitutional questions.¹¹ That doctrine of avoidance, however, is applicable to the entire Federal Judiciary, not just to this Court, cf. *Arizo-*

nans for Official English v ante, p. 43, 137 L Ed 2d Ct 1055, and comes into the court has acquired jurisdiction a case. It does not dictate a tionary denial of every petition raising a novel constitutional question. It does, however, appropriate to identify two constitutional issues not passed within the petition for sented by the petition for that we need not address

**[520 US 691]**

**[6c]** First, because the munity is asserted in a federal and relies heavily on the separation of powers that each of the three branches Federal Government from ing on the domain of the see, e.g., *Buckley v Valeo*, 122, 46 L Ed 2d 659, 96 (1976) *(per curiam)*, it is sary to consider or decide a comparable claim might in a state tribunal. were being heard in forum, instead of adjudicative separation-of-powers arguments tioner would presumably

---

9. Brief for United States in Support of Petition 5.
10. Brief in Opposition 8, 10, 23.
11. **[5b]** As we have explained: "If there is one doctrine more deeply rooted in the process of constitutional adjudication, it is that we ought not to pass on constitutionality... unless such adjudication is unavoidable." *Spector M... McLaughlin*, 323 US 104, 105 [89 L Ed 101, 65 S Ct 152 (1944)]. It has long been considered practice not to decide abstract, hypothetical or contingent questions decide any constitutional question in advance of the necessity for its decision... formulate a rule of constitutional law broader than is required by the precise facts to be applied... or to decide any constitutional question except with reference to facts to which it is to be applied... *Alabama State Federation of Labor v M*... 450, 461 [89 L Ed 1725, 65 S Ct 1384 (1945)]. 'It is not the habit of the court to tions of a constitutional nature unless absolutely necessary to a decision of the *United States*, 196 US 283, 295 [49 L Ed 482, 25 S Ct 243 (1905)]." *Rescue Arm Court of Los Angeles*, 331 US 549, 570, n. 34, 91 L Ed 1666, 67 S Ct 1409 (1947)

12. **[6b]** The two questions presented in the certiorari petition are: "1. Whether of a private civil damages action against an incumbent President must in all exceptional cases be deferred until the President leaves office"; and "2. Whether as a proper exercise of judicial discretion, may stay such litigation until the President fice." Our review is confined to these issues. See this Court's Rule 14.1(a).

---

tional cases," Brief for Petitioner i, the Constitution affords the President temporary immunity from civil damages litigation arising out of events that occurred before he took office—cannot be sustained on the basis of precedent.

Only three sitting Presidents have been defendants in civil litigation involving their actions prior to taking office. Complaints against Theodore Roosevelt and Harry Truman had been dismissed before they took office; the dismissals were affirmed after their respective inaugurations.¹⁵ Two companion cases arising out of an automobile accident were filed against John F. Kennedy in 1960 during the Presidential campaign.¹⁶ After taking office, he unsuccessfully argued that his status as Commander in Chief gave him a right to a stay under the Soldiers' and Sailors' Civil Relief Act of 1940, 50 USC App. §§ 501-525 [50 USCS Appx §§ 501-525]. The motion for a stay was denied by the District Court, and the matter was settled out of court.¹⁷ Thus, none of those cases sheds any light on the constitutional issue before us.

**[8]** The principal rationale for affording certain public servants im-

gm and comity concerns,¹³ as the interest in protecting officials from possible local ee that underlies the authorize move certain cases brought federal officers from a state deral court, see 28 USC [28 USCS § 1442(a)]; *Mesa rnia*, 489 US 121, 125-126, d 2d 99, 109 S Ct 959 (1989). r those concerns would a more compelling case for ty is a question that is not

Second, our decision rejecting immunity claim and allowing to proceed does not require front the question whether may compel the attendance President at any specific time We assume that the testimony the President, both for discovery and for use at trial, may be d the White House at a time

**[520 US 692]**

will accommodate his busy and that, if a trial is held, would be no necessity for the it to attend in person, though elect to do so.¹⁴

