DATE: JULY 14, 2006

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

URIOSTE -V- NELSON ET AL
ASSIGNED TO: JUDGE HAROLD A. BAKER
REFERRED TO: MAGISTRATE JUDGE
JOHN A. GORMAN
DEMAND: 50,000.00
CAUSE 42:1983 CIVIL RIGHTS

JURISDICTION: F.R.CIV.P. RULES 1, 8(a)
JURY DEMAND: PLAINTIFF
JURISDICTION: FEDERAL QUESTION

JUDGMENT
6/28/2006 - IN FAVOR OF DEFENDANTS

"A FORMAL NOTICE OF APPEAL FROM FINAL JUDGMENT"
PURSUANT TO 28 U.S.C. / 1291
[WITH REQUEST TO RETURN ALL MY PAPERS & EXHIBITS]

OR "ALTERNATIVELY"
MOTION FOR
REHEARING &
BASED ON
F.R.C.P. RULE
1 AND 25 ET
SEQ. [NO ATTORNEY
LETTER APPOINTED OR
CONTAINING PATIENT PRISONER
OR ANY DISCOVERY PROCEEDINGS HAD]

SINCERELY YOURS,
PRO SE IN FORMA PAUPERIS
Mr./Ms. Urioste N-87529
BY A STATE PRISONER
AND MENTAL PATIENT
MARK URIOSTE - N-87529
DIXON CORRECTIONAL CENTER
2600 N. BRINTON AVE.
DIXON ILLINOIS - 61021

FILED JUL 20 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

RECEIVED JUL 20 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

E-FILED
Friday, 21 July, 2006 11:22:41 AM
Clerk, U.S. District Court, ILCD

"MORE LEGAL GROUNDS FOR RELIEF GRANTED"

I NOW EVOKE PENDENT JURISDICTION AS IS DEFINED AND APPLIED IN THE CASE OF UNITED MINE WORKERS -V- GIBBS, 383 U.S. 715, 725 (1966)

SUPPLEMENTAL CODIFIED PENDENT JURISDICTION, 28 U.S.C. SECTION 1367 ET SEQ.

AND

"THE STATE OF ILLINOIS CONSTITUTION ARTICLE I, BILL OF RIGHTS, SECTIONS 1-24 ET SEQ [EFFECTIVE JULY 1, 1971.]"

AND;

"THE CONSTITUTION OF THE UNITED STATES, AMENDMENTS 1st, 4th, 5th, 6th, 7th, 8th, 9th & 14th."

AND;

"U.S.C.A. TITLE 42/1983" [DEPRIVATION OF CIVIL RIGHTS]

AND;

"THE AMERICANS WITH MENTAL AND PHYSICAL DISABILITY ACT OF 1990"

*[Handwritten annotations in margin: "U.S. -V- Nixon / U.S. Case # / DENIED SUPP OF FACT" and "U.S. -V- Nixon / Case / President B 2796" and circled "3"]*

94 S.Ct. 3090
41 L.Ed.2d 1039
(Cite as: 418 U.S. 683, 94 S.Ct. 3090)

289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), he emphasized the importance of maintaining the secrecy of the deliberations of a petit jury in a criminal case. 'Freedom of debate might be stifled and independence of thought checked if jurors were made to feel that their arguments and ballots were to be freely published to the world.' Id., at 13, 53 S.Ct. at 469. Nonetheless, the Court also recognized that isolated inroads on confidentiality designed to serve the paramount need of the criminal law would not vitiate the interests served by secrecy. 'A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere importance of malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor. The chance that now and then there may be found some timid soul who will take counsel of his fears and give way to their repressive power is too remote and shadowy to shape the course of justice.' Id., at 16, 53 S.Ct. at 470.

**3110 On the other hand, the allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts. A President's acknowledged need for confidentiality *713 in the communications of his office is general in nature, whereas the constitutional need for production of relevant evidence in a criminal proceeding is specific and central to the fair adjudication of a particular criminal case in the administration of justice. Without access to specific facts a criminal prosecution may be totally frustrated. The President's broad interest in confidentiality of communications will not be vitiated by disclosure of a limited number of conversations preliminarily shown to have some bearing on the pending criminal cases.

[47][48] We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice. The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial.

D

[49][50][51] We have earlier determined that the District Court did not err in authorizing the issuance of the subpoena. If a President concludes that compliance with a subpoena would be injurious to the public interest he may, properly, as was done here, invoke a claim of privilege on the return of the subpoena. Upon receiving a claim of privilege from the Chief Executive, it became the further duty of the District Court to treat the subpoenaed materials as presumptively privileged and to require the Special Prosecutor to demonstrate that the Presidential material was 'essential to the justice of the (pending criminal) case.' United States v. Burr, 25 Fed.Cas., at 192. Here the District Court treated the material as presumptively privileged, proceeded to find that the Special *714 Prosecutor had made a sufficient showing to rebut the presumption, and ordered an in camera examination of the subpoenaed material. On the basis of our examination of the record we are unable to conclude that the District Court erred in ordering the inspection. Accordingly we affirm the order of the District Court that subpoenaed materials be transmitted to that court. We now turn to the important question of the District Court's responsibilities in conducting the in camera examination of Presidential communications delivered under the compulsion of the subpoena duces tecum.

E

[52][53][54][55]   Enforcement of the subpoena duces tecum was stayed pending this Court's resolution of the issues raised by the petitions for certiorari. Those issues now having been disposed of, the matter of implementation will rest with the District Court. '(The guard, furnished to (the President) to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a (district) court after those subpoenas have issued; not in any circumstance which is to precede their being issued.' United States v. Burr, supra, at 34. Statements that meet the test of admissibility and relevance must be

---

94 S.Ct. 3090
41 L.Ed.2d 1039
(Cite as: 418 U.S. 683, 94 S.Ct. 3090)

delivered to the District Judge in camera, questions may arise as to the excising of parts, and it lies within the discretion of that court to seek the aid of the Special Prosecutor and the President's counsel for in camera consideration of the validity of particular excisions, whether the basis of excision is relevancy or admissibility or under such cases as United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953), or C. & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948).

isolated, all other material must be excised. At this stage the District Court is not limited to representations of the Special Prosecutor as to the evidence sought by the subpoena; the material will be available to the District Court. It is elementary that in *3111 camera inspection of evidence is always a procedure calling for scrupulous protection against any release or publication of material not found by the court, at that stage, probably admissible in evidence and relevant to the issues of the trial for which it is sought. That being true of an ordinary situation, it is obvious that the District Court has *715 a very heavy responsibility to see to it that Presidential conversations, which are either not relevant or not admissible, are accorded that high degree of respect due the President of the United States. Mr. Chief Justice Marshall, sitting as a trial judge in the Burr case, supra, was extraordinarily careful to point out that

'(i)n no case of this kind would a court be required to proceed against the president as against an ordinary individual.' at 192.

