E-FILED
Friday, 21 July, 2006 11:26:06 AM
Clerk, U.S. District Court, ILCD

DATE: July 14, 2006

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

04-1380
05-1098

Urioste -V- Nelson Et Al
Assigned to: Judge Harold A. Baker
Referred to: Magistrate Judge
John A. Gorman
DEMAND: $50,000.00
CAUSE 42:1983 Prisoner Civil Rights

RECEIVED JUL 20 2006
FILED JUL 20 2006
JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Jurisdiction F.R.C.v.P. Rules 1;8(a);
Jury Demand: Plaintiff
Jurisdiction: Federal Question

Judgment
6/28/2006 - In Favor of Defendants

"A Formal Motion To Vacate Above Judgment Pursuant to F.R.C.P. Rules 1, And 60(b)(1)(2)(3)(4)(5)"

Claims of
(1) Plaintiff
Exhausted Prison
Grievances Because
2) They Were
Ignored And
Never Answered.
3) Plaintiff
Requested One Million
Dollars on His Grievances

Sincerely Yours, Pro Se
In Forma Pauperis,
Mark S. Urioste N-87529
By A State Prisoner
And Mental Patient
Mark Urioste - N-87529
Dixon Correctional Center
2600 N. Brinton Ave.
Dixon, Illinois 61021

(2)

## "GROUNDS FOR RELIEF"

" I RESTATE THE FACT THAT I AM NOW SUEING EACH NAMED DEFENDANT- IN THEIR

(1) [INDIVIDUAL CAPACITY] - AS ADULTS WHO ARE NOT CONFINED TO MENTAL INSTITUTION AFTER BEING JUDGE MENTALLY INSANE BY A CIVIL JUDGE OR JURY [RESPONSIBLE FOR NATURAL CONSEQUENCES OF THEIR OWN ACTIONS]

(2) [OFFICIAL CAPACITY] - AS EMPLOYEES FOR STATE OF ILLINOIS, DEPARTMENT OF CORRECTIONS BRANCH FOR COMMITTING INTENTIONAL ACTS WITH DELIBERATE INDIFFERENCE THAT WERE ILLEGAL, UNLAWFUL, AND UNCONSTITUTIONAL.

(3) - IN THEIR [UNOFFICIAL CAPACITY] - FOR COMMITING ACTS THAT A PRISON OFFICIAL KNEW OR SHOULD HAVE KNOWN VIOLATED THIS PLAINTIFFS CONSTITUTIONAL AND CIVIL RIGHTS - FOR SOLE PURPOSE OF CAUSING THIS PLAINTIFF MALICIOUS SADISTIC WANTON INFLICTION OF PAIN, AGONY SUFFER AND, MENTAL TRAUMA, EMBARRASSMENT AND PAIN AND SERIOUS IRREPAIRABLE INJURY.

Handwritten annotations: "(3)", "U.S. v. Nixon U.S. PRESIDENT ET AL 418 U.S. 683 DECIDED JULY 24 1974", "EXHIBIT TO BACKS DECISION FOR IMMUNITY"

---

94 S.Ct. 3090
41 L.Ed.2d 1039
(Cite as: 418 U.S. 683, 94 S.Ct. 3090)

Page 13

681 (1974), regulations of the Attorney General delegated certain of his discretionary powers to the Board "**696** of Immigration Appeals and required that Board to exercise its own discretion on appeals in deportation cases. The Court held that so long as the Attorney General's regulations remained operative, he denied himself the authority to exercise the discretion delegated to the Board even though the original authority was his and he could reassert it by amending the regulations. Service v. Dulles, 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957), and Vitarelli v. Seaton, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959), reaffirmed the basic holding of Accardi.

Here, as in Accardi, it is theoretically possible for the Attorney General to amend or revoke the regulation defining the Special Prosecutor's authority. But he has not done so. [FN10] So long as this **\*3102** regulation remains in force the Executive Branch is bound by it, and indeed the United States as the sovereign composed of the three branches is bound to respect and to enforce it. Moreover, the delegation of authority to the Special Prosecutor in this case is not an ordinary delegation by the Attorney General to a subordinate officer: with the authorization of the President, the Acting Attorney General provided in the regulation that the Special Prosecutor was not to be removed without the 'consensus' of eight designated leaders of Congress. FN 8, supra.

FN10. At his confirmation hearings, Attorney General William Saxbe testified that he agreed with the regulation adopted by Acting Attorney General Bork and would not remove the Special Prosecutor except for 'gross impropriety.' Id., at 5–6, 8–10. There is no contention here that the Special Prosecutor is guilty of any such impropriety.

[11] The demands of and the resistance to the subpoena present an obvious controversy in the ordinary sense, but that alone is not sufficient to meet constitutional standards. In the constitutional sense, controversy means more than disagreement and conflict; rather it means the kind of controversy courts traditionally resolve. Here **\*697** at issue is the production or nonproduction of specified evidence deemed by the Special Prosecutor to be relevant and admissible in a pending criminal case. It is sought by one official of the Executive Branch within the scope of his express authority; it is resisted by the Chief Executive on the ground of his duty to preserve the confidentiality of the communications of the President. Whatever the correct answer on the merits, these issues are of a type which are traditionally justiciable. United States v. ICC, 337 U.S., at 430, 69 S.Ct., at 1413. The independent Special Prosecutor with his asserted need for the subpoenaed material in the underlying criminal prosecution is opposed by the President with his steadfast assertion of privilege against disclosure of the material. This setting assures there is 'that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.' Baker v. Carr, 369 U.S., at 204, 82 S.Ct., at 703. Moreover, since the matter is one arising in the regular course of a federal criminal prosecution, it is within the traditional scope of Art. III power. Id., at 198, 82 S.Ct. 691.

[12][13] In light of the uniqueness of the setting in which the conflict arises, the fact that both parties are officers of the Executive Branch cannot be viewed as a barrier to justiciability. It would be inconsistent with the applicable law and regulation, and the unique facts of this case to conclude other than that the Special Prosecutor has standing to bring this action and that a justiciable controversy is presented for decision.

