E-FILED
Monday, 07 August, 2006 11:16:42 AM
Clerk, U.S. District Court, ILCD

FILED
AUG 07 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DATE: SUNDAY: JULY 30, 2006

CLERK AND JUDGES OF THE
U.S. COURT OF APPEALS FOR 7th CIRCUIT

U.S. 7th Circuit APPEAL
RE: URIOSTE, MARK S. — v — NICKLAW,
SONIA — APPEAL No. 06-3005
AND, 7th CIR.
RE: URIOSTE, MARK S. — v — CHANDLER, NEDRA
APPEAL NO. 06-3004
[APPEAL FROM U.S. DIST. CT. C.D. ILL.
HAROLD A. BAKER, JUDGE]
NO. 05 C 1098 — AND — U.S. DIST. CT. C.D.
NO. 04-C-1380

"MOTIONS" PRO SE INFORMA PAUPERIS

(1) TO WITHDRAW NOTICE OF APPEAL
TO THIS COURT (2) APPOINTMENT
OF COUNSEL (3) "THIRTY-ONE (31) DAY
STAY IN U.S. DIST CT." (4) MOTION TO BRING
A LAWYER AS NEEDED BY A STATE PRISONER AND
DEFENDANT FOR A MENTAL PATIENT
REHEARING AND
IMPEACHMENT ACTION            SINCERELY YOURS, PRO SE
PURSUANT TO ALL         MARK S. URIOSTE N-87829
LAWS AND CASES          A MARK URIOSTE-N87829
CITED IN ATTACHED       DIXON CORRECTIONAL CENTER [D.C.C.]
LEGAL EXHIBIT           2600 N. BRINTON AVE.
BY TO: U.S. DIST.       DIXON, ILLINOIS 61021
C.D. ILL.
4 — 28 U.S.C. 1746 AND 18 U.S.C. 1621

Exibit

## 1118    679 FEDERAL REPORTER, 2d SERIES

intervene. Fed.Rules Civ.Proc. Rule 24(b)(2), 28 U.S.C.A.; Civil Rights of Institutionalized Persons Act, §§ 2-12, 5, 42 U.S.C.A. §§ 1997-1997j, 1997c.

### 25. Civil Rights ⟸2

Procedural provision of section of Civil Rights of Institutionalized Persons Act dealing with intervention by United States was not applicable to class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections which was pending when Act was passed, since Act was aimed to preclude, inter alia, possibility that suits in which amicus or plaintiff intervenor would be disrupted by defendants' motions to dismiss United States as party. Fed.Rules Civ. Proc. Rule 24(b)(2), 28 U.S.C.A.; Civil Rights of Institutionalized Persons Act, §§ 2-12, 5, 42 U.S.C.A. §§ 1997-1997j, 1997c.

### 26. Civil Rights ⟸2

No "manifest injustice" would result from application of Civil Rights of Institutionalized Persons Act to class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, even though Act was not passed until after United States had been properly permitted United States to intervene as party plaintiff. Fed.Rules Civ. Proc. Rule 24(b)(2), 28 U.S.C.A.; Civil Rights of Institutionalized Persons Act, §§ 2-12, 5, 42 U.S.C.A. §§ 1997-1997j, 1997c.

### 27. Federal Civil Procedure ⟸331

In action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, district court properly permitted United States to intervene as party plaintiff. Fed.Rules Civ. Proc. Rule 24(b)(2), 28 U.S.C.A.; Civil Rights of Institutionalized Persons Act, §§ 2-12, 5, 42 U.S.C.A. §§ 1997-1997j, 1997c.

### 28. Federal Courts ⟸265

States' Eleventh Amendment sovereign immunity bars action in federal court against state or state agency unless state has consented to suit. U.S.C.A.Const. Amend. 11.

### 29. Civil Rights ⟸13.7

Congress, in enacting section providing that every person who, under color of state law, causes deprivation of rights, privileges or immunities secured by Constitution shall be liable to party injured, did not intend to override traditional sovereign immunity of states, and, therefore, neither states nor state agencies are "persons" within meaning of that section. 42 U.S.C.A. 1983; U.S.C.A.Const.Amend. 11.

See publication Words and Phrases for other judicial constructions and definitions.

### 30. Civil Rights ⟸13.7

For purposes of class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, Texas Board of Corrections, which manages and controls Department, was not "person" within meaning of section providing that any person who, under color of state law, causes deprivation of rights, privileges or immunities secured by Constitution, shall be liable to party injured, nor, consequently, was it proper party defendant. 42 U.S.C.A. § 1983; U.S.C.A.Const.Amend. 11.

