CLERK AND JUDGES OF THE
U.S. COURT OF APPEALS FOR
THE 7th CIRCUIT

7th CIR. APPEAL NO. 06-3004
AND - 06-3005
URIOSTE, MARK S. -V- CHANDLER, NEDRA
AND
URIOSTE, MARK S. -V- NICKLAUS, SONJA

SEE ATTACHED WITH
Motions EXHIBITS - JURISDICTION
FOR - "30 DAY STAY"

(1) "STAY" IN U.S. DIST. CT. IN
NO. 84C 1380 AND HAROLD
A. BAKER, PRESIDING JUDGE"
[I WILL BE RELEASED FROM PRISON
AND WILL RETAIN MY OWN PRIVATE
LAWYER TO REPRESENT ME, A MENTALLY
AND PHYSICALLY DISABLED PERSON]

MORE DISCOVERY NEEDED!

(2) PURSUANT TO - RULE 19(B)SEQ. F.R.C.P."
I NOW MOTION JUDGE HAROLD A. BAKER BE
BROUGHT IN AS DEFENDANT NECESSARY FOR
A JUST ADJUDICATION. SINCERELY YOURS, P.S.
LIFE IS GUILTY OF MURDER, MARK S. URIOSTE N-87529
INTERPRETERS ARE NOT MARK URIOSTE - N-87529
PROTECTING MY U.S. DIXON CORRECTIONAL CENTER
CONST. RIGHTS AND, 2600 N. BRINTON AVE.
ACTION LEAKAGE WITH DIXON, ILLINOIS 61021

FILED
AUG 21 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

A-F.R.C.P.
RULE 56
AFFIDAVIT
AND F.R.C.P.
RULE 15(A)SEQ.
AMDT-1-OF-F.
C.P.

*JURISDICTION EXHIBIT - ALL LAWS AND CASES ATTACHED HEREWITH APPLY TO ME*

## U.S. SUPREME COURT REPORTS

### CLINTON v JONES
(1997) 520 US 681, 137 L Ed 2d 945, 117 S Ct 1636

of such litigation will ever engulf the Presidency. As for the case at hand, if properly managed by the District Court, it appears to us highly unlikely to occupy any substantial amount of petitioner's time.

[18, 19a] Of greater significance, petitioner errs by presuming that most of the interactions between the Judicial Branch and the Executive, even quite burdensome interactions, necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions. "[O]ur system imposes upon the Branches a degree of overlapping responsibility, a duty of interdependence as well as independence the absence of which 'would preclude the establishment of a Nation capable of governing itself effectively.'" *Mistretta*, 488 US, at 381, 102 L Ed 2d 714, 109 S Ct 647 (quoting *Buckley*,

[520 US 703]

424 US, at 121, 46 L Ed 2d 659, 96 S Ct 612). As Madison explained, separation of powers does not mean that the branches "ought to have no partial agency in, or no *controul* over the acts of each other." The fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution. Two long-settled propositions, first announced by Chief Justice Marshall, support that conclusion.

[19b, 20] First, we have long held that when the President takes official action, the Court has the au-

thority to determine whether he acted within the law. Perhaps the most dramatic example of such a case is our holding that President Truman exceeded his constitutional authority when he issued an order to take possession of and to direct the Secretary of Commerce to take possession of and operate most of the Nation's steel mills in order to avert a national catastrophe. *Youngstown Sheet & Tube Co. v Sawyer*, 343 US 579, 96 L Ed 1153, 72 S Ct 863 (1952). Despite the serious impact of that decision on the ability of the Executive Branch to accomplish its assigned mission, and the substantial time that the Court must necessarily have devoted to matter as a result of judicial intervention, we have exercised our jurisdiction to decide whether official conduct conformed to law. Our holding was an application of the principle established in *Marbury v Madison*, 1 Cranch 137 (1803), that "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Id.*, at 177, 2 L Ed 60.

