WEDNESDAY 8-  -2006 APPEAL 28 ...

DATE: SUNDAY JULY 30, 2006

CLERK AND JUDGES OF THE
U.S. DISTRICT COURT C.D. ILLINOIS

F.R.C.P.
R. 56 (F)
AFFIDAVIT ...
F.R.C.P. R. 15 ...
F.R.C.P. R. 3...

7th Cir. APPEAL NO. 06-3004
AND - 06-3005

04-1380

URIOSTE, MARK S. -v- NICKLAUS, SONJA
AND
URIOSTE, MARK S. -v- CHANDLER, NEDRA

RECEIVED AND RETURNED UNFILED
AUG 21 2006
U.S. COURT OF APPEALS
SEVENTH CIRCUIT

"MOTIONS"
SEE-ATTACHED WITH EXHIBITS "Jurisdiction"

(1) FOR "30 DAY STAY"
    "STAY IN U.S. DIST. CT. FOR
    NO. 94C 1380 AND - HAROLD
    A. BAKER, PRESIDING JUDGE"

MORE DISCOVERY
FILED
AUG 30 2006
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

[I WILL BE RELEASED FROM PRISON
AND WILL RETAIN MY OWN PRIVATE
LAWYER TO REPRESENT ME, A MENTALLY
AND PHYSICALLY DISABLED PERSON.]

(2) PURSUANT TO "RULE 19 ET SEQ. F.R.C.P."
I NOW REQUEST JUDGE HAROLD A. BAKER BE
BROUGHT IN AS A DEFENDANT NECESSARY FOR
A JUST ADJUDICATION.

[HE IS GUILTY OF ...
... AND NOT
PROTECTING MY U.S.
CONST. RIGHTS AND
ACTIVELY PARTICIPATING
IN CONSPIRACY WITH
DEFENDANTS IN A LONG CUSTOM HISTORY ... PRACTICE

SINCERELY YOURS, PRO SE.
x Mark Urioste   N-87529
x MARK URIOSTE - N07529
DIXON CORRECTIONAL CENTER
2600 N. BRINTON AVE.
DIXON, ILLINOIS 61021

JURISDICTION TO EXHIBITS - ALL LAWS AND CASES ATTACHED HEREWITH APPLY TO ME! ②

invalidation of his official actions.[40] We therefore hold that the doctrine of separation of powers does not

[520 US 706]

require federal courts to stay all private actions against the President until he leaves office.

**[1h]** The reasons for rejecting such a categorical rule apply as well to a rule that would require a stay "in all but the most exceptional cases." Brief for Petitioner i. Indeed, if the Framers of the Constitution had thought it necessary to protect the President from the burdens of private litigation, we think it far more likely that they would have adopted a categorical rule than a rule that required the President to litigate the question whether a specific case belonged in the "exceptional case" subcategory. In all events, the question whether a specific case should receive exceptional treatment is more appropriately the subject of the exercise of judicial discretion than an interpretation of the Constitution. Accordingly, we turn to the question whether the District Court's decision to stay the trial until after petitioner leaves office was an abuse of discretion.

## VII

The Court of Appeals described the District Court's discretionary decision to stay the trial as the "functional equivalent" of a grant of temporary immunity. 72 F. 3d, at 1361, n. 9. Concluding that petitioner was not constitutionally entitled to such an immunity, the court held that it was error to grant the sta[y] Although we ultimately [...] that the stay should not h[...] granted, we think the issue [...] difficult than the opinion of t[...] of Appeals suggests.

**[23, 24, 25a]** Strictly spea[...] stay was not the functional [...] lent of the constitutional i[...] that petitioner claimed, be[...] District Court ordered dis[...] proceed. Moreover, a stay [...] the trial or discovery might [...] fied by considerations tha[...] require the recognition of a[...] tutional immunity. The[...] Court has broad discretio[...] proceedings as an incide[...] power to control its own do[...] *e.g., Landis* v *North*

[520 US 707]

*Ame[...]* 299 US 248, 254, 81 L Ed [...] Ct 163 (1936). As we have e[...] "[e]specially in cases of extr[...] public moment, [a plainti[...] required to submit to dela[...] moderate in extent and no[...] sive in its consequences if t[...] welfare or convenience wi[...] be promoted." *Id.*, at 256, [...] 153, 57 S Ct 163. Althoug[...] rejected the argument that t[...] tial burdens on the Preside[...] separation-of-powers princi[...] burdens are appropriate [...] the District Court to evalu[...] management of the case. [...] respect that is owed to th[...] the Chief Executive, thoug[...] fying a rule of categorical [...] is a matter that should [...] conduct of the entire p[...]