## IV

Petitioner's principal submission at "in all but the most excep-

---

cause the Supremacy Clause makes federal law "the supreme Law of the Land," Art. may direct control by a state court over the President, who has principal responsibility that those laws are "faithfully executed," Art. II, § 3, may implicate concerns that are ferent from the interbranch separation-of-powers questions addressed here. Cf., *e.g.*, *Train*, 426 US 167, 178-179, 48 L Ed 2d 555, 96 S Ct 2006 (1976); *Mayo v United 19* US 441, 445, 87 L Ed 1504, 63 S Ct 1137 (1943). See L. Tribe, American tional Law 513 ('2d ed. 1988) ("[A]bsent explicit congressional consent no state may federal officials... to take action in derogation of their... federal responsibilities

though Presidents have responded to written interrogatories, given depositions, and videotaped trial testimony, see *infra*, at 704-705, 137 L Ed 2d, at 967, no sitting has ever testified, or been ordered to testify, in open court.

*People ex rel. Hurley v Roosevelt*, 179 N. Y. 544, 71 N. E. 1137 (1904); *DeVault v Tru-Mo*. 1193, 194 S. W. 2d 29 (1946).

Complaints in *Bailey v Kennedy*, No. 757,200, and *Hills v Kennedy*, No. 757,201 (Cal. filed Oct. 27, 1960).

72 F. 3d, at 1362, n. 10.

EXHIBIT [handwritten annotations]
APPLY ALL THESE LAWS AND CASES TO ALL
HOUSE USE ONLY

4-16-2006 - BELOW

EXHIBIT: NAMED ITEMS - ILLEGALLY
Honorable UNLAWFULLY UNCONSTITUTIONALLY TAKEN FROM ME
To Judge Mr. BAKER  DAVE Jealous Broke C.T.V.
HERE'S whAt They Took on APRIL 8, 06 sAturdAy
DAVE 33-48 would EAt commissAry when BAchelor living

| | | |
|---|---|---|
| 1. | Box mAtches - 82¢ | 2-Nuts - 2.40 |
| 2. | Choc chip cookies - 2.60 | 1-b. berry Donut - 1.87 |
| 3. | DentuRe creAm 15.42 | 2-INSTANT oAtmeal 3.74 |
| 1. | PeAnut Butter 2.27 | 1-Honey bun 1.55 |
| 2. | 8oz T.G. coffee 13.96 | 1-PRO line oil 2.31 |
| 2. | SuPreme cRAckers 3.57 | 1- Box TeA - 1.58 |
| 1. | Squeeze cheese 2.34 | 18 cASS TApes & box |
| 6. | menthol Punches 3.90 | 1-Pillow by C.O.Rodriguez 5-30-05 |
| 2 | GRApe Jelly 2.42 | 2-Hot cocoA 3.36 |
| 2. | SugAR Twins 1.67 | 5- Rulers |
| 2. | Jolly RAnchers 2.14 | 5 miRRoRs |
| 2. | FReshscent b.P. 1.72 | 1- shAver 52.59 |
| 1. | mouthwAsh 2.13 | 5-sweat PAnts mARk w/ my |
| 24. | chili Noodles | nAme, should shAke Down |
| 2 | b.B.Q. sAuce. 9.84 | H.U. 33! cAuse lAst NAme on |
| 2. | Nutty bARs 2.60 | my TApes! |

I stoRe Items in JAR'S oR contAiners, cAuse buy Alot FoR
we shop Every 2 wk's! bAg's open Right hAnd shAke's mAkes
Mess in PRoperty box, See I buy Alot oF commissARy
sometime's Go 3 wk's! I lost my StAte Detergent bottle
So bought A 2. bottle FAlsely went to segRigAtion!
I wAS violAted No body believe me. sundAy 4-16-06 I
told it ms. DAniel & MR. GoRmAN wAS violAted
WITHOUT DUE PROCESS OF LAW - EQUAL
PROTECTION OF LAW AND NO JUST COMPENSATION

*[Handwritten annotation in left margin:]* EXHIBIT — U.S. V. NIXON U.S. PRESIDENT ET AL (JULY 24, 1974) APPLY ALL ERROR'S FROM THIS CASE TO ME.