Marshall's statement cannot be read to mean in any sense that a President is above the law, but relates to the singularly unique role under Art. II of a President's communications and activities, related to the performance of duties under that Article. Moreover, a President's communications and activities encompass a vastly wider range of sensitive material than would be true of any 'ordinary individual.' It is therefore necessary [FN21] in the public interest to afford Presidential confidentiality the greatest protection consistent with the fair administration of justice. The need for confidentiality even as to idle conversations with associates in which casual reference might be made concerning political leaders within the country or foreign statesmen is too obvious to call for further treatment. We have no doubt that the District Judge will at all times accord to Presidential records that high degree of deference suggested in United States v. Burr, supra and will discharge his responsibility to see to *716 it that until released to the Special Prosecutor no in camera material is revealed to anyone. This burden applies with even greater force to excised material; once the decision is made to excise, the material is restored to its privileged status and should be returned under seal to its lawful custodian.

[56] Since this matter came before the Court during the pendency of a criminal prosecution, and on representations that time is of the essence, the mandate shall issue forthwith.

Affirmed.

Mr. Justice REHNQUIST took no part in the consideration or decision of these cases.

94 S.Ct. 3090, 418 U.S. 683, 41 L.Ed.2d 1039

Briefs and Other Related Documents (Back to top)

• 1974 WL 174854 (Appellate Brief) Brief for the United States (Jun. 21, 1974)

• 1974 WL 174855 (Appellate Brief) Brief for the Respondent, Cross-Petitioner Richard M. Nixon, President of the United States (Jun. 21, 1974)

• 1974 WL 174856 (Appellate Brief) Motion for Leave to File Brief Amicus Curiae and Brief Amicus Curiae of the American Civil Liberties Union (Jun. 21, 1974)

• 1973 WL 159435 (Appellate Brief) Reply Brief for the Respondent, Cross-Petitioner Richard M. Nixon, President of the United States (Jul 1973)

• 1973 WL 159436 (Appellate Brief) Reply Brief for the United States (Jul 1973)

• 1973 WL 159434 (Appellate Brief) Supplemental

FN21.   When the subpoenaed material is

*[Stamp: "NIXON PRESIDENTIAL MATERIALS STAFF LITIGATION USE ONLY"]*

U.S. SUPREME COURT REPORTS

of such litigation will ever engulf the Presidency. As for the case at hand, if properly managed by the District Court, it appears to us highly unlikely to occupy any substantial amount of petitioner's time.

[18, 19a] Of greater significance, petitioner errs by presuming that interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions. "[O]ur . . . system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" *Mistretta*, 488 US, at 381, 102 L Ed 2d 714, 109 S Ct 647 (quoting *Buckley*,

[520 US 703]

424 US, at 121, 46 L Ed 2d 659, 96 S Ct 612). As Madison explained, separation of powers does not mean that the branches "ought to have no *partial agency* in, or no *control* over the acts of each other."[37] The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution. Two long-settled propositions, first announced by Chief Justice Marshall, support that conclusion.

[19b, 20] First, we have long held that when the President takes official action, the Court has the au-

thority to determine whether the law permits [...] acted within the law. [...] most dramatic example [...] case is our holding that [...] Truman exceeded his consti[...] authority when he issued [...] directing the Secretary of [...] to take possession of [...] most of the Nation's steel [...] order to avert a national [...] *Youngstown Sheet & Tube [...]* yer, 343 US 579, 96 L Ed [...] Ct 863 (1952). Despite [...] impact of that decision on [...] of the Executive Branch, [...] plish its assigned mission [...] substantial time that the [...] must necessarily have devo[...] matter as a result of judicial [...] ment, we exercised our A[...] jurisdiction to decide wheth[...] ficial conduct conformed to [...] Our holding was an appli[...] the principle established in [...] v *Madison*, 1 Cranch 137 [...] (1803), that "[i]t is emphat[...] province and duty of the [...] department to say what the [...] *Id.*, at 177, 2 L Ed 60.

[19c, 21a] Second, it is al[...] that the President is subje[...] cial process in appropriate [...] stances. Although Thomas [...] apparently thought otherwis[...] Justice Marshall, when p[...] the treason trial of Aaron [...] that a subpoena *duces [...]* be directed

[520 US 704]

to the President [...] *States v Burr*, 25 F. Cas. 3[...] 14,692d) (CC Va. 1807).[38] [...] equivocally and emphati[...]

---

37. The Federalist No. 47, pp. 325-326 (J. Cooke ed. 1961) (emphasis in original [...] *Mistretta*, 488 US, at 381, 102 L Ed 2d 714, 109 S Ct 647; *Nixon v Administrator of [...] Services*, 433 US, at 442, n. 5, 53 L Ed 2d 867, 97 S Ct 2777.

38. After the decision was rendered, Jefferson expressed his distress in a letter to a pro[...] plaintiffs is considerably smaller and the risk of litigation less intense.

[...] for at the trial, noting that "[t]he Constitution enjoins [the President's] constant agency [...]

---

CLINTON v JONES
(1997) 520 US 681, 137 L Ed 2d 945, 117 S Ct 1636

Marshall's position when we twice given videotaped testimony in that President Nixon was obli- criminal proceedings, see *United to comply with a subpoena States v McDougal*, 934 F. Supp. 296 ending him to produce certain (ED Ark. 1996); *United States v ecordings of his conversations Branscum*, No. LRP-CR-96-49 (ED his aides. *United States v* Ark., June 7, 1996). Moreover, sit-418 US 683, 41 L Ed 2d 1039, ting Presidents have also voluntarily Ct 3090 (1974). As we ex- complied with judicial requests for d, "neither the doctrine of testimony. President Grant gave a tion of powers, nor the need lengthy deposition in a criminal case fidentiality of high-level com- under such circumstances, 1 R. Ro-ations, without more, can sus- tunda & J. Nowak, Treatise on Con-absolute, unqualified Presi- stitutional Law § 7.1 (2d ed. 1992), privilege of immunity from and President Carter similarly gave process under all circum- videotaped testimony for use at a ." *Id.*, at 706, 41 L Ed 2d criminal trial, *id.*, § 7.1(b) (Supp. 94 S Ct 3090.[39] 1997).

g Presidents have responded [19, 19d, 22a] In sum, "[i]t is settled rt orders to provide testimony law that the separation-of-powers her information with sufficient doctrine does not bar every exercise ency that such interactions of jurisdiction over the President of en the Judicial and Executive the United States." *Fitzgerald*, 457 ies can scarcely be thought a US, at 753-754, 73 L Ed 2d 349, 102 t President Monroe responded S Ct 2690. If the Judiciary may se-en interrogatories, see Ro- verely burden the Executive Branch Presidents and Ex-Presidents by reviewing the legality of the Presi-nesses: A Brief Historical Foot- dent's official conduct, and if it may 1975 U. Ill. L. Forum 1, 5-6, direct appropriate process to the ent Nixon—as noted above— President himself, it must follow ced tapes in response to a sub- that the federal courts have power to determine the legality of his unof-ficial conduct. The burden on the *v Nixon*, President Ford com- President's time and energy that is a with an order to give a deposi- mere byproduct of such review a criminal trial, *United States* surely cannot be considered as oner-*time*, 405 F. Supp. 578 (ED Cal. ous as the direct burden imposed by and President Clinton has judicial review and the occasional

---

of 6. millions of people." 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905). He g is the law paramount to this, which calls on him on behalf of a single one" *Ibid.*, see *rgerald*, 457 US, at 751-752, n. 31, 73 L Ed 2d 349, 102 S Ct 2690 (quoting Jefferson's sits at length). For Chief Justice Marshall, the answer—quite plainly—was yes.