### III
### Rule 17(c)

The subpoena duces tecum is challenged on the ground that the Special Prosecutor failed to satisfy the requirements of Fed.Rule Crim.Proc. 17(c), which governs the issuance of subpoenas duces tecum in federal criminal proceedings. If we sustained this challenge, there would be no occasion to reach the claim of privilege asserted with respect to the subpoenaed material. Thus we turn to the question whether the requirements of Rule 17(c) have been satisfied. See Arkansas Louisiana Gas Co. v. Dept. of Public Utilities, 304 U.S. 61, 64, 58 S.Ct. 770, 771, 82 L.Ed. 1149 (1938); Ashwander v. TVA, 297 U.S. 288, 346–347, 56 S.Ct. 466, 482–483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

FN9. That this was the understanding of Acting Attorney General Robert Bork, the author of the regulation establishing the independence of the Special Prosecutor, is shown by his testimony before the Senate Judiciary Committee: 'Although it is anticipated that Mr. Jaworski will receive cooperation from the White House in getting any evidence he needs to conduct investigations and prosecutions, it is clear and understood on all sides that he has the power to use judicial processes to pursue evidence if disagreement should develop.' Hearings on the Special Prosecutor before the Senate Committee on the Judiciary, 93d Cong., 1st Sess., pt. 2, p. 450 (1973). Acting Attorney General Bork gave similar assurance to the House Subcommittee on Criminal Justice. Hearings on H.J.Res. 784 and H.R. 10937 before the Subcommittee on Criminal Justice of the House Committee on the Judiciary, 93d Cong., 1st Sess. 266 (1973). At his confirmation hearings, Attorney General William Saxbe testified that he shared Acting Attorney General Bork's views concerning the Special Prosecutor's privilege in the courts. Hearings on the Nomination of William B. Saxbe to be Attorney General before the Senate Committee on the Judiciary, 93d Cong., 1st Sess. 9 (1973).

[10] So long as this regulation is extant it has the force of law. In United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed.

---

94 S.Ct. 3090
41 L.Ed.2d 1039
(Cite as: 418 U.S. 683, 94 S.Ct. 3090)

Page 14

[14][15][16][17] Rule 17(c) provides: 'A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive. The court may direct that books, papers, documents or objects designated in the subpoena be produced before the court at a time prior to the trial or prior to the time when they are to be offered in evidence and may, upon their production, permit the books, papers, documents or objects or **\*3103** portions thereof to be inspected by the parties and their attorneys.'

A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise. The leading case in this Court interpreting this standard is Bowman Dairy Co. v. United States, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879 (1951). This case recognized certain fundamental characteristics of the subpoena duces tecum in criminal cases: (1) it was not intended to provide a means of discovery for criminal cases, id., at 220, 71 S.Ct. 675; (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of **\*699** subpoenaed materials, [FN11] ibid. As both parties agree, cases decided in the wake of Bowman have generally followed Judge Weinfeld's formulation in United States v. Iozia, 13 F.R.D. 335, 338 (SDNY 1952), as to the required showing. Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary [FN12] and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

FN11. The Court quoted a statement of a member of the advisory committee that the purpose of the Rule was to bring documents into court 'in advance of the time that they are offered in evidence, so that they may then be inspected in advance, for the purpose . . . of enabling

http://print.westlaw.com/delivery.html?dest=atp&dataid=B005580000002410004573368B....    2/17/04

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Page 13 of 22

http://print.westlaw.com/delivery.html?dest=atp&dataid=B005580000002410004573368B....    2/17/04

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Page 14 of 22

invalidation of his official actions.[40] We therefore hold that the doctrine of separation of powers does not re-

[520 US 706]

quire federal courts to stay all private actions against the President until he leaves office.

**[1h]** The reasons for rejecting such a categorical rule apply as well to a rule that would require a stay "in all but the most exceptional cases." Brief for Petitioner i. Indeed, if the Framers of the Constitution had thought it necessary to protect the President from the burdens of private litigation, we think it far more likely that they would have adopted a categorical rule than a rule that required the President to litigate the question whether a specific case belonged in the "exceptional case" subcategory. In all events, the question whether a specific case should receive exceptional treatment is more appropriately the subject of the exercise of judicial discretion than an interpretation of the Constitution. Accordingly, we turn to the question whether the District Court's decision to stay the trial until after petitioner leaves office was an abuse of discretion.

## VII

The Court of Appeals described the District Court's discretionary decision to stay the trial as the "functional equivalent" of a grant of temporary immunity. 72 F. 3d, at 1361, n. 9. Concluding that petitioner was not constitutionally entitled to such an immunity, the court held that it

**40. [22b]** There is, no doubt, some truth to Learned Hand's comment that a lawsuit is to be "dreaded . . . beyond almost anything else short of sickness and death." 3 Association of the Bar of the City of New York, Lectures on Legal Topics 105 (1926). We recognize that the President, like any other official or private citizen, may become distracted or preoccupied by pending litigation. Presidents and other officials face a variety of demands on their time, however, some private, some political, and some as a result of official duty. While such distractions may be vexing to those subjected to them, they do not ordinarily implicate constitutional separation-of-powers concerns.

968

was error to grant the stay. Although we ultimately conclude that the stay should not have been granted, we think the issue is more difficult than the opinion of the Court of Appeals suggests.

Nevertheless, we are persuaded that it was an abuse of discretion for the District Court to defer the trial until after the President leaves office. Such a lengthy and categorical stay takes no account of the respondent's interest in bringing the case to trial. The complaint was filed within the statute of limitations period—albeit near the end of that period—and delaying trial would increase the danger of

[520 US 707]

prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party.

**[26]** The decision to postpone the trial was, furthermore, premature. The proponent of a stay bears the burden of establishing its need. *Landis v North American Co.* 299 US 248, 254, 81 L Ed 153, 57 S Ct 163. In this case, at the stage at which the District Court made its ruling, there was no way to assess whether a stay of trial after the completion of discovery would be warranted. Other than the fact that a trial may consume some of the President's time and attention, there is nothing in the record to enable a judge to assess the potential harm that may ensue from subjecting the trial promptly after its conclusion. We think the District Court may have given undue weight to the concern that a trial might generate unrelated civil actions that could conceivably hamper the President in conducting the duties of his office. If and when that should occur, the court's discretion would permit it to manage those actions in such fashion (including deferral of trial) that interference with the President's duties would not occur. But no such impingement upon the President's conduct of his office was shown here.