### 31. Civil Rights ⟸13.11

Action on behalf of inmates confined in various institutions operated by Texas' Department of Corrections, individual members of Texas Board of Corrections, which manages and controls Department, were proper party defendants, as individual members were responsible for any violation of constitutional rights caused by their management. 42 U.S.C.A. § 1983; U.S.C.A.Const.Amend. 11.

### 32. Civil Rights ⟸13.11

Mere fact that Director of Texas Department of Corrections was named defendant and could respond to any court orders in class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections did not preclude naming individual members of Texas Board of Corrections, which manages and controls

---

## RUIZ v. ESTELLE    1119
Cite as 679 F.2d 1115 (1982)

Department, as defendants. 42 U.S.C.A. § 1983; U.S.C.A.Const.Amend. 11.

### 33. Criminal Law ⟸1213

In reviewing claims by prison inmates of cruel and unusual punishment, test to be applied is that of totality of circumstances. U.S.C.A.Const.Amend. 8.

### 34. Civil Rights ⟸13.13(3)

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, district court's findings concerning specific episodes of inmate violence and staff brutality were supported by substantial evidence and would not be overturned. U.S.C.A.Const. Amend. 8.

### 35. Civil Rights ⟸13.13(3)

In class action on behalf of inmates confined to various institutions operated by Texas Department of Corrections, district court's conclusion that overcrowding, along with inmate violence, staff brutality and low guard-inmate ratio, constituted cruel and unusual punishment was supported by substantial evidence. U.S.C.A.Const. Amend. 8.

### 36. Injunction ⟸1

Although district court has wide discretion in tailoring remedial injunction, that discretion is not unconfined.

### 37. Criminal Law ⟸1213

Constitutional mandate against cruel and unusual punishment is not warranty of pleasant prison conditions. U.S.C.A.Const. Amend. 8.

### 38. Civil Rights ⟸13.2(1)

In cases involving alleged cruel and unusual punishment, reparative injunctive relief must be targeted at elimination of unconstitutional conditions. U.S.C.A.Const. Amend. 8.

### 39. Prisons ⟸4(3)

In actions alleging cruel and unusual punishment, district court can order only relief sufficient to correct violation found. U.S.C.A.Const.Amend. 8.

### 40. Prisons ⟸4(2)

Court of Appeals has neither commission nor competence to prescribe purposes of confinement. U.S.C.A.Const.Amend. 8.

### 41. Prisons ⟸4(3)

As matter of respect for state's role and for allocation of functions in federal system, as well as comity toward state, relief ordered by federal courts in actions alleging cruel and unusual punishment must be consistent with policy of minimum intrusion into affairs of state prison administration. U.S.C.A.Const.Amend. 8.

### 42. Prisons ⟸4(2)

In fashioning remedy in action alleging cruel and unusual punishment, Court of Appeals should fashion least intrusive remedy that will still be effective and, in shaping that remedy, Court must also, as matter of judicial administration, regard essential nature of federal courts in adversary system. U.S.C.A.Const.Amend. 8.

### 43. Prisons ⟸4(2)

In cases alleging cruel and unusual punishment, conservative treatment with regard to remedy is essential because it is more readily administered, less costly and is not irreversible; therefore, remedy should begin with what is absolutely necessary and, if those measures later prove ineffective, more stringent ones should be considered. U.S.C.A.Const.Amend. 8.

### 44. Criminal Law ⟸1213

Neither the number of inmates in one cell nor the amount of space provided for inmates in dormitory alone determines whether confinement is cruel and unusual. U.S.C.A.Const.Amend. 8.

### 45. Criminal Law ⟸1213

If inmate uses his living quarters only for sleeping, and is not threatened with violence, single bunk space, 18 or 20 square feet, may be adequate under Eighth Amendment. U.S.C.A.Const.Amend. 8.

### 46. Constitutional Law ⟸82(1)

Constitutional rights are not confined to those available at modest cost.

**89. Prisons ⬤=13(7)**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, district court did not abuse its discretion by requiring Department to tape record or in some other way make verbatim record of all disciplinary hearings, preserve recordings for at least one year and follow prescribed procedures for making recordings available to inmates or their legal representatives, as that provision imposed little expense or inconvenience on Department, did not change manner in which state officials discharged their duties, was narrowly focused to prevent repetition of proven violations of inmates' due process rights in connection with disciplinary proceedings and was not unnecessarily intrusive on state functions. U.S.C.A.Const.Amends. 5, 14.

**90. Federal Courts ⬤=5**

Federal courts are necessarily confined to limited jurisdiction granted by Article III and by act of Congress. U.S.C.A.Const.Art. 3, § 1 et seq.