[19c, 21a] Second, it is also settled that the President is subject to judicial process in appropriate circumstances. Although Thomas Jefferson apparently thought otherwise, Chief Justice Marshall, when presiding over the treason trial of Aaron Burr, ruled that a subpoena *duces tecum* could be directed

[520 US 704]

to the President. *United States v Burr*, 25 F. Cas. 187 (No. 14,692d) (CC Va. 1807). We unequivocally and emphatic-

ally endorsed this ruling, which calls on him on behalf of a single one". *Ibid.*, see *Nixon*, 457 US, at 751-752, n. 31, 73 L Ed 2d 349, 102 S Ct 2690 (quoting Jefferson's letter at length). For Chief Justice Marshall, the answer—quite plainly—was yes.

[21b] Of course, it does not follow that a court may "proceed against the president as against an ordinary individual." *United States v Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807). Special caution is appropriate if the materials or testimony sought by the court relate to a President's official activities, with respect to which "[t]he interest in preserving confidentiality is weighty indeed and entitled to great respect." 418 US, at 712, 41 L Ed 2d 1039, 94 S Ct 3090. We have held, though, that in a criminal case the powerful interest in the "fair administration of criminal justice" requires that the evidence be given under appropriate circumstances lest the "very integrity of the judicial system" be eroded. *Id.*, at 709, 711-712, 41 L Ed 2d 1039, 94 S Ct 3090.

and Marshall's position when we twice given videotaped testimony in criminal proceedings, see *United States v McDougal*, 934 F. Supp. 296 (ED Ark. 1996); *United States v Branscum*, No. LRP-CR-96-49 (ED Ark., June 7, 1996). Moreover, sitting Presidents have also voluntarily complied with judicial requests for testimony. President Grant gave a lengthy deposition in a criminal case under such circumstances, 1 R. Rotunda & J. Nowak, Treatise on Constitutional Law § 7.1 (2d ed. 1992), and President Carter similarly gave videotaped testimony for use at a criminal trial, *id.*, § 7.1(b) (Supp. 1997).

[19d, 22a] In sum, "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States." *Fitzgerald*, 457 US, at 753-754, 73 L Ed 2d 349, 102 S Ct 2690. If the Judiciary may severely burden the Executive Branch by reviewing the legality of the President's official conduct, and if it may direct appropriate process to the President himself, it must follow that the federal courts have power to determine the legality of his unofficial conduct. The burden on the President's time and energy that is a mere byproduct of such review surely cannot be considered as onerous as the direct burden imposed by judicial review and the occasional

that President Nixon was obligated to comply with a subpoena commanding him to produce certain recordings of his conversations with his aides. *United States v Nixon*, 418 US 683, 41 L Ed 2d 1039, 94 S Ct 3090 (1974). As we explained, "neither the doctrine of separation of powers, nor the need for confidentiality of high-level communications, without more, can sustain an absolute, unqualified Presidential privilege of immunity from judicial process under all circumstances." *Id.*, at 706, 41 L Ed 2d 1039, 94 S Ct 3090.

Presidents have responded to such orders to provide testimony and other information with sufficient frequency that such interactions between the Judicial and Executive Branches can scarcely be thought a novelty. President Monroe responded to written interrogatories, see Ro-tunda, Presidents and Ex-Presidents as Witnesses: A Brief Historical Footnote, 1975 U. Ill. L. Forum 1, 5-6, President Nixon—as noted above—produced tapes in response to a subpoena *duces tecum*, see *United States v Nixon*, President Ford complied with an order to give a deposition in a criminal trial, *United States v Fromme*, 405 F. Supp. 578 (ED Cal. 1975), and President Clinton has

---

966

37. The Federalist No. 47, pp. 325-326 (J. Cooke ed. 1961) (emphasis in original).

38. After the decision was rendered, Jefferson expressed his distress in a letter to Mr. Hay, the prosecutor at the trial, noting that "[t]he Constitution enjoins the President's constant agency in the concerns of 6, millions of people." 10 Works of Thomas Jefferson 404, n. (P. Ford ed. 1905). He continued, "[t]he law paramount to this,

with far fewer people in his private life than in his official capacity, the claim by plaintiffs is considerably smaller and the risk of litigation less intense.