[...]ng the timing and scope of dis[...] [...]41

[...] Nevertheless, we are per[...] [...] that it was an abuse of dis[...] for the District Court to defer [...]al until after the President [...] office. Such a lengthy and [...]rical stay takes no account [...]er of the respondent's interest [...]ging the case to trial. The [...]int was filed within the statu[...]mitations period—albeit near [...]d of that period—and delaying [...]ould increase the danger of

[520 US 708]

[...]ice resulting from the loss of [...]ce, including the inability of [...]ses to recall specific facts, or [...]sible death of a party.

[...26]] The decision to postpone [...]al was, furthermore, prema[...] [...]he proponent of a stay bears [...]den of establishing its need. [...]255, 81 L Ed 153, 57 S Ct 163. [...] case, at the stage at which [...]strict Court made its ruling, [...]as no way to assess whether [...]of trial after the completion of [...]ry would be warranted. Other [...]he fact that a trial may con[...]ome of the President's time [...]ention, there is nothing in the [...]to enable a judge to assess the [...]al harm that may ensue from [...]ling the trial promptly after [...]ry is concluded. We think the District Court may have given undue weight to the concern that a trial might generate unrelated civil actions that could conceivably hamper the President in conducting the duties of his office. If and when that should occur, the court's discretion would permit it to manage those actions in such fashion (including deferral of trial) that interference with the President's duties would not occur. But no such impingement upon the President's conduct of his office was shown here.

## VIII

We add a final comment on two matters that are discussed at length in the briefs: the risk that our decision will generate a large volume of politically motivated harassing and frivolous litigation, and the danger that national security concerns might prevent the President from explaining a legitimate need for a continuance.

We are not persuaded that either of these risks is serious. Most frivolous and vexatious litigation is terminated at the pleading stage or on summary judgment, with little if any personal involvement by the defendant. See Fed. Rules Civ. Proc. 12, 56. Moreover, the availability of sanctions provides a significant deterrent to litigation directed at the President in his unofficial capacity for purposes

40. **[22b]** There is, no doubt, some truth to Learned Hand's comment that a la[wsuit] be "dread[ed] . . . beyond almost anything else short of sickness and death." 3 A[...] the Bar of the City of New York, Lectures on Legal Topics 105 (1926). We recog[...] President, like any other official or private citizen, may become distracted or pr[...] pending litigation. Presidents and other officials face a variety of demands o[...] however, some private, some political, and some as a result of official duty. While [...] tions may be vexing to those subjected to them, they do not ordinarily implicate c[...] separation-of-powers concerns.

[...5b]] Although these claims are in fact analytically distinct, the District Court does not [...] have drawn that distinction. Rather than basing its decision on particular factual [...]that might have buttressed an exercise of discretion, the District Court instead sug[...]at a discretionary stay was supported by the *legal conclusion* that such a stay was [...]by *Fitzgerald*. See 869 F. Supp., at 699. We therefore reject petitioner's argument that [...]urisdiction over respondent's cross-appeal from the District Court's alternative holding [...]ecision was "also permitted," *inter alia*, "under the equity powers of the Court." *Ibid.* [...]t of Appeals correctly found that pendent appellate jurisdiction over this issue was [...]ee 72 F. 3d, at 1357, n. 4. The District Court's legal ruling that the President was [...]d by a temporary immunity from trial—but not discovery—was "inextricably [...]ed," *Swint* v *Chambers County Comm'n*, 514 US 35, 51, 131 L Ed 2d 60, 115 S Ct 1203 [...]ith its suggestion that a discretionary stay having the same effect might be proper; "review of the [latter] decision [is] necessary to ensure meaningful review of the [...] *ibid.*

D[...] SEGR[...] [...]OUSE [...]SE ONLY

727 F.2d 669, Saxner v. Benson, (C.A.7 (Ind.) 1984)                                                                Page 6

school board members. (FN5)   The experience in this circuit demonstrates the need to analyze carefully each of the factors established by Butz. (FN6)

*679 In this case, the defendants are federal correctional officers who serve on a committee called the Institutional Disciplinary Committee (IDC). (FN7) Although, as prison officials they were primarily responsible for the day-to-day operations of the prison, they argue that they were discharging a quasi-judicial function while serving on the IDC, and, thus, that they ought to be entitled to absolute immunity for these acts in light of Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). I agree.

Clearly, the appellants, as members of the IDC, are functionally comparable to judges. Indeed, IDC members are involved in the classic judicial function: they are required to determine whether an accused person is guilty or innocent of the charges brought against him. See Bureau of Prisons Policy Statement, 7400.5C (1974), Sec. 9(b). See also 28 C.F.R. Sec. 541.14(c). They are required to judge the credibility of witnesses, to weigh the evidence, and to make a principled determination of guilt or innocence. Because the IDC members discharge responsibilities which are identical to judges, (FN8) I believe that the first prong of the Butz test is satisfied. See United States v. Irving, 684 F.2d 494, 496-97 (7th Cir.1982) (parole board members are functionally comparable to judges). Cf. Reed v. Village of Shorewood, 704 F.2d 943, 951 (7th Cir.1983) (liquor control commissioner entitled to absolute immunity because acting in "judicial capacity").