94 S.Ct. 3090
41 L.Ed.2d 1039
(Cite as: 418 U.S. 683, 94 S.Ct. 3090)

consideration **3099 if the District Court order was final. 28 U.S.C. ss 1254(1), 2101(e).

[3][4] The finality requirement of 28 U.S.C. s 1291 embodies a strong congressional policy against piecemeal reviews, and against obstructing or impeding an ongoing judicial proceeding by interlocutory appeals. See, e.g., Cobbledick v. United States, 309 U.S. 323, 324–326, 60 S.Ct. 540, 541–542, 84 L.Ed 783 (1940). This requirement ordinarily promotes judicial efficiency and hastens the ultimate termination of litigation. In applying this principle to an order denying a motion to quash and requiring the production of evidence pursuant *691 to a subpoena duces tecum, it has been repeatedly held that the order is not final and hence not appealable. United States v. Ryan, 402 U.S. 530, 532, 91 S.Ct. 1580, 1581, 29 L.Ed.2d 85 (1971); Cobbledick v. United States, supra; Alexander v. United States, 201 U.S. 117, 26 S.Ct. 356, 50 L.Ed. 686 (1906). This Court has 'consistently held that the necessity for expedition in the administration of the criminal law justifies putting one who seeks to resist the production of desired information to a choice between compliance with a trial court's order and resistance to that order with the concomitant possibility of an adjudication of contempt if his claims are rejected on appeal.' United States v. Ryan, supra, 402 U.S., at 533, 91 S.Ct. at 1582.

The requirement of submitting to contempt, however, is not without exception and in some instances the purposes underlying the finality rule require a different result. For example, in Perlman v. United States, 247 U.S. 7, 38 S.Ct 417, 62 L.Ed. 950 (1918), a subpoena had been directed to a third party requesting certain exhibits; the appellant, who owned the exhibits, sought to raise a claim of privilege. The Court held an order compelling production was appealable because it was unlikely that the third party would risk a contempt citation in order to allow immediate review of the appellant's claim of privilege. Id., at 12–13, 38 S.Ct. at 419–420. That case fell within the 'limited class of cases where denial of immediate review would render impossible any review whatsoever of an individual's claims.' United States v. Ryan, supra, 402 U.S., at 533, 91 S.Ct. at 1582.

[5][6] Here too, the traditional contempt avenue to immediate appeal is peculiarly inappropriate due to the unique setting in which the question arises. To require a President of the United States to place himself in the posture of disobeying an order of a court merely to trigger the procedural mechanism for review of the ruling would be *692 unseemly, and would present an unnecessary occasion for constitutional confrontation between two branches of the Government. Similarly, a federal judge should not be placed in the posture of issuing a citation to a President simply in order to invoke review. The issue whether a President can be cited for contempt could itself engender protracted litigation, and would further delay both review on the merits of his claim of privilege and the ultimate termination of the underlying criminal action for which his evidence is sought. These considerations lead us to conclude that the order of the District Court was an appealable order. The appeal from that order was therefore properly 'in' the Court of Appeals, and the case is now properly before this Court on the writ of certiorari before judgment. 28 U.S.C. s 1254; 28 U.S.C. s 2101(e). Gay v. Ruff, 292 U.S. 25, 30, 54 S.Ct 608, 610, 78 L.Ed. 1099 (1934). [FN7]

FN7. The parties have suggested that this Court has jurisdiction on other grounds. In view of our conclusion that there is jurisdiction under 28 U.S.C. s 1254(1) because the District Court's order was appealable, we need not decide whether other jurisdictional vehicles are available.