[21b] Of course, it does not follow that a court may "proceed against the president as ary individual," *United States v Nixon*, 418 US, at 715, 41 L Ed 2d 1039, 94 S [...] (quoting *United States v Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807)). Special is appropriate if the materials or testimony sought by the court relate to a President's activities, with respect to which "[t]he interest in preserving confidentiality is weighty and entitled to great respect." 418 US, at 712, 41 L Ed 2d 1039, 94 S Ct 3090. We have [...] that in a criminal case the powerful interest in the "fair administration of criminal [...] requires that the evidence be given under appropriate circumstances lest the "very [...] of the judicial system" be eroded. *Id.*, at 709, 711-712, 41 L Ed 2d 1039, 94 S Ct 3090.

U.S. SUPREME COURT REPORTS    128 L Ed

agree governs the claim in this case. The parties disagree, however, on the proper test for deliberate indifference, which we must therefore undertake to define.

[511 US 835]

**B**

**1**

[1b] Although we have never paused to explain the meaning of the term "deliberate indifference," the case law is instructive. The term first appeared in the United States Reports in *Estelle v Gamble*, 429 US, at 104, 50 L Ed 2d 251, 97 S Ct 285, and its use there shows that deliberate indifference describes a state of mind more blameworthy than negligence. In considering the inmate's claim in *Estelle* that inadequate prison medical care violated the Cruel and Unusual Punishments Clause, we distinguished "deliberate indifference to serious medical needs of prisoners," *ibid.*, from "negligen[ce] in diagnosing or treating a medical condition," *id.*, at 106, 50 L Ed 2d 251, 97 S Ct 285, holding that only the former violates the Clause. We have since read *Estelle* for the proposition that Eighth Amendment liability requires "more than ordinary lack of due care for the prisoner's interests or safety," *Whitley v Albers*, 475 US 312, 319, 89 L Ed 2d 251, 106 S Ct 1078 (1986).

[1c, 4] While *Estelle* establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. That point underlies the ruling that "application of the deliberate indifference standard is inappropriate" in one class of prison cases: when "officials stand accused of using excessive physical force," *Hudson v McMillian*, 503 US ___, at 6-7, 117 L Ed 2d 156, 112 S Ct 995; see also *Whitley*, *supra*, at 320, 89 L Ed 2d 251, 106 S Ct 1078. In situations, where the decisions of prison officials are typically made "in haste, under pressure, and frequently without the luxury of a second chance," *Hudson v McMillian*, *supra*, at 6, 117 L Ed 2d 156, 112 S Ct 995 (quoting *Whitley*, *supra*, at 320, 89 L Ed 2d 251, 106 S Ct 1078), an Eighth Amendment claimant must show more than "indifference," deliberate or otherwise. The claimant must show that officials applied force "maliciously and sadistically for the very purpose of causing harm," *Whitley*, *supra*, at 6, 117 L Ed 2d 156, 112 S Ct 995 (internal quotation marks and citations omitted), or, as the Court also

[511 US 836]

put it, that officials used force with "a knowing willingness that [harm] occur," *id.*, at 7, 117 L Ed 2d 156, 112 S Ct 995 (internal quotation marks and citation omitted). These standards of purposeful or knowing conduct are not, however, necessary to satisfy the *mens rea* requirement of deliberate indifference for claims challenging conditions of confinement; "the very high state of mind prescribed by *Whitley* does not apply to prison conditions cases." *Wilson*, *supra*, at 302-303, 115 L Ed 2d 271, 111 S Ct 2321.

With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. See, e.g., *LaMarca v Turner*, 995 F2d 1526, 1535 (CA11 1993); *Manarite v Springfield*, 957 F2d 953, 957 (CA1 1992); *Redman v County of San Diego*, 942 F2d 1435, 1443 (CA9 1991); *McGill v Duckworth*, 944 F2d 344, 347; *Miltier v Beorn*, 896 F2d 848, 852 (CA4 1990); *Martin v White*, 742 F2d 469, 474 (CA8 1984); see also *Springfield v Kibbe*, 480 US 257, 269, 94 L Ed 2d 293, 107 S Ct 1114 (1987) (O'Connor, J., dissenting). It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

That does not, however, fully answer the pending question about the level of culpability deliberate indifference entails, for the term recklessness is not self-defining. The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. See Prosser and Keeton § 34, pp 213-214; Restatement (Second) of Torts § 500 (1965). The criminal

[511 US 837]

law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware. See R. Perkins & R. Boyce, Criminal Law 850-851 (3d ed 1982); J. Hall, General Principles of Criminal Law 115-116, 120, 128 (2d ed 1960) (hereinafter Hall); American Law Institute, Model

FARMER v BRENNAN
(1994) 511 US 825, 128 L Ed 2d 811, 114 S Ct 1970

Penal Code § 2.02(2)(c), and Comment 3 (1985); but see *Commonwealth v Pierce*, 138 Mass 165, 175-178 (1884) (Holmes, J.) (adopting an objective approach to criminal recklessness). The standards proposed by the parties in this case track the two approaches (though the parties do not put it that way): petitioner asks us to define deliberate indifference as what we have called civil-law recklessness,[5] and respondents urge us to adopt an approach consistent with recklessness in the criminal law.[6]

[1d] We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage,

[511 US 838]

and if harm does result society might well wish

---

4. See, e.g., *LaMarca v Turner*, 995 F2d 1526, 1535 (CA11 1993); *Manarite v Springfield*, 957 F2d 953, 957 (CA1 1992); *Redman v County of San Diego*, 942 F2d 1435, 1443 (CA9 1991); *McGill v Duckworth*, 944 F2d 344, 347; *Miltier v Beorn*, 896 F2d 848, 852 (CA4 1990); *Martin v White*, 742 F2d 469, 474 (CA8 1984); see also *Springfield v Kibbe*, 480 US 257, 269, 94 L Ed 2d 293, 107 S Ct 1114 (1987) (O'Connor, J., dissenting).

5. Between the poles lies "gross negligence" too, but the term is a "nebulous" one, in practice typically meaning little different from recklessness as generally understood in the civil law, which we discuss later in the text. See W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 34, p 212 (5th ed 1984) (hereinafter Prosser & Keeton).

6. See Brief for Respondents 16 (asserting that deliberate indifference requires that a prison "official must know of the risk of harm to which an inmate is exposed").