## VIII

We add a final comment on two matters that are discussed at length in the briefs: the risk that our decision will generate a large volume of politically motivated harassing and frivolous litigation, and the danger that national security concerns might prevent the President from explaining a legitimate need for a continuance.

We are not persuaded that either of these risks is serious. Most frivolous and vexatious litigation is terminated at the pleading stage or on summary judgment, with little if any personal involvement by the defendant. See Fed. Rules Civ. Proc. 12, 56. Moreover, the availability of sanctions provides a significant deterrent to litigation directed at the President in his unofficial capacity for purposes

**[25b]** Although these claims are in fact analytically distinct, the District Court does not appear to have drawn that distinction. Rather than basing its decision on particular factual findings that might have buttressed an exercise of discretion, the District Court instead suggested that a discretionary stay was supported by the *legal conclusion* that such a stay was required by *Fitzgerald*. See 869 F. Supp., at 699. We therefore reject petitioner's argument that the District Court's alternative holding over respondent's cross-appeal from the District Court's alternative holding was jurisdiction "also permitted," inter alia, "under the equity powers of the Court." Ibid. See 72 F. 3d, at 1357, n. 4. The District Court's legal ruling that the President was temporary immunity from trial—but not discovery—was "inextricably with its suggestion that a discretionary stay having the same effect might be proper, and its review of the [latter] decision [is] necessary to ensure meaningful review of the [former]." Ibid.

969

**APPEARANCES OF COUNSEL ARGUING CASE**

**Elizabeth Alexander** argued the cause for petitioner.
**Paul Bender** argued the cause for respondents.
Summaries of Briefs; Names of Participating Attorneys, p 1009, infra.

## OPINION OF THE COURT

[511 US 828]
Justice **Souter** delivered the opinion of the Court.

[1a] A prison official's "deliberate indifference" to a substantial risk of serious harm to an inmate violates the Eighth Amendment. See *Helling v McKinney* 509 US 25, 125 L Ed 2d 22, 113 S Ct 2475 (1993); *Wilson v Seiter*, 501 US 294, 115 L Ed 2d 271, 111 S Ct 2321 (1991); *Estelle v Gamble*, 429

[511 US 829]
US 97, 50 L Ed 2d 251, 97 S Ct 285 (1976). This case requires us to define the term "deliberate indifference," as we do by requiring a showing that the official was subjectively aware of the risk.

### I

The dispute before us stems from a civil suit brought by petitioner, Dee Farmer, alleging that respondents, federal prison officials, violated the Eighth Amendment by their deliberate indifference to petitioner's safety. Petitioner, who is serving a federal sentence for credit card fraud, has been diagnosed by medical personnel of the Bureau of Prisons as a transsexual, one who has "[a] rare psychiatric disorder in which a person feels persistently uncomfortable about his or her anatomical sex," and who "typically seeks medical treatment, including hormonal therapy and surgery, to bring about a permanent sex change. American Medical Association, Encyclopedia of Medicine 1006 (1989); see also American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 74-75 (3d rev ed 1987). For several years before being convicted and sentenced in 1986 at the age of 18, petitioner,

who is biologically male, wore women's clothing (as petitioner did at the 1986 trial), underwent estrogen therapy, received silicone breast implants, and submitted to unsuccessful "black market" testicle-removal surgery. See *Farmer v Haas*, 990 F2d 319, 320 (CA7 1993). Petitioner's precise appearance in prison is unclear from the record before us, but petitioner claims to have continued hormonal treatment while incarcerated by using drugs smuggled into prison, and apparently wears clothing in a feminine manner, as by displaying a shirt "off one shoulder," App 112. The parties agree that petitioner "projects feminine characteristics." *Id.*, at 74.

The practice of federal prison authorities is to incarcerate preoperative transsexuals with prisoners of like biological sex, see *Farmer v Haas, supra*, at 320, and over time, authorities housed petitioner in several federal facilities, sometimes

[511 US 830]
in the general male prison population but more often in segregation. While there is no dispute that petitioner was segregated at least several times because of violations of prison rules, neither is it disputed that in at least one penitentiary petitioner was segregated because of safety concerns. See *Farmer v Carlson*, 685 F Supp 1335, 1342 (MD Pa 1988).

On March 9, 1989, petitioner was transferred for disciplinary reasons from the Federal Correctional Institute in Oxford, Wisconsin (FCI-Oxford), to the United States Penitentiary in Terre Haute, Indiana (USP-Terre Haute). Though the rec-

---

**FARMER v BRENNAN**
(1994) 511 US 825, 128 L Ed 2d 811, 114 S Ct 1970

ord before us is unclear about the security designations of the two prisons in 1989, penitentiaries are typically higher security facilities that house more troublesome prisoners than federal correctional institutes. See generally Federal Bureau of Prisons, Facilities 1990. After an initial stay in administrative segregation, petitioner was placed in the USP-Terre Haute general population. Petitioner voiced no objection to any prison official about the transfer to the penitentiary or to placement in its general population. Within two weeks, according to petitioner's allegations, petitioner was beaten and raped by another inmate in petitioner's cell. Several days later, after petitioner claims to have reported the incident, officials returned petitioner to segregation to await, according to respondents, a hearing about petitioner's HIV-positive status.