**91. Federal Courts ⬤=6**

Federal court's jurisdiction over state law claims is ultimately a question of judicial power under Constitution, and definition of that power is not to be crabbed. U.S.C.A.Const.Art. 3, § 1 et seq.

**92. Federal Courts ⬤=15**

Where pleadings in class action on behalf of inmates confined in various institutions operated Texas Department of Corrections did not invoke district court's pendent jurisdiction and, as result, exercise of discretion to assume jurisdiction over state law claims was not even mentioned until after lengthy trial on merits had been completed, those factors militated against exercise of pendent jurisdiction even if plaintiffs had not court, had invoked pendent jurisdiction at belated time.

**93. Federal Courts ⬤=15**

Concept that federal trial court may of its own volition, after trial, consider state law claims not pleaded by plaintiffs is not consonant with either doctrine that exercise of pendent jurisdiction is expansive act, permitting disposition in one suit of both state and federal claims, or doctrine of judicial self-restraint under which federal courts will decide federal constitutional issues only if necessarily compelled to do so in order to decide case.

**94. Federal Courts ⬤=15**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, district court should have been reluctant to consider claims grounded on general Texas health and safety statutes where applicability of those statutes to state agencies was unclear and claims under those statutes had not been raised in pleadings.

**95. Criminal Law ⬤=1213**

Fire hazards in institutions operated by Texas Department of Corrections, sanitation problems resulting from overcrowding which facilitated spread of disease and sanitary conditions, inadequate plumbing, violations of food handling standards at some units, violations of sanitation standards in food processing areas and inadequate safety measures which did not meet standards Texas imposes on private industry did not, alone or in combination, considered along with overcrowding and security deficiencies, constitute cruel and unusual punishment. U.S.C.A.Const.Amend. 8.

**96. Civil Rights ⬤=13.16**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, district court was not required to await failure or refusal of Department to comply with decree before appointing special master to implement decree. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

**97. Federal Civil Procedure ⬤=1875**

Noncompliance with district court's decree may constitute one "exceptional condition" under rule of civil procedure governing masters, but noncompliance is not exclusive. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

See publication Words and Phrases for other judicial constructions and definitions.

RUIZ v. ESTELLE
Cite as 679 F.2d 1115 (1982)

**98. Federal Civil Procedure ⬤=1873**

Rule of civil procedure governing masters does not terminate or modify district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering remedy. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

**99. Federal Civil Procedure ⬤=1893**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, insofar as special master appointed by district court was to report on Department's compliance with district court's decree and to help implement decree, he assumed one of plaintiffs' traditional roles, except that, because he was court's agent, he could and should perform his duties objectively. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

**100. Federal Civil Procedure ⬤=1876**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, scope and complexity of decree entered by district court and importance as well as difficulty of ensuring compliance with decree gave district court adequate reason to invoke its implied authority as court of equity to appoint special master. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

**101. Federal Civil Procedure ⬤=1893**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, special master and monitors appointed by district court to supervise implementation of and compliance with district court's decree were not to consider matters that went beyond superintending compliance with decree. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

**102. Federal Civil Procedure ⬤=1893**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, special master and monitors appointed by district court to supervise implementation of and compliance with district court's decree were not to be inmate advocate or "roving federal district court," but rather, powers were not to intrude to unnecessary extent on prison administration. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.

**103. Federal Civil Procedure ⬤=1893**

In class action on behalf of inmates confined in various institutions operated by Texas Department of Corrections, order appointing special master to supervise implementation of and compliance with district court's decree was too sweeping insofar as order permitted special master to submit to district court reports based upon his own observations and investigations in absence of formal hearing before him, as that provision not only transcended powers traditionally given masters by courts of equity, but also denied parties due process of law. Fed.Rules Civ.Proc. Rule 53, 28 U.S.C.A.; U.S.C.A.Const.Amends. 5, 14.

Mark White, Atty. Gen. of Tex., Ed Idar, Jr., Douglas M. Becker, Kenneth L. Petersen, Jr., Asst. Attys. Gen., Pike Powers, Lee C. Clyburn, Austin, Tex., William R. Pakalka, Jerry E. Smith, Houston, Tex., Keith A. Jones, Washington, D.C., for defendants-appellants.

Donald W. Jackson, Edward J. Landry, Asst. County Attys., Houston, Tex., for Heard.

William Bennett Turner, Donna Brorby, San Francisco, Cal., Steven L. Winter, Joel Berger, Jack Greenberg, New York City, Samuel T. Biscoe, Dallas, Tex., for Ruiz, et al.

Jim D. Wiginton, Angleton, Tex., San Francisco, Cal., for L. D. Hilliard.

Dennis J. Dimsey, W. Bradford Reynolds, Appellate Section, Civil Rights Div., U. S. Dept. of Justice, Washington, D.C., for U. S. A.