967

579 F.2d 1365, Durso v. Rowe, (C.A.7 (Ill.) 1978)

inconsistency in the operation of prison management as insufficient to state a claim under the Equal Protection Clause. Having dismissed the two federal claims, the court then dismissed the pendent state claim in Count II.

## II

In dismissing plaintiff's due process claim the district court concluded that Meachum v. Fano, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed. 451 (1976) was controlling and required a finding that revocation of plaintiff's work-release status did not infringe upon a constitutionally protected liberty interest. The Supreme Court in Meachum held that the transfer of state inmates to a prison where the living conditions were "substantially more burdensome" than at the previous prison did not Ipso facto constitute a deprivation of liberty requiring due process. The Court rejected the notion that "Any grievous loss" or "Any change in the conditions of confinement having a substantial adverse impact on the prisoner" is sufficient to activate the procedural safeguards of the Fourteenth Amendment. 427 U.S. at 224, 96 S.Ct. (2532) at 2538 (emphasis in original). The Court reiterated that the pivotal factor in determining whether an asserted interest is constitutionally protected is "the nature of the interest involved rather than its weight."

The Court distinguished the protection of liberty that the Due Process Clause protects "by its own force" and the protection of liberty following a criminal conviction. "(G)iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system . . . . The conviction has sufficiently extinguished the *1369 defendant's liberty interest to empower the State to confine him in Any of its prisons." 427 U.S. at 224, 96 S.Ct. at 2538 (emphasis in original).

Because the prisoners in Meachum had been lawfully convicted, the Court resorted to "state law or practice" to determine whether the nature of the interest was embraced within the Due Process Clause. Specifically, the Court sought to ascertain whether the interprison transfers were conditioned "on proof of serious misconduct or the occurrence of other events." 427 U.S. at 216, 96 S.Ct. at 2534. The Court noted that the governing statute involved there left the decision to transfer to the discretion of prison officials; exercise of the discretion was not restricted in any way. That charges of serious misconduct often initiate and heavily influence the decision to transfer was deemed insufficient to base an expectation that good behavior would insulate a prisoner from transfer. Because the prisoner had no "right or justifiable expectation rooted in state law that he will not be transferred except for misbehavior or upon the occurrence of other specified events," Montanye v. Haymes, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976), the Court held that the interprison transfer did not implicate any constitutionally protected liberty interest.

Central to the holding in Meachum was the absence of any state-created right grounded in law or practice. (FN1) A right "grounded in law," missing in Meachum, was present in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). In that case a state statute not only provided a right to good time but also specified that it could be forfeited only for serious misconduct. Because the statute restricted the discretion of prison authorities, the Court held that the prisoner's interest was within the concept of liberty protected by the Due Process Clause.

[1] The predicate necessary to trigger the Due Process Clause is not restricted to statutorily-created rights; it may also be found in official policies or practices. For example, in Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), the governing statute gave prison officials unfettered discretion to revoke one's parole at any time or for any reason. Nonetheless the Court held that the termination of parole must be accompanied with procedural safeguards because a parolee relies on "an implicit promise that (his) parole will be revoked only if he fails to live up to the parole conditions." (FN2) 408 U.S. at 482, 92 S.Ct. at 2601.

[2] Whether plaintiff's due process claim is cognizable therefore depends upon whether he has a right or justifiable expectation based on state law or practice which conditions the revocation of his work-release status upon proof of serious misconduct or the occurrence of other specified events. If he does have such a right or expectation, the minimum procedures required by the Due Process Clause are necessary "to insure that the state-created right is not arbitrarily abrogated." Wolff, supra, 418 U.S. at 557, 94 S.Ct. at 2975.

*1370 Plaintiff first argues that his expectation that his work-release status would not be revoked unless he violated a rule or condition of the program is

Copyright (c) West Group 1998 No claim to original U.S. Govt. works

officials, on the ground that a failure by prison officials to prevent inmate assaults violates the Eighth Amendment only if such officials had actual knowledge of a potential danger; in determining that the defendant officials had lacked such knowledge, the District Court noted that the prisoner had never expressed any safety concerns to them. The United States Court of Appeals for the Seventh Circuit summarily affirmed without opinion.