The likelihood that an adverse decision would result in harassing or intimidating litigation is equally apparent. Ward v. Johnson, 690 F.2d 1098, 1108 (4th Cir.1982) (en banc). See United States v. Irving, 684 F.2d at 497 (danger that parole board members will be harassed by retaliatory suits). The ability of prisoners to generate litigation is substantial and well documented. See Ward v. Johnson, 690 F.2d at 1108. The burden of such prodigious litigation upon IDC members would be substantial in terms of time and money; these burdens are likely to affect the fashion in which IDC members discharge their quasi-judicial functions.

In my opinion, the final factor in Butz, whether the procedural safeguards are sufficiently formal to assure that constitutional error will not go uncorrected, is the crux of this dispute. See Butz v. Economou, 438 U.S. at 512, 98 S.Ct. at 2913-2914; Reed v. Village of Shorewood, 704 F.2d at 952. This factor is an expression of the inverse relationship between procedural regularity and the incremental deterrent effect of qualified immunity; if the formality of the procedure is sufficient to assure that constitutional error will be corrected, then qualified immunity will have only a marginal deterrent effect which, in turn, will not warrant exposing persons acting in a quasi-judicial function to the risk of personal liability and the expense of defending against the complaint of a disappointed litigant. *680   See Simons v. Bellinger, 643 F.2d 774, 782 (D.C.Cir.1980) ("The presence of these checks reduces the need for private causes of action and thereby renders absolute immunity appropriate."). Thus, absolute immunity is justified only when the procedures afforded the litigants are sufficient to assure that the risk of uncorrected constitutional error is low, and the attendant need for the incremental deterrent effect of qualified immunity is limited.

The procedures in effect at the time of the plaintiff's hearing before the IDC were fairly extensive. (FN9) Under Policy Statement 7400.5C, which was in effect in 1975, no staff member having personal knowledge of the incident which is the subject matter of a hearing is permitted to serve on the IDC. Policy Statement, 7400.5C, Sec. 9(a). See 28 C.F.R. Sec. 541.14(b). The IDC is required to keep a record of the proceedings which documents the inmate's awareness of his rights, the IDC's findings, its decision, the specific evidence relied upon by the IDC, and an explanation of the reasons for imposing the sanction chosen. Policy Statement 7400.5C, Sec. 9(c)(4). See 28 C.F.R. Sec. 541.15(g). Moreover, prisoners are entitled to seek review of the IDC's decision. Initial review of an IDC decision is provided by the warden; an adverse decision by the warden may be appealed to the Regional Director, Bureau of Prisons. Finally, decisions of the Regional Director may be reviewed by the Assistant Director (General Counsel), Bureau of Prisons. Policy Statement 7400.5C, Sec. 10. See 28 C.F.R. Sec. 541.17.

An inmate charged with misconduct is entitled to notice of all charges against him at least 24 hours before his hearing. Policy Statement, 7400.5C, Sec. 9(c)(1). See 28 C.F.R. Sec. 541.15(a). He also is entitled to select a correctional staff member as an advocate for his position; the IDC may order the hearing continued to assure that the selected advocate has sufficient time to prepare for the hearing. Policy Statement, 7400.5C, Sec. 9(c)(2). See 28 C.F.R. Sec. 541.15(b). An inmate is permitted to call witnesses and to present documentary evidence on his behalf; the staff representative may question these witnesses or, if the right to a staff representative is waived, the inmate may submit written questions to be asked by the IDC. (FN10) Policy Statement 7400.5C, Sec. 9(c)(3). See 28 C.F.R. Sec. 541.15(c). If the IDC refuses to call a witness requested by the inmate, the reasons for the refusal must be determined in the record. Policy Statement 7400.5C, Sec. 9(c)(3). See 28 C.F.R. Sec. 541.15(c). The inmate is entitled to be present during all phases of the hearing, except during the deliberations of the IDC. Policy Statement 7400.5C, Sec. 9(c)(5). See 28 C.F.R. Sec. 541.15(c).