**3100 II
JUSTICIABILITY

[7] In the District Court, the President's counsel argued that the court lacked jurisdiction to issue the subpoena because the matter was an intra- branch dispute between a subordinate and superior officer of the Executive Branch and hence not subject to judicial resolution. That argument has been renewed in this Court with emphasis on the contention that the dispute does not present a 'case' or 'controversy' which can be adjudicated in the federal courts. The President's counsel argues that the federal courts should not intrude into areas committed to the other branches of Government. *693 He views the present dispute as essentially a 'jurisdictional' dispute within the Executive Branch

---

Page 11

94 S.Ct 3090
41 L.Ed.2d 1039
(Cite as: 418 U.S. 683, 94 S.Ct. 3090)

which he analogizes to a dispute between two congressional committees. Since the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case, Confiscation Cases, 7 Wall. 454, 19 L.Ed 196 (1869); United States v. Cox, 342 F.2d 167, 171 (CA5), cert. denied sub nom. Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700 (1965), it is contended that a President's decision is final in determining what evidence is to be used in a given criminal case. Although his counsel concedes that the President has delegated certain specific powers to the Special Prosecutor, he has not 'waived nor delegated to the Special Prosecutor the President's duty to claim privilege as to all materials . . . which fall within the President's inherent authority to refuse to disclose to any executive officer.' Brief for the President 42. The Special Prosecutor's demand for the items therefore presents, in the view of the President's counsel, a political question under Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), since it involves a 'textually demonstrable' grant of power under Art. II.

[8][9] The mere assertion of a claim of an 'intra-branch dispute,' without more, has never operated to defeat federal jurisdiction; justiciability does not depend on such a surface inquiry. In United States v. ICC, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949), the Court observed, 'courts must look behind names that symbolize the parties to determine whether a justiciable case or controversy is presented.' Id., at 430, 69 S.Ct., at 1413. See also Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); ICC v. Jersey City, 322 U.S. 503, 64 S.Ct. 1129, 88 L.Ed. 1420 (1944); United States ex rel. Chapman v. FPC, 345 U.S. 153, 73 S.Ct. 609, 97 L.Ed. 918 (1953); Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); FMB v. Isbrandtsen Co., 356 U.S. 481, 483 n. 2, 78 S.Ct. 851, 853, 2 L.Ed.2d 926 (1958); United States v. Marine Bancorporation Inc., 418 U.S. 602, 94 S.Ct. 2856, 41 L.Ed.2d 978; and United States v. Connecticut National Bank, 418 U.S. 656, 94 S.Ct. 2788, 41 L.Ed.2d 1016.

*694 Our starting point is the nature of the proceeding for which the evidence is sought–here a pending criminal prosecution. It is a judicial proceeding in a federal court alleging violation of federal laws and is brought in the name of the United States as sovereign. Verger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed 1314 (1935). Under the authority of Art. II, s 2, Congress has vested in the Attorney General the power to conduct the criminal litigation of the United States Government. 28 U.S.C. s 516. It has also vested in him the power to appoint subordinate officers to assist him in the discharge of his duties. 28 U.S.C. ss 509, 510, 515, 533. Acting pursuant to those statutes, the Attorney General has delegated the authority to represent the United States in these particular matters to a Special Prosecutor with unique authority and tenure. [FN8] The regulation gives the *695 Special **3101 Prosecutor explicit power to contest the invocation of executive privilege in the process of seeking evidence deemed relevant to the performance of these specially delegated duties. [FN9] 38 Fed.Reg. 30739, as amended by 38 Fed.Reg. 32805.

FN8. The regulation issued by the Attorney General pursuant to his statutory authority, vests in the Special Prosecutor plenary authority to control the course of investigations and litigation related to 'all offenses arising out of the 1972 Presidential Election for which the Special Prosecutor deems it necessary and appropriate to assume responsibility, allegations involving the President, members of the White House staff, or Presidential appointees, and any other matters which he consents to have assigned to him by the Attorney General.' 38 Fed.Reg. 30739, as amended by 38 Fed.Reg. 32805. In particular, the Special Prosecutor was given full authority, inter alia, 'to contest the assertion of "Executive Privilege" . . . and band(e) all aspects of any cases within his jurisdiction.' Id., at 30739. The regulations then go on the provide:

'In exercising this authority, the Special Prosecutor will have the greatest degree of independence that is consistent with the Attorney General's statutory accountability for all matters falling within the jurisdiction of the Department of Justice. The Attorney General will not countermand or interfere with the Special Prosecutor's decisions or actions. The