See Reply Brief for Petitioner 5 (suggesting that a prison official is deliberately indif-

EXHIBIT APPLY ALL THESE LAWS AND LAWS TO ME

Court held that both students had been suspended without procedural due process. (FN5) It also held that petitioners were not entitled to qualified immunity from damages under the second branch of *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), because they "should have known that a lengthy suspension without any adjudicative hearing of any type" would violate procedural due process. App. to Pet. for Cert. A14. (FN6) Despite these holdings, the District Court declined to award damages because:

"Plaintiffs put no evidence in the record to qualify their [435 U.S. 252] damages, and the record is completely devoid of any evidence which could even form the basis of a speculative inference measuring the extent of their injuries. Plaintiffs' claims for damages therefore fail for complete lack of proof." *Ibid.*

The court also stated that the students were entitled to declaratory relief and to deletion of the suspensions from their school records, but for reasons that are not apparent the court failed to enter an order to that effect. Instead, it simply dismissed the complaints. No finding was made as to whether respondents would have been suspended if they had received procedural due process.

On respondents' appeal, the Court of Appeals reversed and remanded. 545 F.2d 30 (1976). It first held that the District Court erred in not granting declaratory and injunctive relief. It also held that the District Court should have considered evidence submitted by respondents after judgment that tended to prove the pecuniary value of each day of school that they missed while suspended. The court said, however, that respondents would not be entitled to recover damages representing the value of missed school time if petitioners showed on remand "that there was just cause for the suspension[s] and that therefore [respondents] would have been suspended even if a proper hearing had been held." *Id.*, at 32.

Finally, the Court of Appeals held that even if the District Court found on remand that respondents' suspensions were justified, they would be entitled to recover substantial "nonpunitive" damages simply because they had been denied procedural due process. *Id.*, at 31. Relying on its earlier [435 U.S. 253] decision in *Hostrop v. Board of Junior College Dist. No. 515*, 523 F.2d 569 (CA7 1975), cert. denied, 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976), the court stated that such damages should be awarded "even if, as in the case at bar, there is no proof of individualized injury to the plaintiff, such as mental distress . . . ." 545 F.2d, at 31. We granted certiorari to consider whether, in an action under § 1983 for the [*1047] deprivation of procedural due process, a plaintiff must prove that he actually was injured by the deprivation before he may recover substantial "nonpunitive" damages. 430 U.S. 964, 97 S.Ct. 1642, 52 L.Ed.2d 355 (1977).

II

Title 42 U.S.C. § 1983, Rev.Stat. § 1979, derived from § 1 of the Civil Rights Act of 1871, 17 Stat. 13, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The legislative history of § 1983, elsewhere detailed, *e. g., Monroe v. Pape*, 365 U.S. 167, 172-183, 81 S.Ct. 473, 476-481, 5 L.Ed.2d 492 (1961); *id.*, at 225-234, 81 S.Ct. 504-509 (Frankfurter, J., dissenting in part); *Mitchum v. Foster*, 407 U.S. 225, 238-242, 92 S.Ct. 2151, 2159-2161, 32 L.Ed.2d 705 (1972), demonstrates that it was intended to "[create] a species of tort liability" in favor of persons who are deprived of "rights, privileges, or immunities secured" to them by the Constitution. *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 996, 47 L.Ed.2d 128 (1976).

Petitioners contend that the elements and prerequisites for recovery of damages under this "species of tort liability" should parallel those for recovery of damages under the common law of torts. In particular, they urge that the purpose of an award of damages under § 1983 should be to compensate [435 U.S. 254] persons for injuries that are caused by the deprivation of constitutional rights; and, further, that plaintiffs should be required to prove not only that their rights were violated, but also that injury was caused by the violation, in order to recover substantial damages. Unless respondents prove that they actually were injured by the deprivation of procedural due process, petitioners argue, they are entitled at most to nominal damages.

Respondents seem to make two different arguments in support of the holding below. First, they contend that substantial damages should be awarded under §

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

986 F.2d 1521, Jordan v. Gardner, (C.A.9 (Wash.) 1993)                                               Page 7

officials use force to maintain order, a greater showing is required; in that situation, wantonness turns on " 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.' " *Hudson v. McMillian,* 503 U.S. 1, ----, 112 S.Ct. 995, 998, 117 L.Ed.2d 156 (1992) (quoting *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1084). The reasons for this distinction are plain. Whether in the context of a prison-wide disturbance or an individual confrontation between an officer and prisoner, corrections officers often must act immediately and emphatically to defuse a potentially explosive situation. *See, e.g., Williams v. Burton,* 943 F.2d 1572, 1575-76 (11th Cir.1991), *cert. denied,* 505 U.S. 1208, 112 S.Ct. 3002, 120 L.Ed.2d 877 (1992). In such a situation, officers must make difficult judgments whether, and how much, force is appropriate. *Id.* The officer rarely has time for reflection; instead, the decision to use force must be made " 'in haste, under pressure, and frequently without the luxury of a second chance.' " *Hudson,* 503 U.S. at ----, 112 S.Ct. at 998 (quoting *Whitley,* 475 U.S. at 320, 106 S.Ct. at 1084). Because the critique of such decisions in hindsight could chill effective action by prison officials, the Supreme Court has held that the higher standard is appropriate. (FN7)

[9] We conclude that in this situation "wantonness" is determined by the deliberate indifference standard. Unlike judgment in the excessive force context, our task is not to critique in hindsight the exercise of judgment of a particular officer on a specific occasion. The cross-gender clothed body search policy was developed over time, with ample opportunity for reflection. Moreover, unlike incidents of excessive force, the cross-gender clothed body search policy does not inflict pain on a one-time basis; instead, as with substandard conditions of confinement, the policy will continue to inflict pain upon the inmates indefinitely. *Cf. Wilson,* 501 U.S. at ---- n. 1, 111 S.Ct. at 2324 n. 1 ("Undoubtedly deprivations inflicted upon all prisoners are, as a policy matter, of greater concern than deprivations inflicted upon particular prisoners...."). When, as here, officials formulate a policy in circumstances where there are no particular constraints on the officials' decisionmaking process, *see Redman v. County of San Diego,* 942 F.2d 1435, 1442 (9th Cir.1991) (en banc), *cert. denied,* 502 U.S. 1074, 112 S.Ct. 972, 117 L.Ed.2d 137 (1992), and the implementation of the policy will inflict pain upon the inmates on a routine basis, we need not look for a showing of action taken "maliciously and sadistically"

before Eighth Amendment protections are implicated.