Acting without counsel, petitioner then filed a *Bivens* complaint, alleging a violation of the Eighth Amendment. See *Bivens v Six Unknown Fed. Narcotics Agents*, 403 US 388, 29 L Ed 2d 619, 91 S Ct 1999 (1971); *Carlson v Green*, 446 US 14, 64 L Ed 2d 15, 100 S Ct 1468 (1980). As defendants, petitioner named respondents: the warden of USP-Terre Haute and the Director of the Bureau of Prisons (sued only in their official capacities); the warden of FCI-Oxford and a case manager there; and the Director of the Bureau of Prisons North Central Region Office and an official in that office (sued in their official and personal capacities). As later amended, the complaint alleged that respondents either

[511 US 831]
transferred petitioner to USP-Terre Haute or placed petitioner

in its general population despite knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that petitioner, as a transsexual who "projects feminine characteristics," would be particularly vulnerable to sexual attack by some USP-Terre Haute inmates. This alleged1y amounted to a deliberately indifferent failure to protect petitioner's safety, and thus to a violation of petitioner's Eighth Amendment rights. Petitioner sought compensatory and punitive damages, and an injunction barring future confinement in any penitentiary, including USP-Terre Haute.[1]

Respondents filed a motion for summary judgment supported by several affidavits, to which petitioner responded with an opposing affidavit and a cross-motion for summary judgment; petitioner also invoked Federal Rule of Civil Procedure 56(f), asking the court to delay its ruling until respondents had complied with petitioner's pending request for production of documents. Respondents then moved for a protective order staying discovery until resolution of the issue of qualified immunity, raised in respondents' summary judgment motion.

Without ruling on respondents' request to stay discovery, the District Court denied petitioner's Rule 56(f) motion and granted summary judgment to respondents, concluding that there had been no deliberate indifference to petitioner's safety. The failure of prison officials to prevent inmate assaults violates the Eighth Amendment, the court stated, only if

---

[1] Petitioner also sought an order requiring the Bureau of Prisons to place petitioner in a "co-correctional facility" (i.e., one separately housing male and female prisoners but allowing coeducational programming). Petitioner tells us, however, that the Bureau no longer operates such facilities, and petitioner apparently no longer seeks this relief.

98 S.Ct. 1042, 435 U.S. 247, Carey v. Piphus, (U.S.Ill. 1978)

Page 2

Rights Act of 1871. 42 U.S.C.A. § 1983.

[5] Civil Rights ⚷109

78 ----
  78I Rights Protected and Discrimination Prohibited
    78I(A) In General
      78k108 Rights Protected
        78k109 Due Process of Law and Equal Protection.

(Formerly 78k13.3(2))

[See headnote text below]

[5] Civil Rights ⚷273

78 ----
  78II Federal Remedies
    78II(B) Civil Actions
      78II(B)3 Judgment and Relief
        78k269 Damages
          78k273 Mental Suffering, Emotional Distress, Humiliation, or Embarrassment.

(Formerly 78k13.17(5), 78k13.17)

Mental and emotional distress caused by denial of procedural due process itself is compensable under Civil Rights Act of 1871, but neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14.

[6] Civil Rights ⚷109

78 ----
  78I Rights Protected and Discrimination Prohibited
    78I(A) In General
      78k108 Rights Protected
        78k109 Due Process of Law and Equal Protection.

(Formerly 78k13.3(2))

Denial of procedural due process should be actionable for nominal damages without proof of actual injury. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14.

[7] Damages ⚷12

115 ----
  115II Nominal Damages
    115k10 Nominal or Substantial Damages
      115k12 Extent of Damage Not Shown.

If suspensions of students from public elementary and secondary schools were justified, they would nevertheless be entitled to recover nominal damages not to exceed $1 for deprivation of procedural due process, but they would not be entitled to substantial nonpunitive damages in such circumstances, absent proof of any other actual injury. 42 U.S.C.A. § 1983; U.S.C.A.Const. Amend. 14.

*1043 Syllabus (FN*)

In actions by public school students under 42 U.S.C. § 1983 against school officials, wherein the students were found to have been suspended from school without procedural due process, the students, absent proof of actual injury, are entitled to recover only nominal damages. Pp. 1047-1054.

*1044 (a) The basic purpose of a § 1983 damages award is to compensate persons for injuries caused by the deprivation of constitutional rights. Pp. 1047-1049.

(b) To further the purpose of § 1983, the rules governing compensation for injuries caused by the deprivation of constitutional rights should be tailored to the interests protected by the particular right in question, just as the common-law rules of damages were defined by the interests protected in the various branches of tort law. Pp. 1049-1050.

(c) Mental and emotional distress caused by the denial of procedural due process cannot be presumed to occur, as in the case of presumed damages in the common law of defamation *per se*, but, although such distress is compensable, neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury actually was caused. Pp. 1050-1052.

(d) The issues of what elements and prerequisites for recovery of damages are appropriate to compensate for injuries caused by the deprivation of constitutional rights must be considered with reference to the nature of the interests protected by the particular right in question. Therefore, cases dealing with awards of damages for injuries caused by the deprivation of constitutional rights other than the right to procedural due process, are not controlling in this case. Pp. 1052-1053.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

986 F.2d 1521, Jordan v. Gardner, (C.A.9 (Wash.) 1993)

Page 8

Moreover, Vail's attempts to ensure that the searches were conducted in a professional manner do not negate the conclusion that he was deliberately indifferent to the inmates' pain when it became obvious that the pain would be inflicted no matter how professionally the searches were conducted. Psychologists on the WCCW staff warned Vail that the guards' professional demeanor would not ameliorate the risk of psychological harm, and the severe reaction of one inmate occurred during a search that was performed in accordance with the policy.

Implicit in Judge Trott's dissent is the belief that the deliberate indifference standard should not be applied to the adoption of prison policies, because officials who institute policies generally do so after carefully examining the consequences. In the dissent's view, such officials cannot be said to have manifested "deliberate indifference" to the constitutional rights involved, and, thus, prison policies should rarely if ever be found to violate the Eighth Amendment. While at first blush such analysis may have some appeal, a closer examination reveals that it has a fatal infirmity.

The dissent's analysis fails to take into account the full scope of the term "deliberate indifference." It is not enough to say that before enacting a policy prison authorities considered an issue carefully. That is only one part of their obligation. Prison authorities are also required to afford sufficient weight to the constitutional rights of individuals. The failure to treat constitutional provisions with appropriate respect constitutes deliberate indifference to the rights the policy seeks to limit. If a prison administrator decides to ignore grave suffering because of irrelevant or unimportant concerns, that administrator demonstrates a deliberate indifference to the harm being done and to the constitutional principle at stake. For example, if the superintendent of a prison becomes aware that a disruptive prisoner has been threatened with death by other prisoners and he does nothing because he decides that the morale of the prison guards will improve if the disruptive prisoner dies, or that the guards' morale will suffer if he interferes with their wholly inadequate approach to handling the situation, the superintendent will have acted with deliberate indifference to the prisoner's *1530 welfare and to his constitutional rights. No matter how much thought and consideration the superintendent gives to the problem, his failure to place a higher value on a prisoner's life than on the staff's morale will constitute "deliberate indifference."