David Crump, Law School, University of Houston, Susan E. Waite, The Legal Foundation of America, Houston, Tex., for amicus curiae Legal Foundation of America.

Alvin J. Bronstein, ACLU, Elizabeth Alexander, Washington, D.C., for amicus curiae ACLU–National Prison Project.

Appeals from the United States District Court for the Southern District of Texas.

DIXON COURTHOUSE SEGREGATION UNIT ONLY

CLINTON v JONES
(1997) 520 US 681, 137 L Ed 2d 945, 117 S Ct 1636

§ 45 — stay — court's discretion — conditions

Federal District Court has discretion to stay proceedings incident to its power to control its docket; especially in cases of extraordinary public moment, a party may be required to submit to delay not immoderate in extent and not oppressive in its consequences if the public welfare or convenience will thereby be promoted.

§ 43; Depositions and Discovery § 22 — management of proceeding against President

The potential burdens on a President of the United States are appropriate matters for a Federal Court to evaluate in its management of an action brought against the President; the high respect that is owed to the office of the Chief Executive is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery.

§ 1367 — discretionary stay of trial — review

The United States Supreme Court has jurisdiction over an appeal from a Federal District Court decision to stay the trial of an individual's action for civil damages against the President of the United States, which action was based on actions allegedly taken before the President's term began, where the District Court—rather than basing its decision on particular factual findings that might have buttressed an exercise of discretion—ruled that a discretionary stay was (1) supported by the legal conclusion that such a stay was required by Supreme Court precedent, and (2) also permitted under the District Court's equity powers; pendent appellate jurisdiction over the issue whether the stay was permitted on equitable grounds is proper because (1) the District Court's legal ruling that the President was protected by a temporary immunity from trial was inextricably intertwined with the District Court's suggestion that a discretionary stay having the same effect might be proper, and (2) review of the decision regarding the discretionary stay is necessary to insure meaningful review of the District Court's legal ruling.

Evidence § 383 — burden — stay

26. The proponent of a stay bears the burden of establishing its need.

RESEARCH REFERENCES

[...] 2d, Actions § 76; 16 Am Jur 2d, Constitutional Law § 314; 77 Am [Jur] 2d, United States § 42

[...] Constitution, Art II; Art III

[...] gest, Actions § 45; Constitutional Law § 69; United States § 22

[...] dex, Abuse of Discretion or Power; President of the United States; Separation of Powers; Stay

[...] dex, Discretion of Court; President of the United States; Separation [of] Powers; Stay of Action or Proceeding

[...]tions:

[...] Court's views as to validity, construction, and application of 42
[...]CS § 1985 (and similar predecessor provisions), providing for civil li-

---

resolving the issue; however, the courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed.

Constitutional Law § 68.5 — separation of powers — duties of branches

17. Even when a branch of the Federal Government does not arrogate power to itself, the doctrine of separation of powers, under the Federal Constitution, requires that a branch not impair another in the performance of its constitutional duties.

Constitutional Law § 68.5 — separation of powers — effect of action by other branches

18. The federal governmental system imposes upon the branches of government a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which would preclude the establishment of a nation capable of governing itself effectively; the doctrine of separation of powers, under the Federal Constitution, does not mean that the branches ought to have no partial agency in, or no control over, the acts of each other.

Constitutional Law § 69; United States § 22 — judicial encroachment on executive — presidential immunity

19a-19d. The doctrine of separation of powers, under the Federal Constitution, does not bar every exercise of jurisdiction over the President of the United States; the fact that a federal court's exercise of its traditional jurisdiction pursuant to Article III of the Constitution may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution, because (1) when the President takes office, [...] the United States Supreme [Court] has the authority to [decide] whether the President [acted] within the law, and (2) the [President] is subject to judicial pro[cess in] appropriate circumstances, [neither] the doctrine of separation of powers nor the need for confidentiality of high-level communications, without more, can sustain an absolute and unqualified presidential privilege of immunity from judicial process under all circumstances.

[See annotation p 1[...]

Courts § 92.5 — duty

20. It is the province [and duty] of the federal judicial department to say what the law is.

Criminal Law § 1; United States § 22 — presidential [immunity] — evidence — fairness

21a, 21b. For purposes of determining the immunity of a President of the United States from legal process, (1) special caution is appropriate if the materials or testimony sought by the court implicate the President's official actions with respect to which the interest in serving confidentiality is great and entitled to great respect, and (2) in a criminal case, the interest in the fair administration of criminal justice requires that evidence be given under [such] circumstances lest the [integrity of] the judicial system be eroded.

[See annotation p [...]