On certiorari, the United States Supreme Court vacated the judgment of the Court of Appeals and remanded the case for further proceedings. In an opinion by SOUTER, J., joined by REHNQUIST, Ch. J., and BLACKMUN, STEVENS, O'CONNOR, KENNEDY, and GINSBURG, JJ., it was held that (1) a prison official may be held liable for denying to a prisoner humane conditions of confinement, under the rule that an official's "deliberate indifference" to a substantial risk of serious harm to a prisoner violates the Eighth Amendment, only if the official is subjectively aware that the prisoner faces such a risk and disregards that risk by failing to take reasonable measures to abate the risk; but (2) it was appropriate to remand the case, because the prisoner's failure to give the officials advance notice of a risk of harm was not dispositive with respect to the prisoner's claims for damages and injunctive relief, and the District Court might have mistakenly placed decisive weight on the prisoner's failure to give the officials such advance notice.

BLACKMUN, J., concurring, (1) expressed the view that inhumane prison conditions violate the Eighth Amendment even if no prison official has an improper subjective state of mind, but (2) joined the court's opinion because the court, though applying a previous Supreme Court decision which had improperly protected prison officials with arguably benign intentions from lawsuits, created no new obstacles for prisoners to overcome and sent a clear message to prison officials that their duty to provide for prisoners' safety was not to be taken lightly.

STEVENS, J., concurring, (1) expressed the view that prison conditions could constitute cruel and unusual punishment without any officials' improper subjective motivations, but (2) joined the court's opinion because it was faithful to the court's precedents.

THOMAS, J., concurring in the judgment, expressed the view that (1) conditions of confinement, unless imposed as part of a sentence, were not punishment for purposes of the Eighth Amendment; (2) the court correctly rejected the plaintiff prisoner's theory of liability even under the precedents treating conditions of confinement as within the scope of the Eighth Amendment; (3) the court's opinion did not intimate that the courts below reached the wrong result; and (4) if, on remand, the Court of Appeals concludes that the District Court did not erroneously give dispositive weight to the prisoner's failure to give advance notice to the officials of the risk of harm, the Court of Appeals may summarily affirm the District Court's summary judgment in favor of the officials.

---

FARMER v BRENNAN
(1994) 511 US 825, 128 L Ed 2d 811, 114 S Ct 1970

Classified to United States Supreme Court Digest, Lawyers' Edition

HEADNOTES (sFC3)

Criminal Law § 78 — cruel and unusual punishment — prison conditions — deliberate indifference — knowledge of risk of harm

1a–1e. A prison official may be held liable for denying to a prisoner humane conditions of confinement, under the rule that an official's deliberate indifference to a substantial risk of serious harm to a prisoner violates the cruel and unusual punishments clause of the Federal Constitution's Eighth Amendment, only if the official is subjectively aware that prison officials face such a risk—the official not only being aware of such facts from which an inference of such a risk could be drawn, but also drawing that inference—and disregards that risk by failing to take reasonable measures to abate the risk; deliberate indifference is equivalent to reckless disregard and describes a state of mind more blameworthy than negligence, but is something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result; subjective recklessness, as defined in the criminal law, is the appropriate test for deliberate indifference; and the failure of prison officials to alleviate a significant risk that they should have perceived, but did not, cannot be condemned as the infliction of punishment within the meaning of the Eighth Amendment. (Thomas, J., dissented in part from this holding.)

Criminal Law § 78 — cruel and unusual punishment — prison conditions

2. "The Federal Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones; the treatment which prisoners receive in prison, and the conditions under which they are confined, are subject to scrutiny under the Constitution's Eighth Amendment; in its prohibition of cruel and unusual punishments, the Eighth Amendment (1) places restraints on prison officials, who may not use excessive physical force against prisoners, and (2) imposes duties on prison officials, who must provide humane conditions of confinement by insuring that inmates receive adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee the safety of inmates; under the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners, and although prison conditions may be restrictive and even harsh, gratuitously allowing the beating or rape of one prisoner by another neither serves a legitimate penological objective any more than it squares with evolving standards of decency, and being violently assaulted in prison is not part of the penalty that criminal offenders pay for their offenses against society. (Thomas, J., dissented in part from this holding.)