The proceedings before the IDC are adversarial in nature and are sufficiently formal to assure that any constitutional error will either be corrected in the course of the proceeding, or avoided entirely. Inmates are represented by advocates, and are permitted to present evidence in their defense. The IDC is required to engage in principled *681. decision making, to make detailed findings of fact, and to explain the basis for its decision in writing. At least two of the members of the IDC must be senior officials holding a position equivalent to a department head position; thus, the IDC's decision is unlikely to be a result of intimidating

Copyright (c) West Group 1998   No claim to original U.S. Govt. works

harm, prisoners must show that they are incarcerated under conditions posing a substantial risk of serious harm; and (2) since only the unnecessary and wanton infliction of pain implicates the Eighth Amendment, the official must have a sufficiently culpable state of mind, consisting of deliberate indifference to prisoner health or safety. (Thomas, J., dissented in part from this holding.)

**Criminal Law § 78 — cruel and unusual punishment — excessive force against prisoner**

4. In a case in which a prisoner claims that prison officials have used excessive physical force, in violation of the cruel and unusual punishments clause of the Federal Constitution's Eighth Amendment, the prisoner must show more than indifference on the part of the officials and must show that the officials applied force maliciously and sadistically for the very purpose of causing harm or that the officials used force with a knowing willingness that harm occur.

**Civil Rights § 29 — state of mind**

5. 42 USCS § 1983 contains no state-of-mind requirement independent of that necessary to state a violation of the underlying constitutional right.

**Criminal Law § 78; Evidence § 914; Trial § 249 — cruel and unusual punishment — prisoners' injuries — deliberate indifference — knowledge of risk of harm**

6a, 6b. In order to establish prison officials' deliberate indifference in a case involving an alleged violation of the cruel and unusual punishments clause of the Federal Constitution's Eighth Amendment, a prisoner need not show that the officials acted or failed to act believing that harm actu-

ally would befall the prisoner; it is enough that the officials acted or failed to act despite their knowledge of a substantial risk of serious harm; whether the officials had the requisite knowledge is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence; a factfinder may conclude that the officials knew of a substantial risk from the very fact that the risk was obvious; if the prisoner presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by the officials in the past, and if the circumstances suggest that the officials had been exposed to information concerning the risk and thus must have known about the risk, then such evidence may be sufficient to permit a trier of fact to find that the officials had actual knowledge of the risk; the obviousness of a risk is not conclusive, and the officials may show that the obvious escaped them, but the officials may not escape liability if the evidence shows that they merely refused to verify underlying facts that they strongly suspected to be true or declined to confirm inferences of risk that they strongly suspected to exist, as when the officials (1) are aware of a high probability of facts indicating that one prisoner has planned an attack on another prisoner, but resist opportunities to obtain final confirmation, or (2) know that some diseases are communicable and that a single needle is being used to administer flu shots to prisoners, but refuse to listen to a subordinate who the officials strongly suspect will attempt to explain the associated risk of transmitting disease; when instructing juries in deliberate indifference cases, courts should be careful to insure that the requirement of

subjective culpability is not lost; it is not enough merely to find that a reasonable person would have known, or that the defendant should have known, and juries should be instructed accordingly.

**Criminal Law § 78 — cruel and unusual punishment — deliberate indifference — knowledge of risk of harm**

7. In an action by a prisoner under the cruel and unusual punishments clause of the Federal Constitution's Eighth Amendment, prison officials may not escape liability for deliberate indifference by showing that while they were aware of an obvious, substantial risk to prisoner safety, they did not know that the prisoner was especially likely to be assaulted by the specific inmate who eventually committed the assault; the question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial risk of serious damage to the prisoner's health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to that prisoner or because all prisoners in that prisoner's situation face such a risk; if, for example, prison officials were aware that prisoner rape was so common and uncontrolled that some potential victims dared not sleep, but instead would leave their beds and spend the night clinging to the bars nearest the guards' station, it would be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom; because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open for

prison officials to prove that they were unaware even of an obvious risk to inmate health or safety, as by showing that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of that danger, or that they knew the underlying facts but believed, though unsoundly, that the risk to which the facts gave rise was insubstantial or nonexistent; prison officials who actually knew of a substantial risk to prisoners' health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted; a prison official's duty under the Eighth Amendment is to insure reasonable safety for prisoners, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous persons in safe custody under humane conditions.

**Injunction § 3 — threatened injury**

8. One does not have to await the consummation of threatened injury to obtain preventive relief.

**Injunction §§ 72, 130, 133 — prisoners — risk of serious harm — pleading and proof**

9a, 9b. A subjective approach to defining deliberate indifference, for purposes of the rule that a prison official's deliberate indifference to a substantial risk of serious harm to a prisoner violates the cruel and unusual punishments clause of the Federal Constitution's Eighth Amendment, does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event, such as an actual assault, before obtaining relief; in a suit seeking injunctive relief to prevent a substantial risk of serious injury to a prisoner from ripening into actual harm,

the totality of the conditions of confinement does not offend the Constitution unless prison conditions are cruel and unusual, and not merely harsh or restrictive.