The record mandates the conclusion that the inmates met their burden of establishing the requisite "deliberate indifference." Superintendent Vail indicated that the policy was not required for security purposes and that he adopted the cross-gender clothed body search policy without a great deal of knowledge about the impact of the searches upon the inmates, *see supra* note 4. Yet long before the policy was actually implemented, Superintendent Vail was urged by members of his own staff not to institute cross-gender clothed body searches due to the psychological trauma which many inmates likely would suffer. Further, once the policy took effect, a court order was necessary to prevent the searches although one of the first inmates *1529 to be searched suffered a severe reaction. Even now, despite ample testimony of the harmful effects of this policy, the prison officials are intent upon reversing the district court injunction. In short, we find that the record supports but one conclusion: the prison officials acted with deliberate indifference as to the harm that the cross-gender clothed body searches were likely to cause. *See Berry v. City of Muskogee,* 900 F.2d 1489, 1498 (10th Cir.1990) (knowledge of risk of harm and failure to act to prevent the harm constitute deliberate indifference); *see also Williams v. Griffin,* 952 F.2d 820, 826 (4th Cir.1991) (same); *DesRosiers v. Moran,* 949 F.2d 15, 19 (1st Cir.1991) (deliberate indifference established by showing knowledge of risk of impending harm that is easily preventable, and failure to prevent it); *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir.), *cert. denied,* 488 U.S. 823, 109 S.Ct. 68, 102 L.Ed.2d 45 (1988) (actual or constructive knowledge of risks plus failure to act constitutes deliberate indifference); *cf. Redman,* 942 F.2d at 1443 (prison officials may not act with reckless indifference to a particular vulnerability of which the officials know or should know). (FN8)

The district court's finding that Superintendent Vail was a credible witness does not undermine the above analysis. As the district court noted, Vail believed that he was in a "lose-lose situation." He believed that if he did not accede to the union's demands and institute the cross-gender clothed body search policy, he would be sued by the employees' union. The wish to avoid a lawsuit from an employees' union, however, does not provide a justification for inflicting pain of a constitutional magnitude upon inmates, even if the belief that a labor grievance suit would be filed was sincere.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

TDC contends that the appointment of a special master was improper because the district court failed to comply with rule 53, which, according to TDC, codifies and limits a court's authority to appoint a special master.[234] Rule 53(b) states that a district court may appoint a special master "only upon a showing that some exceptional condition requires" the appointment.[235]

[96, 97] The district court stated several reasons for its decision to make the appointment: the difficulty of superintending the implementation of "a comprehensive, detailed plan for the elimination of the unconstitutional conditions found to exist in the Texas prison system"; TDC's "record of intransigence toward previous court orders requiring changes in TDC's practices and conditions",[236] the "strained" working relations between TDC's lawyers and the plaintiffs' lawyers; TDC's failure to acknowledge even "completely evident" constitutional violations; and TDC's failure to conform its actual practices to its written policies and procedures.[237] The district court did not, as TDC implies, simply rely on the "mere complexity" of the case.[238] More-over, the court was not required to await "Master," "master hearing officer," "monitor," "human rights committee," "Ombudsman," or others[242] to implement it. Noncompliance may constitute one "exceptional condition" under rule 53,[239] but it is not exclusive.

[98] Furthermore, rule 53 does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy.[240] The power of a federal court to appoint an agent to supervise the implementation of its decrees has long been established.[241] Such court-appointed agents have been identified by "a confusing plethora of titles: 'receiver,' 'Master,' 'Special master' as a factfinder in advance of the court's remedial decree or as an expert to recommend the amount of damages or other remedial relief after a finding of liability." Nathan, *The Use of Masters in Institutional Reform Litigation*, 10 Tol.L.Rev. 419, 428 (1979) (emphasis added), we have implicitly ratified reliance on rule 53 as authority for post-decretal appointment of a special master. *Gary W. v. Louisiana*, 601 F.2d 240, 243–45 (5th Cir. 1979); accord, *Palmigiano v. Garrahy*, 443 F.Supp. 956, 986, 989 (D.R.I.1977).

special master, "as a factfinder in advance of the court's remedial decree or as an expert to recommend the amount of damages or other remedial relief after a finding of liability." Nathan, *The Use of Masters in Institutional Reform Litigation*, 10 Tol.L.Rev. 419, 428 (1979) (emphasis added), we have implicitly ratified reliance on rule 53 as authority for post-decretal appointment of a special master. *Gary W. v. Louisiana*, 601 F.2d 240, 243–45 (5th Cir. 1979); accord, *Palmigiano v. Garrahy*, 443 F.Supp. 956, 986, 989 (D.R.I.1977).

[99] The district court's opinion stated the reasons for the appointment of the special master and his monitors.[243] As it noted, we have previously approved the appointment of such agents to oversee compliance with continuing court orders.[244] Insofar as the special master is to report on TDC's compliance with the district court's decree and to help implement the decree, he assumes one of the plaintiffs' traditional roles, except that, because he is the court's

may direct him to report only upon particular issues or to do or perform particular acts or to receive and report evidence only and may fix the time and place for beginning and closing the hearings and for the filing of the master's report. ...

(e) REPORT.
(1) *Contents and Filing*. The master shall prepare a report upon the matters submitted to him by the order of reference and, if required to make findings of fact and conclusions of law, he shall set them forth in the report. He shall file the report with the clerk of the court and in an action to be tried without a jury, unless otherwise directed by the order of reference, shall file with it a transcript of the proceedings and of the evidence and the original exhibits. The clerk shall forthwith mail to all parties notice of the filing.

(2) *In Non-Jury Actions*. In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous. Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and notice as prescribed in Rule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions.

(3) *In Jury Actions*. In an action to be tried by a jury the master shall not be directed to report the evidence. His findings upon the issues submitted to him are admissible as evidence of the matters found and may be read to the jury, subject to the ruling of the court upon any objections in point of law which may be made to the report.

234. We reject TDC's suggestion that rule 53 does not permit the post-decretal appointment of a special master. Although rule 53 is concerned primarily with the appointment of a

235. One article argues that rule 53's "exceptional conditions" requirement, as interpreted in *La Buy v. Howes Leather Co.*, 352 U.S. 249, 77 S.Ct. 309, 1 L.Ed.2d 290 (1957), does not even apply in cases like this one. "The La Buy restrictions do not ... bar the use of expert special masters in institutional reform cases. The policy considerations that support La Buy's interpretation of rule 53 are absent when resort is had to expert masters after the violations of the defendant institution have been determined." Special Project, *supra*, 78 Colum.L.Rev. at 807. This article does, however, state that "the use of masters in such cases must nonetheless meet the general rule 53(b)(1) requirement that references to masters be the exception and not the rule." *Id.* at 808; cf. *Gary W. v. Louisiana*, 601 F.2d at 244 (quoting district court's recitation of facts justifying the "exceptional" act of appointing a special master).

236. Cf. *Gary W. v. Louisiana*, 601 F.2d at 245 ("noncompliance with a previous court order") (citing *Newman v. Alabama*, 559 F.2d 283, 289–90 (5th Cir. 1977), *rev'd in part on other grounds sub nom. Alabama v. Pugh*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978) (per curiam)).

237. 503 F.Supp at 1389–90.

238. We note, however, that the sheer complexity of the Texas prison system could be found to

constitute a "exceptional condition" under rule 53,[239] but it is not exclusive.

239. See *Gary W. v. Louisiana*, 601 F.2d at 244–45; *Gautreaux v. Chicago Hous. Auth.*, 384 F.Supp. 37, 38 (N.D.Ill.1974).