Here, Superintendent Vail urges, in effect, that it is proper to inflict serious psychological pain on the inmates because otherwise it may be necessary to interrupt the lunch periods of female guards, periods during which they are on duty. He also points to other minor concerns relating to the morale and working conditions of the prison staff, and, belatedly, to routine and automatic security concerns. Superintendent Vail considered the harm his policy would cause and instituted the policy nevertheless. He did so because of an exaggerated regard for pragmatic interests of lesser significance and a lack of proper concern for the serious infringement of a counter-vailing constitutional interest. He was advised by his staff of the harm that his policy would cause, yet he elevated a far less important concern above the constitutional injury. It is simply not enough to say, as the dissent does, that he gave the issue a great deal of thought. The "sufficiently culpable state of mind" necessary to find deliberate indifference has more meaning than that. See Wilson v. Seiter, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Under these circumstances, we must conclude that the prison officials' conduct in this matter has been "wanton." The district court properly found that the policy is "unnecessary and wanton."

C

[10] The prison officials propose use of another test altogether for establishing a violation of the Eighth Amendment. They argue that the Eighth Amendment challenge, like all of the inmates' other claims, should be measured under the "reasonableness" standard of Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), rather than by the traditional Eighth Amendment approach. We reject this argument.

Although the Supreme Court has stated broadly that "the standard of review we adopted in Turner applies to all circumstances in which the needs of prison administration implicate constitutional rights," Washington v. Harper, 494 U.S. 210, 224, 110 S.Ct. 1028, 1038, 108 L.Ed.2d 178 (1990), Turner has been applied only where the constitutional right is one which is enjoyed by all persons, but the exercise of which may necessarily be limited due to the unique circumstances of imprisonment. See, e.g., id. (due process under Fourteenth Amendment); Turner, 482 U.S. at 91-99, 107 S.Ct. at 2262-66 (free association under First Amendment); Michenfelder, 860 F.2d at 332-36 (applying Turner to privacy and Fourth

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

APPENDIX B—Continued

cial Master's reports and findings shall be treated in accordance with the provisions of Rule 53 of the Federal Rules of Civil Procedure. The Special Master may also submit reports based upon his own observations and investigations in the absence of a formal hearing before him. In any event, however, the Special Master's findings must be based upon evidence which is made part of the record before the Court.

The Special Master shall be compensated at the rate of Ninety-Five Dollars ($95.00) per hour for services performed in accordance with this Order. Appropriate compensation for members of the Special Master's staff as well as that of monitors shall be established by the Court upon the recommendation of the Special Master and after notice to all parties. All reasonable expenses incurred by the Special Master in the course of the performance of his duties, including but not limited to the rental of office space and equipment in Texas, salaries of staff, long distance telephone, photocopying, printing, travel, data processing, and postage, shall be reimbursed.

The cost of the mastership shall be borne by the defendants as costs in the action. The Special Master shall submit, to the Court periodic statements of his time and expenses for review and approval by the Court.

THE DEFENDANTS ARE HEREBY ORDERED to deposit the sum of One Hundred Fifty Thousand Dollars ($150,000.00) with the Clerk of this Court as interim payment of costs, and payments to the Special Master and to monitors shall be made by order of the Court out of such funds. As payments are made by the Clerk, the defendants shall deposit additional sums with the Clerk as the Court may order and direct.

The Special Master may cause copies of this Order of Reference or portions thereof to be posted in any facility under the jurisdiction of the Texas Department of Corrections and may cause such copies to be distributed to inmates within such facilities and to employees of the Texas Department of Corrections.

SO ORDERED this 24th day of July, 1981.

(s) Wm. Wayne Justice
William Wayne Justice
Chief Judge
United States District Court
Eastern District of Texas
Judge Presiding

APPENDIX C

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

DAVID RUIZ, ET AL.,
  Plaintiffs,
UNITED STATES OF AMERICA,
  Plaintiff-Intervenor,
v.                        NO. H-78-987-CA
W. J. ESTELLE, JR., ET AL.,
  Defendants.

ORDER

On April 14, 1982, the Special Master in the above-styled civil action announced that the parties to the action had agreed to a stipulated modification of Sections II(A) and II(D) of the Amended Decree Granting Equitable Relief and Declaratory Judgment, entered May 1, 1981. Plainly, any alteration of a court's remedial order, suggested by the parties, is subject to approval by the court. Moreover, since this action is a class action, the notice provisions of Rule 23(e), F.R.Civ.P., requires that all class members be notified of the proposed settlement and that they be given an opportunity to object to its terms. At the close of the hearing on April 14, 1982, the proposed settlement was accepted for review by the court; additionally, the parties were directed to submit to the court a jointly prepared form of notice to the class, and a proposal as to how such notice should be published.

In an order entered April 21, 1982, preliminary approval was given to the settlement. The terms of the modification are fair and reasonable, and protect, in all respects, the rights of the plaintiff class. As indicated in the order of April 21, a just settlement of the issues involved in the

---

APPENDIX C—Continued

stipulated modification is in the best interests of all parties to this action, not only with respect to these particular issues, but more generally regarding the entire remedial phase of the case.

The order of April 21 also approved a form of notice to the class, as well as a proposed method of publication. Under the terms of this notice, the members were thoroughly apprised of the content of the settlement, and were given an opportunity to challenge its terms, by means of written objections. Class members were directed to file their objections with the clerk of the court, and direct copies to counsel for all parties, and to the Special Master. A hearing was held on June 1, 1982, in Houston, Texas, for the purpose of considering any objections to the proposed settlement filed by members of the plaintiff class.

Numerous inmates filed objections to the stipulated modification of Sections II(A) and II(D) of the Amended Decree. The objections raise serious concerns which merit close attention. With one notable exception, the central thread of the objections is skepticism about defendants' willingness to comply with the terms of the settlement. In view of the history of this litigation, this skepticism is fully understandable. However, as with all portions of the injunctive order in this action, defendants' compliance with the terms of the stipulation will be closely monitored. The Stipulated Modification contains elaborate provisions for ensuring enforcement of its terms. The court is satisfied that this procedure adequately protects the rights of the plaintiff class. Should evidence of noncompliance with the terms of the stipulation be called to the attention of the court, appropriate remedial action will be taken.