Constitutional Law § [69]; Separation of powers — President

22a, 22b. The distractions [of] a President of the United States with respect to pending litigation ordinarily implicate little the powers concerns underlying the Constitution.

[See annotation p [...]

Clinton v. U.S. Preview
U.S. Jones
DIX[...]
SEGR[...]
USE ONLY

U.S. SUPREME COURT REPORTS    112 L Ed 2d

merce clause is an implied right does not diminish its status as a right, privilege, or immunity under § 1983; therefore, (1) suits for violations of the commerce clause may properly be brought under § 1983, and (2) an individual may properly bring a claim, under § 1983, that the commerce clause is violated by certain allegedly retaliatory taxes and fees imposed by a state on motor carriers with vehicles registered in other states and operated in that state. (Kennedy, J., and Rehnquist, Ch. J., dissented from this holding.)

**Civil Rights § 22; Statutes §§ 145.4, 164, 195 — 42 USCS § 1983 — construction**

2. The prime focus of 42 USCS § 1983 and related provisions is to insure a right of action to enforce the protections of the Federal Constitution's Fourteenth Amendment and the federal laws enacted pursuant thereto; however, a broad construction of § 1983 is compelled by (1) the statutory language, which speaks of deprivations of "any" rights, privileges, or immunities secured by the Federal Constitution and laws, and (2) the legislative history, which stresses that § 1983, as a remedial statute, should be liberally and beneficently construed.

**Commerce § 96 — relation between state and federal power**

3. The Federal Constitution's commerce clause (Art I, § 8, cl 3) is a power-allocating provision that gives Congress pre-emptive authority over the regulation of interstate commerce.

**Actions § 2; Declaratory Judgments § 4; Injunction § 72 — commerce clause violation**

4. Individuals injured by state action that violates the Federal Constitution's commerce clause (Art I, § 8, cl 3) are permitted to sue and obtain injunctive and declaratory relief.

**Civil Rights § 22 — 42 USCS § 1983 — violation of implied rights**

5a, 5b. For purposes of 42 USCS § 1983, which provides a cause of action for the deprivation of any federal rights, privileges, or immunities, the violation of a federal right that has been found to be implicit in a statute's language and structure is as much a direct violation of a right as is the violation of a right that is clearly set forth in the text of the statute.

**Civil Rights § 22; Constitutional Law § 34; States, Territories, and Possessions § 18 — supremacy clause — claims covered by 42 USCS § 1983**

6a, 6b. Claims under the Federal Constitution's supremacy clause (Art VI, cl 2) are excluded from the coverage of 42 USCS § 1983—which provides a cause of action for the deprivation of any rights, privileges, or immunities under the Federal Constitution "and laws"—because (1) the supremacy clause is not a source of any federal rights; (2) rather, the supremacy clause secures federal rights by according them priority whenever they come into conflict with state law; and (3) if supremacy clause claims were included within the coverage of § 1983, the "and laws" provision in § 1983 would be superfluous.

**Civil Rights § 0 — effect of federal provisions on state law**

7. Federal statutory rights operate as a guarantee of freedom for private conduct that the state may not abridge until such rights are altered or eliminated by Congress.

---

DENNIS v HIGGINS
(1991) 498 US 439, 112 L Ed 2d 969, 111 S Ct 865
SYLLABUS BY REPORTER OF DECISIONS

Petitioner motor carrier filed suit in a Nebraska trial court, claiming, inter alia, that certain "retaliatory" taxes and fees the State imposed on motor carriers and vehicles such as his, which are registered in other States but operate in Nebraska, constituted an unlawful burden on interstate commerce and that respondents were liable under 42 USC § 1983 [42 USCS § 1983]. Among other things, the court concluded that the taxes and fees violated the Commerce Clause and permanently enjoined respondents from assessing, levying, or collecting them; but it dismissed petitioner's § 1983 claim. The State Supreme Court affirmed the dismissal, holding that there is no cause of action under § 1983 for Commerce Clause violations because the Clause allocates power between the State and Federal Governments and does not establish individual rights against the government.

*Held:* Suits for violations of the Commerce Clause may be brought under § 1983.

(a) A broad construction of § 1983 is compelled by the statutory language, which speaks of deprivations of "any rights, privileges, or immunities secured by the Constitution and laws." It is also supported by § 1983's legislative history and by this Court's decisions, which have rejected attempts to limit the types of constitutional rights that are encompassed within the phrase "rights, privileges, or immunities," see, e. g., Lynch v Household Finance Corp., 405 US 538, 31 L Ed 2d 424, 92 S Ct 1113.