Criminal Law § 78 — cruel and unusual punishment — prison conditions

3. In order for there to be a violation by a prison official of the cruel and unusual punishments clause of the Federal Constitution's Eighth Amendment, (1) the deprivation alleged by a prisoner must be, objectively, sufficiently serious, that is, the official's act or omission must result in the denial of the minimal civilized measure of life's necessities, and for claims based on failure to prevent

DIXON CC XHOUSE SEGREGATION USE ONLY

APPENDIX B—Continued

ment, it has been exercised by the federal courts, when sitting in equity, by appointing, either with or without the consent of the parties, special masters, auditors, examiners and commissioners. *Ex parte Peterson,* 253 U.S. 300 [40 S.Ct. 543, 64 L.Ed. 919] (1920). The enforcement of its remedial order is a judicial duty which rests with this Court, and it has the inherent power to appoint a Special Master to provide assistance toward this end.

Second, the Court relies upon Rule 53 of the Federal Rules of Civil Procedure in making this reference. In its Memorandum Opinion of December 10, 1980, referred to above, the Court has demonstrated that the appointment of a Master is both necessary and appropriate in accordance with the provisions of Rule 53. The formal fact finding role contemplated by the Rule will be particularly relevant to the Special Master in this case to the extent that he may hold hearings and make factual findings as a result of those hearings for review by the Court.

Pursuant to these bases of authority, the Special Master shall assist the Court by monitoring compliance with the Court's orders in this cause. All actions of the Special Master and any monitors or members of the Special Master's staff will be under the direct control and supervision of the Court. In particular, the Special Master and other persons operating on the Special Master's behalf shall not intervene in the administrative management of the Texas Department of Corrections or any of its institutions. In addition, the Special Master, his staff and any monitors who are appointed shall not be empowered to direct the defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. The sole power to direct compliance and to punish noncompliance remains with this Court. The duties of the Special Master, then, will be to observe, monitor, find facts, report or testify as to his findings, and make recommendations to the Court concerning steps which should be taken to achieve compliance. The Special Master may and should assist the defendants in every possible way, and to this end he may and should confer informally with the defendants and their subordinates on matters affecting compliance. In order to accomplish these objectives, the Special Master shall have the following powers:

1. The Special Master shall have unlimited access to any facilities, buildings, or premises under the jurisdiction or control of the Texas Department of Corrections, and no advance notice of any visit or inspection shall be required.

2. The Special Master shall have unlimited access to the records, files and papers maintained by the Texas Department of Corrections to the extent that such access is related to the performance of the Special Master's duties of monitoring compliance. Such access shall include all Departmental, institutional, and inmate records, including but not limited to medical records. The Special Master may obtain copies of all such relevant records, files and papers.

3. The Special Master may conduct confidential interviews with all staff members and employees of the Texas Department of Corrections. In addition, he may engage in informal conferences with such staff members and employees, and such persons shall cooperate with the Special Master and respond to all inquiries and requests related to compliance with the Court's orders in this case. The Special Master may require compilation and communication of oral or written information relevant to such compliance.

4. The Special Master may conduct confidential interviews and meetings at the institution to which they are confined with any prisoner or group of prisoners under the jurisdiction of the Texas Department of Corrections.

5. The Special Master may attend any formal institutional meetings or proceedings at any institution under the

APPENDIX B—Continued

jurisdiction of the Texas Department of Corrections.

6. The Special Master may require written reports from any staff member or employee of the Texas Department of Corrections with respect to compliance with this Court's orders.

7. The Special Master shall have the full power to order and conduct hearings with respect to the defendants' compliance with this Court's orders. To this end he shall have the power to require the attendance of witnesses, including both prisoners and employees of the Texas Department of Corrections, and he shall exercise all other powers described in subsection (c) of Rule 53 of the Federal Rules of Civil Procedure.