These precepts provide the illumination by which we examine those provisions of the district court's decree based on the eighth amendment.

### 6.2 Findings by the District Court

#### 6.21 Overcrowding

At the time of trial, TDC confined over 26,000 inmates. (The inmate population has since increased to over 33,000.) About 1,000 were sleeping on floors. (None are now on floors but many are confined in tents.) In cells measuring forty-five square feet,⁹⁹ originally designed for one occupant, TDC confined two to four inmates. The district court found that assault or molestation by fellow inmates was a continual threat. It found that the population density of inmates confined in dormitories was "shocking."¹⁰⁰

This overcrowding "exercises a malignant effect on all aspects of inmate life."¹⁰¹ Day rooms designed for recreational purposes must serve double and even triple the number of inmates for which they were planned. Access to gymnasiums, outdoor playing fields, craft shops, and libraries is

---

99. A few cells are slightly larger or smaller than 45 square feet. 503 F.Supp. at 1277 n.7.

100. Id. at 1278.

101. Id. at 1277, accord, e.g., Worthington v. Fauver, 88 N.J. 183, 188–189, 440 A.2d 1128, 1130 (1982).

---

cannot safely be employed on any given day. "Therefore, at many units, the inmates work on a rotating basis. As many as one-half to three-fourths of the inmate population will remain idle in the living quarters on a specific day."¹⁰³ In view of the "unprecedented surge" in prison population, new facilities being constructed will not eliminate the overcrowding. The district judge emphasized the threat to inmates' safety, the lack of privacy for inmates, the increase in stress and tension, and the possible spread of disease, all caused by overcrowding.¹⁰⁵

#### 6.22 Security and Supervision

TDC's prisons are severely understaffed. During the summer of 1979, TDC employed one guard for every 12.45 inmates, one of the worst guard-inmate ratios in the nation;¹⁰⁶ the average nationally is one guard

Although TDC contends that, because of TDC's "work ethic," inmates spend little of their time in cells or dormitory sleeping areas, in fact inmates spend much of their time in their living quarters. Because of a shortage of civilian guards who can be assigned to supervise inmates working in agricultural programs, the full complement of inmates assigned to work on TDC's farms

It is commonly acknowledged that overcrowding in prisons causes grave problems. Rehabilitative programs and recreation become disrupted or nonexistent. As crowding increases, frustration and anger emerge, causing tempers to flare and fights to erupt. Lack of space makes it difficult if not impossible to segregate prisoners for disciplinary and other purposes. Overcrowding can contribute to riots.

102. 503 F.Supp. at 1280.

103. Id. at 1279 n.11.

104. Id. at 1280–81.

105. Id. at 1281–83.

106. With the help of additional legislative appropriations, by the time this appeal was heard, there was one guard for every 10.4 inmates. Ruiz VI, 666 F.2d at 860.

---

for every five inmates.¹⁰⁷ TDC's argument that its system requires fewer guards than over rate that "results in virtually perpetuating for new guards, and from a high turnover rate that "results in virtually perpetual vacancies in low-level guard positions."¹¹⁵

Overcrowding, combined with the relatively small number of security guards, results in a "constant threat to the inmates' personal safety."¹⁰⁹ Escapes are virtually unheard of and homicides are uncommon, but there is excessive nonhomicidal violence. "[V]irtually all inmates are exposed to, and many are victimized by, the concomitants of unguarded, overcrowded cells and dormitories—the ever-present risk of assaults, rapes and other violence—for every day of their incarceration at TDC."¹¹⁰ "TDC inmates are routinely subjected to brutality, extortion, and rape" by their cellmates.¹¹¹ "Inmates who live in dormitories are exposed to the same threats of violence endemic to the cells."¹¹² The threat to inmates in dormitories may be even greater because "[p]otentially assaultive inmates are present in great numbers in every dormitory" and the dormitories are "practically unsupervised."¹¹³ "Numerous examples of the inability of TDC staff to protect inmates' personal safety were graphically presented by credible testimony at the trial."¹¹⁴

These conditions result from having too few civilian guards to supervise inmate activities adequately, from inadequate train-

107. 503 F.Supp. at 1290.