240. "Beyond the provisions of [Fed.R.Civ.P. 53] for appointing and making references to Masters, a Federal District Court has 'the inherent power to supply itself with this instrument for the administration of justice when deemed by it essential.'" *Schwimmer v. United States*, 232 F.2d 855, 865 (8th Cir.) (quoting *In re Peterson*, 253 U.S. 300, 311, 40 S.Ct. 543, 547, 64 L.Ed. 919, 924 (1920)), *cert. denied*, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956); *accord, Veneri v. Draper*, 22 F.2d 33, 35 (4th Cir. 1927) ("the power is inherent in the federal courts independently of any statute"), *cert. denied*, 276 U.S. 633, 48 S.Ct. 339, 72 L.Ed. 742 (1928); Kaufman, *Masters in the Federal Courts: Rule 53*, 58 Colum.L.Rev. 452, 462 (1958) ("Over and above the authority contained in rule 53 to direct a reference, there has always existed in the federal courts an inherent authority to appoint masters as a natural concomitant of their judicial powers."); see *Reed v. Cleveland Bd. of Educ.*, 607 F.2d 737, 746 (6th Cir. 1979); *Powell v. Ward*, 487 F.Supp. 917, 935 (S.D.N.Y.1980), *aff'd per curiam as modified*, 643 F.2d 924 (2d Cir.), *cert. denied*, 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981); *Jordan v. Wolke*, 75 F.R.D. 696, 701 (E.D.Wis.1977); *Connecticut Importing Co. v. Frankfort Distilleries, Inc.*, 42 F.Supp. 225, 227 (D.Conn.1940). Compare *Arthur Murray, Inc. v. Oliver*, 364 F.2d 28, 32 (8th

241. See *In re Peterson*, 253 U.S. at 312–14, 40 S.Ct. at 547–48, 64 L.Ed. at 925; *Newman v. Alabama*, 559 F.2d at 290 (appointment of master and several monitors suggested as "appropriate steps to ensure compliance with [district court's] decree"); *Sun Theatre Corp. v. RKO Radio Pictures, Inc.*, 213 F.2d 284, 293 (7th Cir. 1954); *Kroese v. General Steel Castings Corp.*, 179 F.2d 760, 764 (3d Cir.), *cert. denied*, 339 U.S. 983, 70 S.Ct. 1026, 94 L.Ed. 1386 (1950); Special Project, *supra*, 78 Colum.L.Rev. at 826 (footnote omitted); see Fed.R.Civ.P. 53(a).

242. Special Project, *supra*, 78 Colum.L.Rev. at 826 (footnote omitted); see Fed.R.Civ.P. 53(a).

243. See pp. 1160–1161 *supra*.

244. 503 F.Supp. at 1390 (citing *Gates v. Collier*, 501 F.2d at 1321); see *Miller v. Carson*, 401 F.Supp. 835, 841 (M.D.Fla.1975), *aff'd in part, modified in part, and remanded*, 563 F.2d 741, 752–53 (5th Cir. 1977); *Newman v. Alabama*, 559 F.2d at 290; *Gary W. v. Louisiana*, 601 F.2d at 244–45. TDC's reliance on *United States v. City of Parma, supra*, is misplaced. In that case, the district court appointed a special master "upon its own motion ... there was "no support ... in the record" for the district court's conclusion that a special master was necessary for the orderly resolution of the case. 661 F.2d at 578. Moreover, the court noted that the appointment of a special master was "antithetical to the recommendations of" the plaintiffs' own chief witness on remedy. *Id.* None of these circumstances is present in this case.

EXHIBIT
REPORT CLASS ACT LAWS
PRISON OF
SEGREGATION
USE ONLY
JACKHOUSE

375 F.3d 593
375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.))
(Cite as: 375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.)))

Page 7

interlocutory order.

Additionally, we must evaluate the relation between the unappealable order(s) and the appealable order—how "entwined" are they? This requires more than a close link between the two: "It must be practically indispensable that we address the merits of the unappealable order in order to resolve the property-taken appeal." *Valders Stone & Marble*, 909 F.2d at 262. This is such a case-specific question that we find earlier decisions to be of limited utility in answering it here. Because it affects our jurisdiction, it is one that we must answer for ourselves, based on our independent review of the record and the district court's rulings.

[6][7] We are satisfied, based on that review, that the September 25 and March 19 orders are sufficiently woven together to justify invocation of pendent appellate jurisdiction. This is so even though the earlier dismissal of the state-law claims was not a perfect but-for cause of the court's later decision to dismiss without prejudice the federal-law claims. A district court may abstain under *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), in deference to parallel state-court proceedings whether or not state-law claims remain in the federal action. To that extent, the September 25 order surrendering jurisdiction over the state-law claims did not necessarily lead to the district court's subsequent entry of a stay and then dismissal. Nonetheless, we recently had occasion to emphasize how sparingly the *Colorado River* doctrine should be used, see *AXA Corporate Solutions v. Underwriters Reins.*, 347 F.3d 272, 278 (7th Cir.2003), and that lesson applies with even greater force here. The plaintiffs had not yet even filed suit in state court before the district court's refusal to exercise its jurisdiction. It seems plain that the September 25 order catalyzed the parallel state-court proceeding on which the court later relied to justify its orders first staying and then dismissing the federal-law claims. Furthermore, it is clear that only one constitutional "case" is present here, even though the Montaño parties have a number of theories supporting the November 27 order, been a case that reached federal court through removal, it is doubtful that the court would have had the authority to remand only the state claims,

because they are not "separate and independent." See 28 U.S.C. § 1441(c). The City has therefore satisfied all three of the requirements necessary to establish pendent appellate jurisdiction over the September 25 order, which we conclude is properly before us along with the March 19 order.

*7 Montaño also urges us to reject the City's effort to challenge the November 27 order in this appeal. Once again, he rests primarily on the argument that the City filed an untimely notice of appeal of the November 27 order and so has waived its right to appeal that order. As we noted earlier, the November 27 order awarded summary judgment to some of the defendants and stayed the federal parallel state-court action. Montaño also urges us to appeal the adverse summary *601 judgment and the City cross-appealed challenging the order. We dismissed the appeal for want of jurisdiction on March 20, 2002, concluding that Montaño had not designated the part of the district court's order staying the federal action in his notice of appeal, as required by Fed. R. App. P. 3(c), and that his efforts to obtain review of the district court's entry of summary judgment were "otherwise premature." *Montaño*, Nos. 01-4284 & 02-1034, slip op. at 2. The City's cross-appeal of the stay order was dismissed as untimely under the principle that a finding that an appellant's notice of appeal is invalid will also render invalid a cross-appeal that was not filed within the 30-day period specified by fed. R. App. P. 4(a)(1)(A). See *Abbs*, 963 F.2d at 925.

Montaño now argues that, based on a strict reading of *Abbs* and the fact that this court has already once declared that the City's attempt to challenge the November 27 stay was time-barred, the City has waived its right to appeal that order. The current problem with appellate jurisdiction, however, has nothing to do with either the law of the case or the timing of the City's appeal this time around. It is instead the fact that the district court's March 19 order mooted the November 27 order by converting the stay into a dismissal without prejudice. The stay entered in the November 27 order now has no continuing force in this case. We therefore will not offer any opinion about the November 27 order, except insofar as it is relevant to the March 19 order that is properly before us.

---

375 F.3d 593
375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.))
(Cite as: 375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.)))

Page 8

III

[8] We turn at last to the merits. We take up first the district court's September 25 order declining to exercise its supplemental jurisdiction over the state-law claims. We review the district court's refusal to exercise supplemental jurisdiction over the state-law claims for an abuse of discretion. *Groce v. Eli Lilly Co.*, 193 F.3d 496, 499-500 (7th Cir.1999).