One objection filed by a member of the plaintiff class deserves special comment. Originally, notice of the proposed settlement was provided to plaintiff class only in English. Consequently, Spanish-speaking inmates were severely limited in their ability to review and comment on the terms of

Cite as 679 F.2d 1115 (1982)
RUIZ v. ESTELLE     1173

the settlement. To cure this shortcoming, the parties were directed to arrange for publication of notice in Spanish. Such arrangements were made forthwith, and the court is satisfied that all inmates of the Texas Department of Corrections have been adequately notified of the settlement. Given consideration to the highly acute sophisticated objections previously made, it appears extremely unlikely that any meritorious objections not previously raised would be advanced. Thus, on the basis of the arguments and evidence adduced at the hearing, it appears that the members of the plaintiff class have received due notice of Section II(A) and II(D) of the Amended Decree should be finally approved.

This action has been remanded temporarily to the district court from the Court of Appeals for the Fifth Circuit, to permit hearing as to the approval and entry of the stipulated modification of the Amended Decree vel non. It appears from the order and remand that entry of final approval will automatically re-vest jurisdiction over the appeal in the Court of Appeals. Nevertheless, the parties are directed to notify the Clerk of the Court of Appeals for the Fifth Circuit that the present order has been entered and to furnish him with a complete record in this matter, including all pleadings and orders relating thereto. The parties are further directed to take any action necessary to insure this action is reinstated in that court. Finally, defendants are directed, in accordance with Section XIV.A. of the Stipulated Modification, to file in this Court of Appeals a motion for voluntary dismissal of the portion of their appeal relating to Sections II(A) and II(D) of the Amended Decree.

It is so ORDERED.

SIGNED and ENTERED this 1st day of June, 1982.

(s) Wm. Wayne Justice
Chief Judge
United States District Court
Eastern District of Texas
Judge Presiding

DIXON CC XHOUSE SEGREGATION USE ONLY

[The page contains rotated/sideways printouts of Westlaw pages 5 and 6 of 9 from 375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.)). Content is legal text discussing collateral order doctrine, appellate jurisdiction, the March 19 order, and related case law including Matter of U.S. Brass Corp., Quackenbush, Cohen v. Beneficial Industrial Loan Corp., Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co., and others.]

375 F.3d 593
375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.))
(Cite as: 375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.)))

Page 5

that the March 19 order was indeed a de facto final judgment. As we have mentioned, the March 19 order dismisses the remaining two federal claims "without prejudice." In the usual case, an order dismissing a complaint without prejudice is not final, and is therefore not appealable under 28 U.S.C. § 1291, because the plaintiff is free to amend her pleading and continue the litigation. See, e.g., Hoskins v. Poelstra, 320 F.3d 761, 763 (7th Cir.2003); Strong v. David, 297 F.3d 646, 648 (7th Cir.2002); Furnace v. Bd. of Tr's. of S. Ill. Univ., 218 F.3d 666, 669 (7th Cir.2000). There are, however, situations in which an order nominally dismissing a case without prejudice is in fact final because an amendment would be unavailing. See, e.g., Hoskins, 320 F.3d at 763; Dixon v. Page, 291 F.3d 485, 488 (7th Cir.2002); Larkin v. Galloway, 266 F.3d 718, 721 (7th Cir.2001); United States v. City of Milwaukee, 144 F.3d 524, 528 n. 7 (7th Cir.1998). It seems likely that no amendment would change things in this case, and given normal rules of claim and issue preclusion, see 28 U.S.C. § 1738, there might be nothing meaningful left that could be litigated, after the March 19 order is finished. If that were the case, the March 19 order and all orders entered before that date would be appealable under § 1291.

[3] The possibility of additional proceedings in federal court is real enough, however (in large part because the district court so explicitly anticipated them), that we think it prudent to decide in the alternative *598 whether appellate jurisdiction exists if the March 19 order is better viewed as non-final. The answer, we are confident, is yes, because in substance the March 19 order represents a decision by the federal court to abstain, and it otherwise fits the description of "collateral orders," as we explain below. Either way—as an abstention order or as a collateral order—immediate appellate review of the March 19 order itself is available, for the reasons we now explain.

Putting labels to one side, the March 19 order is best understood as an order of abstention, implemented through dismissal rather than a stay. As such, it is independently appealable under the rule announced in Quackenbush v. Allstate Insurance Co., 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), Id. at 714, 116 S.Ct. 1712; see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Co., 460 U.S. 1, 12-13, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), Matter of U.S. Brass Corp., 110 F.3d 1261, 1267 (7th Cir.1997). Quackenbush represents a special application of the general "collateral order" theory, under which certain orders can be reviewed as "final" judgments because they effectively end the litigation in a particular respect. Even if the March 19 order is seen as something other than an abstention ruling (although we confess it is hard to see why it should be), appellate jurisdiction would be proper under the appellate collateral order rule set forth in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949).

*5 [4] The collateral order doctrine permits an appeal from a non-final judgment where the issues raised are " 'too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.' " United States v. Thompson, 814 F.2d 1472, 1475 (10th Cir.1987) (quoting Cohen, 337 U.S. at 546, 69 S.Ct. 1221). The requirements for appealing collateral orders are set out in Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978). The order must: (1) conclusively determine the disputed question, (2) resolve an important issue completely separate from the merits of the action, and (3) be effectively unreviewable on appeal from a final judgment. Id. at 468-69, 98 S.Ct. 2454 (citing Abney v. United States, 431 U.S. 651, 658, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); United States v. MacDonald, 435 U.S. 850, 855, 98 S.Ct. 1547, 56 L.Ed.2d 218 (1978).