(b) The Commerce Clause confers "rights, privileges, or immunities" within the meaning of § 1983. In addition to conferring power on the Federal Government, the Clause is a substantive restriction on permissible state regulation of interstate commerce. And individuals injured by state action violating this aspect of the Clause may sue and obtain injunctive and declaratory relief. The three considerations for determining whether a federal statute confers a "right" within the meaning of § 1983—that the provision creates obligations binding on the governmental unit, that the plaintiff's interest is not too vague and amorphous to be beyond the judiciary's competence to enforce, and that the provision was intended to benefit the plaintiff—also weigh in favor of recognition of a right under the Clause. Respondents' argument that the Clause was not designed to benefit the individual has been implicitly rejected, Boston Stock Exchange v State Tax Comm'n, 429 US 318, 321, n 3, 50 L Ed 2d 514, 97 S Ct 599, and this Court's repeated references to "rights" under the Clause constitute a recognition that it was intended to benefit those who are engaged in interstate commerce, see, e. g., Crutcher v Kentucky, 141 US 47, 57, 35 L Ed 649, 11 S Ct 851. Respondents' attempt to analogize the Commerce Clause to the Supremacy Clause, which does not confer "rights, privileges, or immunities" under § 1983, is also rejected. Unlike the Commerce Clause, the Supremacy Clause is not a source of federal rights but merely secures federal rights by according them priority when they come into conflict with state law. The fact that the protection from interference with trade conferred by the Commerce Clause may be qualified or eliminated by Congress does not mean that it cannot be a "right," for, until Congress

when he made his decision to allow cross-gender searches, he was in a "lose/lose" situation. If he turned down the grievance, the guards would sue; if he authorized male guards to conduct the searches, the inmates would sue. (FN5)

Prison administrators call the cross-gender clothed body searches "pat searches." The district court refused to adopt the prison's term, wisely in my view. According to the prison's training materials, the proper way to conduct such a search is to

> Squeeze and knead the shoulders....Knead ... the inside of the waistband of trousers [and] pull[ ] the fly away from the body. From behind, ... [use] both hands across the crotch[,] [p]ushing the hands across the crotch [,] ... [s]queezing and kneading all seams.... The breast area shall be searched in a sweeping motion, using only the back of the hand.... The breasts of a female will be flattened by this method. Use a flat hand and a pushing motion across the crotch area. Maintain a flat, inward pushing motion. The edge of the hand in a downward motion can be used to check the crease in the buttocks. Push inward and upward when searching the crotch and upper thighs of the inmate.

Washington Corrections Center for Women, *Pat-Down Searches of Female Inmates.* While some modifications to the procedure may have occurred, the descriptions by the prison personnel and inmates, the training material, and a videotape viewed by this court reveal that the searches involve nothing so delicate or so tentative as "patting." Rather, the searches are intimate and deeply invasive.

*1534 Male guards conducted the intrusive suspicionless searches on July 5, 1989. After an inmate was searched by a male guard, her fingers had to be pried from the bars she had grabbed; she returned to her cellblock, vomited, and broke down. As soon as the searches began, the inmates filed a *pro se* complaint in district court. The prison informally agreed to suspend them that same day. Two days later, when the superintendent decided to reinstitute the searches, the inmates obtained a temporary restraining order. They subsequently obtained a preliminary injunction and were certified as a class. After a six-day trial, the district court entered a permanent injunction barring cross-gender suspicionless clothed body searches. (FN6) The state appealed.

III.

I believe that invasive cross-gender searches violate the fourth amendment rights of female prisoners. Persons who have been convicted of crimes do not forfeit all of their rights under the Constitution when they pass through the gates of a prison. No "iron curtain" separates prison inmates from constitutional protections, *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974); rather, inmates retain "those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration." *Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 3198, 82 L.Ed.2d 393 (1984) (plurality opinion). Prisoners may not be subjected to invidious racial discrimination, *Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (per curiam); they may petition the government for a redress of grievances, *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); they may not be denied access to the courts, *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); they are entitled to due process of law, *Wolff v. McDonnell, supra;* and they may not be subjected to cruel and unusual punishment, *Hudson v. McMillian,* 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992).

Of more particular concern here, prison inmates have a right of privacy and dignity in their persons. (FN7) Although the Supreme Court has held that prisoners have no right to privacy in their cells, *Hudson v. Palmer, supra* (plurality opinion), the limitation on privacy rights has not been extended to searches of prisoners' bodies. *See id.,* 468 U.S. at 555 n. 31, 104 S.Ct. at 3215 n. 31 (Stevens, J., concurring in part and dissenting in part). Following *Hudson v. Palmer,* courts, including ours, have consistently held that the fourth amendment applies to searches of prisoners themselves. *See, e.g., Cornwell v. Dahlberg,* 963 F.2d 912, 916-17 (6th Cir.1992) (male inmate strip-searched before female guards raises a valid fourth amendment privacy claim); *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988) (visual body cavity searches of inmates do not violate fourth amendment); *Bonitz v. Fair,* 804 F.2d 164 (1st Cir.1986) (fourth amendment right to be free of body cavity search overcomes claim of qualified immunity). The parties do not dispute that the fourth amendment is implicated in this case.