8. The Special Master may select and employ necessary administrative, clerical, and support staff. All such persons, as well as the nature of their compensation, shall be approved by the Court in advance of their employment. In addition, with advance approval of the Court, the Special Master may hire, independent specialists and experts to assist him in fulfilling the responsibilities assigned to him by this Order.

9. In exercising the powers enumerated in paragraphs 1 through 6 above, the Special Master may act by himself, or through monitors appointed by the Court. All actions of such monitors, however, shall be supervised and coordinated by the Special Master in order to accomplish the objectives of this Reference.

The Special Master shall, as he deems necessary or as required by the Court, file reports with the Court in which he shall make findings concerning the defendants' compliance with the provisions of the Court's Orders and the need, if any, for supplemental remedial action. In general, the Special Master's reports to the Court will be based upon reports prepared by individual monitors appointed by the Court as follows:

1. Reports of their factual observations shall be prepared by the monitors appointed by the Court and shall be submitted to the parties and to the Special Master. Any objections to such a report shall be the subject of a hearing before the Special Master, with or without a hearing, the Special Master shall file his report with the Court, including his findings of fact based upon the monitor's report, with the record of any hearing, or both.

2. No objection may be filed to the Special Master's report which could have been filed to the monitor's report preceding it. Otherwise, any party may file written objections to the Special Master's report within fifteen days of the filing thereof with the Court. The objecting party shall note each particular finding or recommendation to which objection is made, shall provide proposed alternative findings, and may request a hearing or oral argument before the Court.

3. Any request for a hearing before the Court must include a list of witnesses and documents to be presented to the Court. A copy of the objections, proposed findings, and any request for a rehearing shall be served on all parties.

4. The Special Master's findings of fact shall be accepted by the Court unless shown to be clearly erroneous. Any evidence not previously presented to the Special Master in the course of the formal hearing preceding his report will be admitted at a hearing before the Court only upon a showing that the party offering it lacked a reasonable opportunity to present the evidence to the Special Master.

In addition, the Special Master may submit reports based upon hearings held by him in the absence of preliminary report by monitors, and in such instances the Spe-

erences to "rights" under the Commerce Clause constitute a recognition that the Clause was intended to benefit those who, like petitioner, are engaged in interstate commerce. The "[c]onstitutional protection against burdens on commerce is for [their] benefit . . . ." Morgan v Virginia, 328 US 373, 376-377, 90 L Ed 1317, 66 S Ct 1050, 165 ALR 574 (1946). As Justice Jackson, writing for the Court, eloquently explained:

"Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free [498 US 450] access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them. Likewise, every consumer may look to the free competition from every producing area in the Nation to protect him from exploitation by any. Such has been the vision of the Founders; such has been the doctrine of this Court which has given it reality." H. P. Hood & Sons, Inc. v Du Mond, 336 US 525, 539, 93 L Ed 465, 69 S Ct 657 (1949).

[11, 6a] Respondents attempt to analogize the Commerce Clause to the Supremacy Clause, Brief for

spondents 17-18, which we have held does not by itself confer any "rights, privileges, or immunities" within the meaning of § 1983. See Golden State, supra, at 106, 107 L Ed 2d 420, 110 S Ct 444; Chapman, 441 US, at 613, 60 L Ed 2d 508, 99 S Ct 1905. The Supremacy Clause, however, is "not a source of any federal rights"; rather, it "secure[s]' federal rights by according them priority whenever they come in conflict with state law." Ibid. By contrast, the Commerce Clause of its own force imposes limitations on state regulation of commerce and is the source of a right of action in those injured by regulations that exceed such limitations.[6]

[7] Respondents also argue that the protection from interference with trade conferred by the Commerce Clause cannot be a "right," because it is subject to qualification or elimination by Congress. Brief for Respondents 21. That argument proves too much, however, because federal statutory rights may also be altered or eliminated by Congress. Until Congress does so, such rights operate as "a guarantee of freedom for private conduct that the State may not abridge."