108. Id. at 1291–92.

109. Id. at 1281.

110. Id. at 1280.

111. Id. at 1281.

112. Id. at 1282.

113. Id.

114. Id. at 1293 (citing examples).

115. Id. at 1283 n.23.

---

TDC officials have the power, the district judge found, to reduce TDC's inmate population quickly by increasing "good time" credit, and restoring forfeited good time.¹¹⁶ Inmates receive incentive ("PIP") points for good performance in work, education, and personal improvement programs. The Board of Pardons and Paroles declines to interview any inmate who has less than a specified number of PIP points, who has suffered a forfeiture of good time that has not been restored, or who is in Class III status. By awarding more PIP points, restoring lost good time, classifying more inmates in Class I status, and preparing favorable "institutional adjustment" reports, TDC officials could increase the number of inmates likely to implement in more than a "half-hearted and unimaginative"¹¹⁸ fashion the work release program authorized by Texas law.¹¹⁹

### 6.23 Failure To Ameliorate Overcrowding

#### 6.3 Challenges to the Findings

The web of conditions is not seamless. The findings of fact concerning various conditions at TDC are discrete. Moreover, the

116. Under Texas good time laws, inmates who exhibit good behavior while serving their sentences may accelerate completion of their period of confinement. It is TDC policy for prisoners entering prison to be automatically assigned to Class I, in which status they earn twenty extra days for every thirty days served. At the discretion of TDC officials, an inmate may be: (1) promoted to a trusty status, in which he earns thirty days for every thirty days served; (2) demoted to Class II, in which he earns ten days for each thirty served; or (3) demoted to Class III, in which no good time is earned. Earned good time may also be forfeited as a disciplinary measure, the unit wardens having the discretion to restore the good time after a period of good conduct has been served.
Id. at 1283 n.23.

117. Id. at 1284.

118. Id.

119. Tex.Rev.Civ.Stat.Ann. art. 6166x–3 (Vernon 1970 & Cum.Supp.1982).

agers, Inc. 447 US 27, 35, 64 L Ed 2d 702, 100 S Ct 2009 (1980).[6]

[488 US 447]

[1c, 3, 4, 5a] Respondents argue, as the court below held, that the Commerce Clause merely allocates power between the Federal and State Governments and does not confer "rights." Brief for Respondents 14-17. There is no doubt that the Commerce Clause is a power-allocating provision, giving Congress pre-emptive authority over the regulation of interstate commerce. It is also clear, however, that the Commerce Clause does more than confer power on the Federal Government; it is also a substantive "restriction on permissible state regulation" of interstate commerce. Hughes v Oklahoma, 441 US 322, 326, 60 L Ed 2d 250, 99 S Ct 1727 (1979). The Commerce Clause "has long been recognized as a self-executing limitation on the power of the States to enact laws imposing substantial burdens on such commerce." South-Central Timber Development, Inc. v Wunnicke, 467 US 82, 87, 81 L Ed 2d 71, 104 S Ct 2237 (1984). In addition, individuals injured by state action that violates this aspect of the Commerce Clause may sue and obtain injunctive and declaratory relief. See, e.g., McKesson Corp. v Division of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla. 496 US 18, 31, 110 L Ed 2d 17, 110 S Ct 2238 (1990). Indeed, the trial court in the case before us awarded petitioner such relief, and respondents do not contest that decision. We have also recently held that taxpayers who are required to pay taxes before challenging a state tax that is subsequently determined to violate the Commerce Clause are entitled to retrospective relief "that will cure any unconstitutional discrimination against interstate commerce during the contested tax period." Id., at 51, 110 L Ed 2d 17, 110 S Ct 2238. This combined restriction on state power and entitlement to relief under the Commerce Clause amounts to a "right, privilege, or immunity" under the ordinary meaning of those terms.[7]

[488 US 448]

The Court has often described the Commerce Clause as conferring a "right" to engage in interstate trade free from restrictive state regulation. In Crutcher v Kentucky, 141 US 47, 35 L Ed 649, 11 S Ct 851 (1891), in which the Court struck down a license requirement imposed on certain out-of-state companies, the Court stated: "To carry on interstate commerce is not a franchise or a privilege granted by the State; it is a right which every citizen of the United States is entitled to exercise under the Constitution and laws of the United States." Id., at 57, 35 L Ed 649, 11 S Ct 851. Similarly, Western Union Telegraph Co. v Kansas ex rel. Coleman, 216 US 1, 26, 54 L Ed 355, 30 S Ct 190 (1910), referred to "the substantial rights of those engaged in interstate commerce." And Garrity v New Jersey, 385 US 493, 500, 17 L Ed 2d 562, 87 S Ct 616 (1967), declared that engaging in interstate commerce is a "right[] of constitutional stature." More recently, Boston Stock Exchange v State Tax Comm'n, 429 US 318, 50 L Ed 2d 514, 97 S Ct 599 (1977), held that regional stock exchanges had standing to challenge a tax on securities transactions as violating the Commerce Clause because, among other things, the exchanges were "asserting their right under the Commerce Clause to engage in interstate commerce free of discriminatory taxes on their business and they allege that the transfer tax indirectly infringes on that right." Id., at 320, n 3, 50 L Ed 2d 514, 97 S Ct 559.