The rules for a district court's exercise of supplemental jurisdiction are set forth at 28 U.S.C. § 1367(a):

[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution....

Section 1367(c) sets forth the circumstances under which a district court may decline to exercise supplemental jurisdiction:

*8 The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

[9] The first problem—practically a fatal one for abuse-of-discretion review—is that we have no idea why the district court decided to dismiss these claims, because it offered no explanation. Nothing on this record suggests that it was for one of the four reasons recognized in § 1367(c). None of the garden-variety tort claims Montaño and his friends asserted raises novel or complex issues of state law. Nor *602 do the state-law claims predominate over the federal-law claims. Prior to the November 27 and March 19 orders staying and then dismissing without prejudice the federal-law claims, the district court had not dismissed all claims over which it had original federal question jurisdiction. Finally,

Montaño cannot point to any compelling rationale that might salvage the total absence of the other three factors. That analysis usually involves consideration of "the values of judicial economy, convenience, fairness, and comity," see *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173, 118 S.Ct. 523, 139 L.Ed.2d 525 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)), but it is unclear how any of those values were served by the district court's refusal to exercise supplemental jurisdiction at that stage in the litigation. Its action virtually compelled the plaintiffs to bring a duplicative state-court action at the same time the federal claims were proceeding in the district court. Had they not done so, they faced the risk of losing those claims forever on statute-of-limitations grounds. In light of this fact, the district court's decision was certain to produce more rather than less overall litigation, and a greater strain on comity and judicial resources. Though our review of decisions under § 1367(c) is deferential, we conclude that the district court's September 25 order refusing to exercise supplemental jurisdiction over the state-law claims crossed over the line and amounted to an abuse of discretion.

[10] The March 19 dismissal without prejudice is just as flawed. The parties appear to agree that the district court's outright dismissal of the federal claims was an abuse of discretion, and we join them in that assessment. While the Supreme Court has expressly reserved the question, *Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 570 n. 21, 103 S.Ct. 3201, 77 L.Ed.2d 837 (1983), this court has repeatedly noted that the appropriate procedural mechanism when deferring to a parallel state-court proceeding is a stay, not a dismissal. See *CIGNA HealthCare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 851 (7th Cir.2002); *Rosser v. Chrysler Corp.*, 864 F.2d 1299, 1308 (7th Cir.1988); *Lumen Constr., Inc. v. Brant Constr. Co., Inc.*, 780 F.2d 691, 698 (7th Cir.1985); *Ohio River Co. v. Carrillo*, 754 F.2d 236, 238 (7th Cir.1985); *Bd. of Educ. v. Bosworth*, 713 F.2d 1316, 1322 (7th Cir.1983); *Evans Transp. Co. v. Scullin Steel Co.*, 693 F.2d 715, 717-18 (7th Cir.1982). And while the usual course has been to remand with instructions to enter a stay rather than a dismissal, see, e.g., *Lumen*, 780 F.2d at 698, in light of the fact

DIXON CC XHOUSE SEGREGATION USE ONLY

§ 7, cls 2 and 3. In a very
[498 US 462]
fundamental sense, separation of powers is designed to secure individual liberty. Yet, we would not say that the Presentment Clauses secure personal rights. Rather, Chadha was able to assert the interests of the other branches of Government because he met our traditional test of standing.

I cannot doubt the truth of the statement, ante, at 449-450, 112 L Ed 2d, at 979-980 (quoting H. P. Hood & Sons, Inc. v Du Mond, 336 US, at 539, 93 L Ed 865, 69 S Ct 657), that the Commerce Clause benefits individuals and entities engaged in interstate commerce. Nor do I question the importance of our dormant Commerce Clause jurisprudence in guaranteeing a single, national market. Benefits to those engaged in commerce, however, are incidental to the purpose of the Commerce Clause; they are but evidence of its sound application. That the Commerce Clause benefits individual traders or consumers does not satisfy the majority's test that a provision must have been intended for the benefit of a particular plaintiff, nor do such benefits prove that the provision secures a plaintiff's constitutional right to engage in any one activity, to receive any direct benefit, or to avoid any specific detriment. Rather, the Commerce Clause "benefits particular parties only as an incident of" its allocation of power between Federal and State sovereignties. Golden State, 493 US, at 109, 107 L Ed 2d 420, 110 S Ct 444.

I continue to draw the distinction made in my Golden State dissent, id., at 113, 107 L Ed 420, 110 S Ct 444, and would hold that while the dormant Commerce Clause does not

988

secure a right, it gives rise to a legal interest in petitioner against taxation which violates the Commerce Clause. Thus, petitioner can rely upon the dormant Commerce Clause. Thus, petitioner ity of the tax in defending a collection action brought by the State, or in pursuing state remedies. This ability to invoke the Commerce Clause against a State, however, is not equivalent to finding a secured right under § 1983. If that were so, all violations of federal law would give rise to a § 1983 cause of action, and there would be little reason to search for statements supporting the existence of a right to engage in interstate commerce or to apply the
[498 US 463]
Golden State test. The majority does not purport to rest its decision upon such an all-inclusive view of § 1983, but that is the necessary consequence of its reasoning.

The Court's analysis demonstrates the poverty of the "intended to benefit" test in the constitutional context, for it shows that even structural provisions that benefit individuals incidentally come within its purview. The Court's logic extends far beyond the Commerce Clause, and creates a whole new class of § 1983 suits derived from Article I. For example, the Court's rationale creates a § 1983 cause of action when a State violates the constitutional doctrine of intergovernmental tax immunity. Davis v Michigan Dept. of Treasury, 489 US 803, 813, 103 L Ed 2d 891, 109 S Ct 1500 (1989) (violation of statute "coextensive with the prohibition against discriminatory taxes embodied in the modern constitutional doctrine of intergovernmental tax immunity"), interferes with the federal power over foreign relations, see Zschernig v Miller, 389 US 429, 19 L Ed 2d 683, 88 S Ct 664 (1968), applies a duty

---

upon imports in violation of Art 1, § 10, cl 2, see Hooven & Allison Co. v Evatt, 324 US 652, 89 L Ed 1252, 65 S Ct 870 (1945), invades the federal power over regulation of the entrance and residence of aliens in violation of Art I, § 8, cl 4, see Hines v Davidowitz, 312 US 52, 66-67, 85 L Ed 581, 61 S Ct 399 (1941), or attempts to tax income upon a federal obligation in derogation of Congress' Art 1, § 8, cl 2, power to "borrow Money," on the credit of the United States," see Missouri ex rel. Missouri Ins. Co. v Gehner, 281 US 313, 74 L Ed 870, 50 S Ct 326 (1930). There is no textual or other support for holding that § 1983 imposes such far-reaching liabilities upon the States.