The district court's March 19 dismissal meets these criteria. It is in no sense tentative: the district court entered a one-sentence order that dismissed without prejudice the federal-law claims pending resolution of the state court proceedings. Compare Microsoftware Computer Sys., Inc. v. Ontel Corp., 686 F.2d 531, 534 (7th Cir.1982) (stay order not sufficiently "conclusive" because the district court "is free to reconsider its denial of the stay throughout the course of the litigation"), overruled on other grounds, Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988). Moreover, particularly in light of the total absence of explanation from the district court, there is nothing in the record to suggest that the order is subject to any conditions

375 F.3d 593
375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.))
(Cite as: 375 F.3d 593, 2004 WL 1557329 (7th Cir.(Ill.)))

Page 6

that might be satisfied. It appears to us that further consideration by the district court of the ruling is out of the question. See Moses H. Cone, 460 U.S. at 12-13, 103 S.Ct. 927; In re Gen. Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1118 (7th Cir.1979).

The other requirements of the collateral order doctrine are met as well. The district court's March 19 order resolves issues that are capable of review without extensive *599 examination of the underlying merits of the case. Indeed, a dismissal without prejudice during the pendency of parallel state-court proceedings explicitly defers all merits consideration in the federal-court proceeding. Further, because judgment in the parallel state-court proceeding may have preclusive effect as to the federal-law claims, see Allen v. McCurry, 449 U.S. 90, 95-96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); Wilhelm v. County of Milwaukee, 325 F.3d 843, 846 (7th Cir.2003), the district court's order will be effectively unreviewable on appeal should the state court proceed to judgment. Moses H. Cone, 460 U.S. at 12, 103 S.Ct. 927; In re Gen. Motors, 594 F.2d at 1121. Thus, considered either as an abstention order or as a straightforward dismissal, we conclude that the March 19 order is appealable as a collateral order.

With jurisdiction over the appeal from the March 19 order secure, the only remaining question is whether we may also review the earlier two orders the City is trying to appeal. We can, if the doctrine of pendent appellate jurisdiction would support review of either or both of those orders. That doctrine allows a court of appeals "to review an otherwise unappealable interlocutory order if it is inextricably intertwined with an appealable one." Jones v. InfoCure Corp., 310 F.3d 529, 536 (7th Cir.2002) (noting that despite the Supreme Court's expression of doubt about pendent appellate jurisdiction in Swint v. Chambers County Commission, 514 U.S. 35, 43-51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), the Court itself relied on this theory in the later case of Clinton v. Jones, 520 U.S. 681, 707 n. 41, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)); see also Greenwell v. Aztar Ind Gaming Corp., 268 F.3d 486, 491 (7th Cir.2001). In its usual guise, pendent appellate jurisdiction may be invoked "only if there are compelling reasons for not deferring the appeal of the former order to the end of the lawsuit." United States for Use of Valders Stone & Marble, Inc. v. C-Way Constr. Co., 909 F.2d 259, 262 (7th Cir.1990) (quoting People of State of Ill. ex rel. Hartigan v. Peters, 861 F.2d 164, 166 (7th Cir.1988)); see also Triad Assocs., Inc. v. Robinson, 10 F.3d 492, 497 n. 2 (7th Cir.1993). As we have noted, "[a]ny taxer approach would allow the doctrine of pendent appellate jurisdiction to swallow up the final-judgment rule." Patterson v. Portch, 853 F.2d 1399, 1403 (7th Cir.1988); see also Asset Allocation and Mgmt. Co. v. W Employers Ins. Co., 892 F.2d 566, 569 (7th Cir.1989). We consider the two remaining orders in light of these principles.

*6 [5] With respect to the September 25 order, we conclude that pendent appellate jurisdiction does not exist and should be exercised here. Montaño claims only that the district court's September 25 order declines to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c) was immediately appealable, but he cites no authority for that proposition and it is not dispositive in any event. It is true that we have found in the past that remands of removed cases that dispose of all remaining claims and that rest on the authority of 28 U.S.C. § 1367(c), rather than 28 U.S.C. § 1447(c), are appealable final judgments. See, e.g., Miller Aviation v. Milwaukee County Bd. of Supervisors, 273 F.3d 722, 727 n. 9 (7th Cir.2001); see also Lindley v. Dillard's, Inc., 306 F.3d 596, 598-99 (8th Cir.2002); Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 615 (4th Cir.2001); In re US Healthcare, Inc., 193 F.3d 151, 159 (3d Cir.1999). But, most importantly, this case did not reach the federal court through the device of removal. Furthermore, the removal cases say nothing about whether remand decisions under § 1367(c) can be appealed before the federal claims are resolved. To that extent, they merely *600 follow the well-settled rule that an appealable final judgment under 28 U.S.C. § 1291 must put the litigation to an end, leaving nothing for the district court to do to execute the judgment. See, e.g., Coopers & Lybrand, 437 U.S. at 467, 98 S.Ct. 2454. This case is totally different. Here the district court's September 25 decision not to retain supplemental jurisdiction over the state-law claims left intact Montaño's federal-law claims and so was not final in any meaningful sense of the term. Thus, the September 25 order was an otherwise unappealable

protection therefore does not deprive the child of liberty in violation of the due process clause, where (1) the harms suffered by the child occur not while he is in the state's custody, but while he is in the custody of his father, and (2) the state plays no part in the creation of the dangers that the child faces, nor does the state do anything to render him any more vulnerable to them; the fact that the state knows that a child faces a special danger of abuse at his father's hands and undertakes to protect the child against that danger by taking temporary custody of him does not give rise to a constitutional duty to protect the child when it returns him to his father's custody, because under such circumstances, the state places the child in no worse position than that in which he would have been had the state not acted at all. (Brennan, Marshall, and Blackmun, JJ, dissented from this holding.)

Appeal §§ 1084(2), 1104.5 — question not raised below or in certiorari petition

2a, 2b. On certiorari, the United States Supreme Court will decline to consider an argument that was neither pleaded in the complaint in the Federal District Court, nor argued to the United States Court of Appeals as a ground for reversing the District Court, nor raised in the petition for certiorari, but is made for the first time in the petitioner's brief to the Supreme Court.

Constitutional Law § 513 — due process — protection against private acts

3a, 3b. Nothing in the language of the due process clause of the Federal Constitution's Fourteenth Amendment requires a state to protect the life, liberty, and property of its citi-

zens against invasion by private actors; a state's failure to protect an individual against private violence does not constitute a violation of the due process clause.