In *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), the Supreme Court established the general standard *1535 for evaluating prisoners' constitutional claims, including fourth amendment claims. (FN8) *Turner* distills the principles originally established in *Bell v. Wolfish,* 441 U.S. 520, 551, 99

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

U.S. SUPREME COURT REPORTS  128 L Ed 2d

Justices agreed with the Court's "obvious[ness]" test and observed that liability is appropriate when policymakers are "on actual or constructive notice" of the need to train, id., at 396, 103 L Ed 2d 412, 109 S Ct 1197 (opinion concurring in part and dissenting in part). It would be hard to describe the Canton understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.

[5] Canton's objective standard, however, is not an appropriate test for determining the liability of prison officials under the Eighth Amendment as interpreted in our cases. Section 1983, which merely provides a cause of action, "contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right." Daniels v Williams, 474 US 327, 330, 88 L Ed 2d 662, 106 S Ct 662 (1986). And while deliberate indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability, see Wilson, 501 US, at 299-300, 115 L Ed 2d 271, 111 S Ct 2321, the "term was used in the Canton case for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents," Collins v Harker Heights, 503 US 115, 124, 117 L Ed 2d 261, 112 S Ct 1061 (1992), a purpose the Canton Court found satisfied by a test permitting liability when a municipality disregards "obvious" needs. Needless to say, moreover, considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official. For these reasons, we cannot accept petitioner's argument that Canton compels the conclusion

**[511 US 842]**
here that a prison official who was unaware of a substantial risk of harm to an inmate may nevertheless be held liable under the Eighth Amendment if the risk was obvious and a reasonable prison official would have noticed it.

[6a] We are no more persuaded by petitioner's argument that, without an objective test for deliberate indifference, prison officials will be free to ignore obvious dangers to inmates. Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. Cf. 1 C. Torcia, Wharton's Criminal Law § 27, p 141 (14th ed. 1978); Hall 115. We doubt that a subjective approach will present prison officials with any serious motivation "to take refuge in the zone between 'ignorance of obvious risks' and 'actual knowledge of risks.'" Brief for Petitioner 27. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, cf. Hall 118 (cautioning against "confusing a mental state with the proof of its existence"), and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Cf. LaFave & Scott § 3.7, p 335 ("[I]f the risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it; but the inference cannot be conclusive, for we know that people are not always conscious of what reasonable people would be conscious of"). For example,

FARMER v BRENNAN
(1994) 511 US 825, 128 L Ed 2d 811, 114 S Ct 1970

if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of

**[511 US 843]**
fact to find that the defendant-official had actual knowledge of the risk." Brief for Respondents 22.[8]

[7] Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health," Helling, 509 US, at 35, 125 L Ed 2d 22, 113 S Ct 2475, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because

8. [6b] While the obviousness of a risk is not conclusive and a prison official may show that the obvious escaped him, see infra, at 844, 128 L Ed 2d, at 830, he would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation; or when a prison official knows that some dis-

all prisoners in his situation face such a risk. See Brief for Respondents 15 (stating that a prisoner can establish exposure to a sufficiently serious risk of harm "by showing that he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates"). If, for example, prison officials were aware that inmate "rape was so common and uncontrolled that some potential victims dared not sleep [but] instead . . . would leave

**[511 US 844]**
their beds and spend the night clinging to the bars nearest the guards' station," Hutto v Finney, 437 US 678, 681-682, n 3, 57 L Ed 2d 522, 98 S Ct 2565 (1978), it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom. Cf. Helling, supra, at 33, 125 L Ed 2d 22, 113 S Ct 2475 (observing that the Eighth Amendment requires a remedy for exposure of inmates to "infectious maladies" such as hepatitis and venereal disease "even though the possible infection might not affect all of those exposed"); Commonwealth v Welansky, 316 Mass 383, 55 NE2d 902 (1944) (affirming conviction for manslaughter under a law requiring reckless or wanton conduct of a nightclub owner who failed to protect patrons from a fire, even though the owner did not know in advance who would light the match that ignited

eases are communicable and that a single needle is being used to administer flu shots to prisoners but refuses to listen to a subordinate who he strongly suspects will attempt to explain the associated risk of transmitting disease). When instructing juries in deliberate indifference cases with such issues of proof, courts should be careful to ensure that the requirement of subjective culpability is not lost. It is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly.