[498 US 451]
Golden State, supra, at 112, 107 L Ed 2d 420, 110 S Ct 444. The same is true of the Commerce Clause.[9]

---

8. [6b] An additional reason why claims under the Supremacy Clause, unlike those under the Commerce Clause, should be excluded from the coverage of § 1983 is that if they were included, the "and laws" provision in § 1983 would be superfluous. See Golden State, 493 US, at 107, n 4, 107 L Ed 2d 420, 110 S Ct 444.

9. In arguing that the Commerce Clause does not secure any rights, privileges, or immunities within the meaning of § 1983, the dissent relies upon Carter v Greenhow, 114 US 317, 29 L Ed 202, 5 S Ct 928 (1885). See post, at 457-458, 112 L Ed 2d, at 965. This

Court, however, has already given that decision a narrow reading, stating that the case "held as a matter of pleading that the particular cause of action set up in the plaintiff's pleading was in contract and was not to redress deprivation of the 'right secured to him by that clause of the Constitution' [the contract clause], to which he had 'chosen not to resort.'" Chapman v Houston Welfare Rights Organization, 441 US 600, 613, n 29, 60 L Ed 2d 508, 99 S Ct 1905 (1979); see also Hague v Committee for Industrial Organization, 307 US 496, 527, 83 L Ed 1423, 59 S Ct 954 (1939) (opinion of Stone, J).

---

preme Court of Nebraska is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

It is so ordered.

### SEPARATE OPINION

Justice Kennedy, with whom The Chief Justice joins, dissenting.

In Golden State Transit Corp. v Los Angeles, 493 US 103, 114, 107 L Ed 2d 420, 110 S Ct 444 (1990), I dissented from the Court's determination that 42 USC § 1983 [42 USCS § 1983] creates a cause of action for damages when the only wrong committed by the State or local entity is its misapprehension of the boundary between state and federal power. Today's decision compounds the error of Golden State. The majority drifts far from the purposes and history of § 1983 and again holds § 1983 applicable to a State's quite innocent but mistaken judgment respecting the shifting boundary between two sovereign powers. The majority removes one of the statute's few remaining limits and increases the burden that a state or local government will face in defending

[498 US 452]

its economic regulation and taxation. With respect, I dissent.

### I

The majority must acknowledge, under even Golden State, that not all violations of federal law give rise to a § 1983 action. The plaintiff must assert "rights, privileges, or immunities secured by the Constitution and laws." 42 USC § 1983 [42 USCS

III

[19] We conclude that the Supreme Court of Nebraska erred in holding that petitioner's Commerce Clause claim could not be brought under 42 USC § 1983 [42 USCS § 1983]. The judgment of the Su-

§ 1983]. The majority appears to base its decision upon three grounds. First, the "ordinary meaning" of the term "right," as confirmed by Black's Law Dictionary indicates that the Commerce Clause provides petitioner a right. Ante, at 447, 112 L Ed 2d, at 978, and n 7. Second, our cases contain scattered references to a "right" to engage in interstate commerce. Ante, at 448, 112 L Ed 2d, at 978-979. And third, the Commerce Clause purportedly meets Golden State's test to determine whether a statutory violation gives rise to a § 1983 cause of action, because the Commerce Clause was intended to benefit those who engage in interstate commerce. Ante, at 448-450, 112 L Ed 2d, at 979-980. The majority errs, I must submit, when it ignores what the sponsors of § 1983 told us about the scope of the phrase "rights, privileges or immunities secured by the Constitution," and errs further when it applies the Golden State test in this context. Even were I to apply the majority's various tests, moreover, I would reach the opposite conclusion.

### A

The Golden State test, arguably necessary in assessing whether any of the hundreds of statutory provisions that confer express obligations upon the States secure rights within

986 F.2d 1521, Jordan v. Gardner, (C.A.9 (Wash.) 1993)                                                   Page 18

(Utah 1977), upholding a conviction of "forcible sexual abuse" where the defendant had touched the vaginal area of the victim through her slip, the court defining the forbidden touching in dictionary terms as including "to examine by *1544 feeling with the fingers"; and *People v. Thomas,* 91 Misc.2d 724, 398 N.Y.S.2d 821 (N.Y.Crim.Ct.1977), where District Attorney Robert Morgenthau successfully prosecuted for the misdemeanor of "sexual contact," N.Y.Penal Law § 130.01(3), a male IRT rush-hour rider who squeezed a female passenger's clothed buttocks.