[1e] Last Term, in Golden State Transit Corp. v Los Angeles, 493 US 103, 107 L Ed 2d 420, 110 S Ct 444 (1989), we set forth three considerations for determining whether a federal statute confers a "right" within the meaning of § 1983:

"In deciding whether a federal right has been violated, we have considered [1] whether the provision in question

---

creates obligations binding on the governmental unit, or rather 'does no more than express a congressional preference for certain kinds of treatment.' Pennhurst State School and Hospital v Halderman, 451 US 1, 19 [67 L Ed 2d 694, 101 S Ct 1531] (1981). [2] The interest the plaintiff asserts must not be 'too vague and amorphous' to be 'beyond the competence of the judiciary to enforce.' Wright v Roanoke Redevelopment and Housing Authority, 479 US 418, 431-432 [93 L Ed 2d 781, 107 S Ct 766] (1987). [3] We have also asked whether the provision in question was 'intend[ed] to benefit' the putative plaintiff. Id., at 430 [93 L Ed 2d 781, 107 S Ct 766]; see also id., at 433 [93 L Ed 2d 781, 107 S Ct 766] (O'Connor, J., dissenting) (citing Cort v Ash, 422 US 66, 78 [45 L Ed 2d 26, 95 S Ct 2080] (1975))." Id., at 106, 107 L Ed 2d 420, 110 S Ct 444.

See also Wilder v Virginia Hospital Assn, 496 US 498, 509, 110 L Ed 2d 455, 110 S Ct 2510 (1990). Respondents do not dispute that the first two considerations weigh in favor of recognition of a right here, but seize upon the third consideration—intent to benefit the plaintiff—arguing that the Commerce Clause does not confer rights within the meaning of § 1983 because it was not designed to benefit individuals, but rather was designed to promote national economic and political union. Brief for Respondents 19-24.

This argument, however, was implicitly rejected in Boston Stock Exchange, supra, at 321, n 3, 50 L Ed 2d 514, 97 S Ct 599, where we found that the plaintiffs were arguably within the "zone of interests" protected by the Commerce Clause. Moreover, the Court's repeated ref-

---

6. See, e.g., CTS Corp. v Dynamics Corp. of America, 481 US 69, 87, 95 L Ed 2d 67, 107 S Ct 1637 (1987); Hughes v Oklahoma, 441 US 322, 326, 60 L Ed 2d 250, 99 S Ct 1727 (1979); Great Atlantic & Pacific Tea Co. v Cottrell, 424 US 366, 370-371, 47 L Ed 2d 55, 96 S Ct 923 (1976); Cooley v Board of Wardens of Port of Philadelphia, 12 How 299, 318, 13 L Ed 996 (1852). These cases are distinguishable from cases involving assertions that state regulations of commerce directly conflict with federal regulations enacted under the authority of the Commerce Clause. An example of the latter is Gibbons v Ogden, 9 Wheat 1, 6 L Ed 23 (1824), in which the Court struck down a New York statute to the extent that it excluded federally licensed boats from operating in New York waters.

7. [1d, 5b] See, e.g., Black's Law Dictionary 1324 (6th ed 1990) (defining "right" as "[a] legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act") (citing Restatement of Property § 1 (1936)). That the right at issue here is an implied right under the Commerce Clause does not diminish its status as a "right, privilege, or immunity" under § 1983. Indeed, we have already rejected a distinction between express and implied rights under § 1983 in the statutory context. "The violation of a federal right that has been found to be implicit in a statute's language and structure is as much a 'direct' violation of a right as is the violation of a right that is clearly set forth in the text of the statute." Golden State Transit Corp. v Los Angeles, 493 US 103, 112, 107 L Ed 2d 420, 110 S Ct 444 (1989).

DIXON EXH SE SEGREGATION USE ONLY considered

unreasonable seizures did in *Soldal;* the fourth amendment is the explicit textual source of constitutional protection against the search, as it was against the seizure. A fixed core meaning inheres in the constitutional prohibition of both unreasonable searches and unreasonable seizures; each describes a discrete form of conduct. Because, in my view, the fourth amendment is without question "the more explicit textual source of constitutional protection" against the searches at issue here, I believe that this case should be decided on that basis.

Even without *Soldal,* logic tells us to consider the fourth amendment first. There is an advantage to simplicity, even in the law. Under the fourth amendment, the legal issue is clear, and the problem is relatively simple. All parties agree that the challenged actions constitute a search; the only question is whether the search is "unreasonable." (FN25) The determination of reasonableness merely requires the application of objective legal principles. Accordingly, we should not commence with the complex issues posed by an exploration of eighth amendment doctrine. (FN26) Moreover, while no search of prisoners' bodies could violate the eighth amendment without also violating the fourth, the converse is not true. Thus, in cases involving such searches, an examination of the fourth amendment issue will always be dispositive, while an eighth amendment analysis *1543 may prove to be only a precursor to the necessarily duplicative fourth amendment review. (FN27)

For the above reasons, I believe we should base our holding on the fourth rather than the eighth amendment.