Petitioner here does not complain that the State of Nebraska has failed to provide him an adequate forum in which to contest the validity of Nebraska's tax. Nebraska has done so. The Nebraska courts acknowledged the invalidity of the State's tax, enjoined its collection, and directed petitioner to file a refund claim for the taxes he had paid to the
[498 US 464]
State. Rather, the significance of the Court's decision, in this and future Commerce Clause litigation, is that a § 1983 claim may permit dormant Commerce Clause plaintiffs to recover attorney's fees and expenses under 42 USC § 1988 [42 USCS § 1988].

In the Civil Rights Attorney's Fees Awards Act of 1976, Pub L 94-559, 90 Stat 2641, codified at 42 USC § 1988 [42 USCS § 1988], Congress authorized the award of attorney's fees to prevailing parties in, inter alia, § 1983 litigation. The award of attorney's fees encourages vindica-

tion of federal rights which, Congress recognized, might otherwise go unenforced because of the plaintiffs' lack of resources and the small size of any expected monetary recovery. See S Rep No. 94-1011, p 6 (1976). Congress was reassured that § 1988 would be "limited to cases arising under our civil rights laws, a category of cases in which attorneys fees have been traditionally regarded as appropriate." Id, at 4.

The significant economic interests at stake in dormant Commerce Clause cases, as well as the resources available to the typical dormant Commerce Clause plaintiff, make such concerns far removed from the realities of dormant Commerce Clause litigation. The pages of the United States Reports testify to the ability of major corporations and industry associations to commence and maintain dormant Commerce Clause litigation without receiving attorney's fee awards under § 1988. By making such fee awards available, the Court does not vindicate the purposes of § 1983 or § 1988, but merely shifts the balance of power away from the States and toward interstate businesses.

Today's decision raises far more questions about the proper conduct of challenges to the validity of state taxation than it answers. The Tax Injunction Act, 28 USC § 1341 [28 USCS § 1341], prevents any attempt in federal court to "enjoin, suspend or restrain" assessment or collection of a state tax, so long as "a plain, speedy and efficient remedy may be had in the courts of such State." The principle of comity likewise prevents a federal court from entertaining any action for damages under
[498 US 465]
§ 1983 to redress allegedly unconstitutional

552 F.2d 193, Little v. Walker, (C.A.7 (Ill.) 1977)

Page 4

both a settled and first principle of the Eighth Amendment, long before the relevant 1972-1974 period in the instant case, that penal measures are constitutionally repugnant if they "are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' or (if they) 'involve the unnecessary and wanton infliction of pain.'" Estelle v. Gamble, 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (citations and footnotes omitted). Violent attacks and sexual assaults by inmates upon the plaintiff while in protective segregation are manifestly "inconsistent with contemporary standards of decency." Id. "Deliberate indifference" to these happenings "constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Id. Moreover, in the highly publicized landmark case of Holt v. Sarver, 442 F.2d 304, 308 (8th Cir. 1971), it was held that under the Eighth Amendment prisoners are entitled to protection from the assaults of other prisoners. See also Kish v. County of Milwaukee, 48 F.R.D. 102, 103-104 (E.D.Wis.1969), subsequent disposition affirmed, 441 F.2d 901 (7th Cir. 1971). Therefore, it is immaterial that Little himself sought refuge in the segregated part of Stateville for bodily protection. On remand, if Little can show that he was deliberately deprived (FN8) of constitutional rights *198 while confined in cell-house B, he will be entitled to damages. (FN9) Black v. Brown, 513 F.2d 652, 654-655 n. 6 (7th Cir. 1975).

[7] Since constitutional developments prior to the May 1972-September 1974 period had crystallized in Little's favor, defendants should have known that their actions within the sphere of their official responsibility would violate his constitutional rights. O'Connor v. Donaldson, 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396. Because under the facts alleged defendants have not met an objective good faith standard (Knell v. Bensinger, supra, at 725), Little need not show whether they had a malicious intent or impermissible motivations. Wood v. Strickland, supra, 420 U.S. at 322, 95 S.Ct. 992. We leave it to the district judge to determine on a fuller record which, if any, of the fifteen defendants (FN10) was immune or too remotely involved to be held liable.

Reversed and remanded for further proceedings consistent herewith.

FN1. The amended complaint was filed on November 30, 1973. Richard L. Whitley was a co-plaintiff as late as March 25, 1974 (R. 64). By at least November 11, 1975, Little was the only plaintiff.

FN2. All facts alleged of course are taken as true for purposes of our review of the granting of the motion to dismiss below. Walker Process Equip. v. Food Machinery and Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247.

FN3. Plaintiff does not directly attack the constitutionality of depriving a protective segregatee of the same privileges as those withheld from a disciplinary segregatee. "Concerning those deprivations of privileges, plaintiff only seeks damages for defendants' subjective bad faith in imposing those deprivations upon him while in voluntary segregation" (Reply Br. at 4-5).

FN4. The Governor of Illinois, the Director of the Department of Corrections and his predecessor, the Warden and his predecessor, the Superintendent of the Stateville Prison and the administrative assistant to the Warden.

FN5. The Knell standard was derived from Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214.

FN6. Nevertheless, Judge Decker noted that Judge Craven's dissent in Breeden has continued to gain support in the Fourth Circuit. See Woodhous v. Commonwealth of Virginia, 487 F.2d 889 (4th Cir. 1973).

FN7. Breeden also complained that he suffered a denial of any opportunity for parole while he was confined in maximum security at his own request. However, the State established that he was not so prejudiced and, in fact, had been released on parole.

FN8. In this opinion we use the term "deliberate deprivation" to denote two species of culpability: actual intent and recklessness. Kimbrough v. O'Neil, 545 F.2d 1059, 1061 and n. 4 (7th Cir. 1976) (en banc). Actual intent here encompasses both the special intent to deprive the plaintiff of his constitutional rights as well as the general intent to perform the conduct whose "natural consequence" is the deprivation of the plaintiff's constitutional rights. See Monroe v. Pape, 365 U.S. 167, 187, 207, 81 S.Ct. 473, 5 L.Ed.2d 492; Bonner v. Coughlin, 545 F.2d 565, 567 (7th Cir. 1976) (en banc).

Under Wood v. Strickland, supra, and Knell v. Bensinger, supra, recklessness under Section 1983 comprehends only an objective standard: whether the conduct is with "such disregard of the (plaintiff's) clearly established constitutional rights that (the) action cannot be reasonably characterized as being in good faith." 420 U.S. at 322, 95 S.Ct. at 1001; 522 F.2d at 725. The subjective standard sometimes a part of definitions of recklessness, corresponding to "white heart/empty head" good faith, is not an appropriate component of the definition of reckless behavior sufficient to state a claim under Section 1983 for the deprivation of constitutional rights. Cf. Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1045 (7th Cir. 1977). While mere inadvertence or negligence cannot support a Section 1983 action raising Eighth Amendment issues, deliberate indifference "(r)egardless of how evidenced" either by actual intent or recklessness will provide a sufficient foundation. Estelle v. Gamble, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251, and authorities cited by Justice Marshall at 4025 nn. 10-12; see also Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976); Smart v. Villar, 547 F.2d 112 (10th Cir. 1976).

*198_ FN9. See La Batt v. Twomey, 513 F.2d 641-645 (7th

Copyright (c) West Group 1998 No claim to original U.S. Govt. works