Constitutional Law § 513 — due process clause — purpose

4. The due process clause of the Federal Constitution's Fourteenth Amendment, like the due process clause of the Fifth Amendment, is intended to prevent government from abusing its power, or employing it as an instrument of oppression.

Constitutional Law § 525 — due process — deprivation of liberty

5. Although the liberty protected under the Federal Constitution's guaranty of due process affords protection against unwarranted government interference, it does not confer an entitlement to such governmental aid as may be necessary to realize all the advantages of that freedom.

Civil Rights § 4.5 — selective denial of state services

6a, 6b. A state may not selectively deny its protective services to certain disfavored minorities without violating the equal protection clause of the Fourteenth Amendment.

Criminal Law § 78 — cruel and unusual punishment — failure to provide medical care

7a, 7b. To make out a claim that a state, in violation of the prohibition against cruel and unusual punishment in the Federal Constitution's Eighth Amendment, failed to provide adequate medical care to an incarcerated prisoner, the prisoner must show that the state defendants exhibited deliberate indifference to the prisoner's serious medical needs;

252

a showing of mere negligent or inadvertent failure to provide adequate care is not enough to make out such a claim.

Criminal Law § 76 — cruel and unusual punishment

8a, 8b. The Federal Constitution's Eighth Amendment applies only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions; the state does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.

Constitutional Law § 528.3 — due process — mental patients

9. It is unconstitutional, under the due process clause of the Federal Constitution's Fourteenth Amendment, for a state to confine involuntarily committed mental patients in unsafe conditions.

Constitutional Law § 78 — due process — cruel and unusual punishment — deprivation of liberty — duty to protect person in custody

10. A state that takes a person into its custody and holds him there against his will has a corresponding duty under the Federal Constitution to assume some responsibility for his safety and general well-being; when the state, by the affirmative exercise of its power, so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Federal Constitution's Eighth

Amendment and the due process clause of the Fourteenth Amendment; the affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf, in the substantive due process analysis, it is the state's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint on personal liberty—which is the "deprivation of liberty" triggering the protections of the due process clause, not the state's failure to act to protect his liberty interests against harms inflicted by other means.

Constitutional Law § 525 — due process — deprivation of liberty

11a, 11b. Both the substantive and the procedural protections of the due process clause of the Federal Constitution's Fourteenth Amendment may be triggered when the state, by the affirmative acts of its agents, subjects an involuntarily confined individual to deprivations of liberty which are not among those generally authorized by his confinement.

Appeal § 1331.5 — question reviewable

12a, 12b. On certiorari to review a United States Court of Appeals decision which held that a state's failure to provide a child with adequate protection against his father's abuse did not violate the due process clause of the Federal Constitution's Fourteenth Amendment where the child, at relevant times, had been in his father's custody, the United States Supreme Court will express no view as to whether there would

253

least be premised on facts rationally determined. This is not a concept without meaning. In most cases it would probably be difficult to find an inquiry minimally fair and rational unless the prisoner were confronted with the accusation, informed of the evidence against him (citations omitted) and afforded a reasonable opportunity to explain his actions." Sostre v. McGinnis, supra, 442 F.2d at 198.

(FN5.) This result is consistent with those cases considering the due process limitations on prison officials' power to transfer inmates to other institutions, which have concluded that transfers accorded during emergencies are not entitled to a prior hearing; but that due process protections are required at a reasonably prompt time after the transfer has been effectuated. See, e. g., Gomes v. Travisono, 490 F.2d 1209, 1215 (1st Cir. 1973); Hoitt v. Vitek, 361 F.Supp. 1238, 1253 (D.N.H.1973), aff'd 497 F.2d 598 (1st Cir. 1974).

*651 (FN6.) We recognize the uncertainty produced by lack of specific standards. We must recognize, however, the diversity of emergency situations which may occur within correctional institutions. In deciding when such due process protections as notice and an opportunity to respond are required, the considerations must be the severity of the action and the concomitant interference with normal prison life; the length of its imposition; and the reasonable availability of opportunity to provide meaningful individual notice. Essentially, as the emergency reaction is extended in time, the dislocation of normal prison activity is magnified, the reasonable opportunity to provide adequate notice increases, and the requirement of due process protections becomes compelling.

(FN7.) Plaintiffs do not challenge the good faith of defendants in imposing the dead-lock (i. e., allege pretextual action) but rather dispute the basis for the decision and its continuation.

(FN8.) We do not understand defendants' position to be that the alleged emergency conditions present within the prison justified the denial, but rather that there was, in fact no denial and that the care provided inmates during the dead-lock period was sufficient and proper. We therefore do not address the issue as to what effect an emergency situation might have on a conceded failure to provide necessary medical treatment. We do note, however, that emergency conditions might be such as to justify a temporary failure to provide medication or treatment for minor ailments.

(FN9.) It appears that the district court overlooked plaintiffs' application to add parties defendant. This may be considered on remand with the proviso that parties are to be granted leave to amend freely, especially, absent any showing of prejudice to the defendant, F.R.Civ.P. 15(a); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Moreover, it is clear that, while the amended complaint could not, as a matter of course, add new parties defendant, this does not destroy the effect of the amended complaint as an amendment as of right as to the defendant Twomey. Cf. Goldlawr, Incorporated v. Shubert, 169 F.Supp. 677, 689 (E.D.Pa.1958), aff'd 276 F.2d 613 (3rd Cir. 1960).

(FN10.) Moreover, we note that an examination of the defendant's proffered affidavits and the facts alleged in the plaintiffs' amended verified complaint reveal important issues of fact outstanding. As to LaBatt's claim, defendant submitted by affidavit that he "should have had enough medication" for the period in question. Actual delivery to LaBatt of the drugs, however, is not established and is, clearly, critical to any claim of denial of medical services. The supplemental affidavit concerning Cook's claim is similarly insufficient to foreclose his claim. It reports that the pharmacy record "lists tedral prescribed in June 29 for seven days. On July 11, 1972, tedral was prescribed for thirty days." (Emphasis added.) These assertions leave in question the adequacy of medication for the period July 6 through July 11.

Copyright (c) West Group 2002 No claim to original U.S. Govt. works