DIXON CC XXXXXX
SEGREGATION USE ONLY

mentally retarded to be "uncommon." To adapt to the present case what the Court itself said in *Stanford*, 492 US, at 374, 106 L Ed 2d 306, 109 S Ct 2969: "[I]t is not only possible, but overwhelmingly probable, that the very considerations which induce [today's majority] to believe that death should *never* be imposed on [mentally retarded] offenders . . . cause prosecutors and juries to believe that it should *rarely* be imposed."

But the Prize for the Court's Most Feeble Effort to fabricate "national consensus" must go to its appeal (deservedly relegated to a footnote) to the views of assorted professional and religious organizations, members of the so-called "world community," and respondents to opinion polls. *Ante*, at 316-317, n 21, 153 L Ed 2d, at 347-348. I agree with the Chief Justice, ante, at 325-328, 153 L Ed 2d, at 352-355 (dissenting opinion), that the views of professional and religious organizations and the results of opinion polls are irrelevant.[6] Equally irrelevant are the practices of the

[536 US 348]

"world community," whose notions of justice are (thankfully) not always those of our people. "We must never forget that it is a Constitution for the United States of America that we are expounding. . . . [W]here there is not first a settled consensus among our own people, the views of other nations, however enlightened the Justices of this Court may think them to be, cannot be imposed upon Americans through the Constitu-

tion." *Thompson*, 487 US, at 868 n 4, 101 L Ed 2d 702, 108 S Ct [...] (Scalia, J., dissenting).

III

Beyond the empty talk of a "national consensus," the Court gives a brief glimpse of what really lies today's decision: pretensions power confined *neither* by the sentiments originally enshrined the Eighth Amendment (its original meaning) *nor even* by the current moral sentiments of the American people. "[T]he Constitution," the Court says, "contemplates that [...] end *our own judgment* w[ill be] brought to bear on the question [of] the acceptability of the death [penalty] under the Eighth Amendment." *v Michigan*, 501 US 957, [...] 115 L Ed 2d 836, 111 S Ct [...] (opinion of Scalia, J.). [...] Amendment is addressed [...] -and-everywhere "cruel" [...], such as the rack and [...]. But where the punishment is itself permissible, "[t]he [...] Amendment is not a ratchet, [...] a temporary consensus on [...] for a particular crime fixes [...] constitutional maxi[mum] [...] abling the States from giv[ing] [...] to altered beliefs and re[...] to changed social [...]" *Id.*, at 990, 115 L Ed 2d [...] S Ct 2680. The second as[...]inability of judges or ju[ries to] take proper account of mental [...]—is not only unsubstanti[ated] [...] contradicts the immemorial [...] here and in England, that [...] ay an *indispensable* role in [...]atters:

"[I]t is very difficult to define the indivisible line that divides perfect and partial insanity; but it must rest upon circumstances duly to be weighed and considered both by the judge and jury, lest on the one side there be a kind of inhumanity towards the defects of human nature, or on the other side too great an indulgence given to great crimes . . ." 1 Hale, Pleas of the Crown, at 30.

Proceeding from these faulty assumptions, the Court gives two reasons why the death penalty is an excessive punishment for all mentally retarded offenders. First, the "diminished

[536 US 350]

capacities" of the mentally retarded raise a "serious question" whether their execution contributes to the "social purposes" of the death penalty, viz., retribution and deterrence. *Ante*, at 318-319, 153 L Ed 2d, at 348. (The Court conveniently ignores a third "social purpose" of the death penalty—"incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future," *Gregg v Georgia*, 428 US 153, 183, n 28, 49 L Ed 2d 859, 96 S Ct 2909 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). But never mind; its discussion of even the other two does not bear analysis.) Retribution is not advanced, the argument goes, because the mentally retarded are *no more culpable* than the average murderer, whom we have already held lacks sufficient culpability to warrant the death penalty, see *Godfrey v Georgia*, 446 US 420, 433, 64 L Ed 2d 398, 100 S Ct 1759 (1980) (plurality opinion). *Ante*, at 319, 153 L Ed 2d, at 349. Who says so? Is there an established correlation between mental acuity and the abil-

---

6. And in some cases positively counter indicative. The Court cites, for example, the v[iews of] the United States Catholic Conference, whose members are the active Catholic Bishops [of the] United States. See *ante*, at 316, n 21, 153 L Ed 2d, at 347 (citing Brief for United [States] Catholic Conference et al. as *Amici Curiae* 2). The attitudes of that body regarding crim[inal] punishment are so far from being representative, even of the views of Catholics, that the[y are] currently the object of intense national (and entirely ecumenical) criticism.