Under prior Washington law, such contacts would not have been criminal unless done "for the purpose of gratifying sexual desire." *State v. Wilson,* 56 Wash.App. 63, 782 P.2d 224, 227 (1989). The statute, as amended in 1988, has eliminated this language. 9A Wash.Rev.Code Ann. § 44.100 (West Supp.1992). It is an open question whether that purpose could still be read into the statute's continuing requirement of "sexual contact." We do know that under *Adams* the touching is criminal whether the woman touched is naked or clothed. The crime is complete "when the other person is incapable of consent by reason of being mentally defective, mentally incapacitated, or physically helpless," 9A Wash.Rev.Code Ann., § 44.100(b). It is fair to say that prisoners are physically helpless. We do know that the criminal law that protects the unimprisoned part of the state's population is not suspended in the state's prisons.

But our task is not to determine if the guards' contacts would be criminal--helpful though the criminal law is in reflecting community standards of decency--but to determine if this cruel and unusual conduct is unconstitutional punishment. The warden focussed on the needs of his prison's administration. Does that fact save him?

The Framers were familiar from their wartime experience of British prisons with the kind of cruel punishment administered by a warden with the mentality of a Captain Bligh. *See* Robert Troup Affidavit (Jan. 17, 1777), in *A Salute To Courage,* at 66 (Dennis P. Ryan, ed. 1979). But they were also familiar with the cruelty that came from bureaucratic indifference to the conditions of confinement. *See* Letter from Robert Morris, George Clymer and George Walton to George Washington (Jan. 7, 1777), in *1 Correspondence of the American Revolution,* at 324-326 (Jared Sparks, ed. 1853); Letter from Benjamin Lincoln to George Washington (Sept. 25, 1780), *3 Correspondence of the American Revolution* at 96-98; Troup Affidavit, *supra,* at 67. The Framers understood that cruel and unusual punishment can be administered by the failure of those in charge to give heed to the impact of their actions on those within their care.

A bland American civil servant can be as much of a beast as a ferocious concentration camp guard if he does not think about what his actions are doing. Single-minded Inspector Javert is a monster, even though he focused only on his duty. Half the cruelties of human history have been inflicted by conscientious servants of the state. The mildest of bureaucrats can be a brute if he does not raise his eyes from his task and consider the human beings on whom he is having an impact. Here the blind spot in the warden's mind-- his inability or unwillingness to take into account the indecencies he was commanding his male guards to commit--constituted indifference, indifference to the suffering he was going to inflict on the helpless persons placed within his responsibility. Such indifference was wanton and it was obdurately maintained even when a flood of light was cast on the subject. It was unconstitutional punishment.

How did a civilized country and a civilized state like Washington get into this fix where it takes federal judges to tell a responsible state official to stop his approval of indecency because he is violating the Constitution? By blindly going down an egalitarian path premised on the belief that there are no real differences between the sexes, that we must march to a unisex world. In the necessary effort to eliminate discrimination based on gender there has been a simpleminded effort to eliminate gender. But we are en-gendered persons.

There should not be male guards at a women's prison. There should not be a male superintendent of a women's prison. Our statutes should not be construed to require such mechanical suppression of the recognition that in our culture such a relation *1545 between men in power and women in prison leads to difficulties, temptations, abuse, and finally to cruel and unusual punishment. That is the broader context of this case.

We, however, are not asked to reform the prison system of Washington, and the constitution does not assign us such a role. Our task is narrower and wholly within our constitutional competence. It has been confided to the federal courts to say when those imprisoned by the state are being subjected by the state to indecent acts, cruel and unusual and punitive. It is the genius of our Constitution to impose on one part of government the duty to protect from excess

Copyright (c) West Group 2002 No claim to original U.S. Govt. works