CONCLUSION

In my view, the prison's cross-gender clothed body searches violate the fourth amendment. I would uphold the injunction on that ground. However, I also believe the searches violate the eighth amendment. I therefore join in Judge O'Scannlain's opinion, except for Part II.

NOONAN, Circuit Judge, concurring:

I concur in Judge O'Scannlain's opinion and add: The prison warden has not ordered his male guards to conduct cavity searches of his women prisoners. Why? It is surely no less deprivation of an employment opportunity for the men. It is surely no less an extra duty for the female officers. It would surely improve security for such searches to be conducted by both sexes. As Judge Trott has observed, prisoners are adept at concealment in their private parts. But common sense, or rather, common decency has told the warden that no one could stomach such gross sexual contacts between male guards and women prisoners. Naked genitalia of one gender cannot be routinely inspected by guards of the other gender. Indecency of this kind is beyond our expectation as a society and beyond what the Constitution countenances.

The plain fact is that the searches at issue here are not essentially different. They are searches of women's genitalia, breasts and buttocks by men--inspections not conducted by consent with a therapeutic purpose, but police operations carried out on persons powerless to object and not only commanded to cooperate by unbuttoning their blouses, removing their belts, taking off their shoes, and raising their legs, but searched and shoved and squeezed in those areas of their bodies that have the closest connection with their sex. That the women are partially clothed does not alter the areas that are explored. That the prison officials should call these probings "pat downs"--a preposterous misdescription as Judge O'Scannlain's opinion makes clear-- underlines the indifference to decency with which the prison warden has proceeded.

Is indecent treatment cruel and unusual in the sense of the Constitution? Standards of decency derive from normal conduct. The indecent is a breach of the norm, is the unusual. The indecent is not necessarily cruel, but when indecency is inflicted by men on powerless women it has the sexual character that manifests the sadistic. It is cruel.

Under the criminal code of the state of Washington sexual contact with the genitalia, breasts or buttocks of another person is a Class B felony. *Matter of Welfare of Adams,* 24 Wash.App. 517, 601 P.2d 995 (1979); 9A Wash.Rev.Code Ann. § 44.100. Even though "the community standards of decency, propriety and morality have degenerated markedly" since 1939, *Adams,* 601 P.2d at 997 n. 2, the sexual touching of such areas of another person's body constitutes the crime of "indecent liberties." *Id.*

Under Washington law it makes no difference that the touching is done through the clothing. *Adams,* 601 P.2d at 997. In reaching this result the Washington court cited similar conclusions reached by an Oregon appellate court, *State v. Buller,* 31 Or.App. 889, 571 P.2d 1263 (1977); by the Utah Supreme Court, *State v. Peterson,* 560 P.2d 1387

Copyright (c) West Group 2002 No claim to original U.S. Govt. works

04-1380

FILED
AUG 30 2006
JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

To Honorable Judge Mr. Baker,

It's I Mark S. Urioste. Now can I finally leave after 20yr's + 1 month. Don't you think I done enough time being innocent! without A D.N.A. if would of gave me one on Aug. 8 of 1986, but Judge Chapman just wanted A Higher office! All Judge Chapman say was 40yr's, but why do I have 3 yr's on parole + 3 yr's home monitor when I didn't do the crime? I was set up no matter no love, who let the dog out you do so let this dog out without parole + monitor. Your Honor not to realize A set up why I went to segregation for 61 days, but I'm Abet violated me! He jumpin "my" cell I didn't ask him. I foundly got all papers together with help from my lawyer Mr. Sullivan's set off Shnday than Monday I got letter said case 04-1380 been terminated, what do I have to do die for justice? you can forget that I love life, even thou I'm half a man! The truth came out you like to be lied too, R.N. Nelson + Lt. Gorman lied to you under oath I'm not stupid I know difference between a tap + rub, Lt. Gorman is power hangry because he Lt. Gorman believe the lies of R.N. Nelson, + Lt. Gorman said shut up pervert + threw in Vant been treated unfair foundly leave this joke not funny, the 8 times I spent in segregation since 1997 cause I'm very misunderstood! your Honor just like all the rest I'm misunderstood, why terminate my case no love or justice God Bless you + thank you why?

N-87589

Presaint Mark S. Urioste

P.S.
my lAwyer is in SegregAtion, so whAt there's no Justice? you's hunch believes the lies sAid on your oath!